**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RECTICEL NORTH AMERICA, INC. | ) | Case No. 09-[          ] |
| | ) | |
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| RECTICEL INTERIORS NORTH AMERICA, LLC | ) | Case No. 09-[          ] |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF DEREK STREHL IN SUPPORT OF FIRST DAY MOTIONS

Derek Strehl states the following to be true under penalty of perjury:

1.      On the date hereof (the "Petition Date"), Recticel North America, Inc. a/k/a Recticel UREPP North America, Inc. ("RUNA") and Recticel Interiors North America, LLC ("RINA," and, together with RUNA, the "Debtors") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court.  I am the Director of Finance and Accounting and Senior Controller of RINA, and the Secretary and Treasurer of both RINA and RUNA.  As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these

#11252220 v6

chapter 11 cases and in support of the first day motions (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

4.     This Declaration is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these cases. Section II sets forth those facts which are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other Declarations submitted in direct support of such motions.

## I.
## BACKGROUND AND EVENTS LEADING TO
## THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     Overview of Business Operations

5.     Each of the Debtors is a wholly-owned indirect subsidiary of Recticel N.V./S.A. ("Recticel"), a global manufacturer of a wide range of foams and synthetic compounds that are primarily used in the automotive, bedding, and building industries. RUNA's corporate headquarters and manufacturing facility are located in Auburn Hills, Michigan. RINA's corporate headquarters is located in Clarkston, Michigan, with manufacturing facilities in Clarkston and Tuscaloosa, Alabama.

6.     RINA is a leading manufacturer of polyurethane sprayed skins and components for car interior trim including dashboards, glove boxes and door panels. The interior trim manufactured by RINA is utilized in various premium car models including the Mercedes-

Benz M-Class and R-Class, Cadillac STS and Buick Enclave, as well as various models of heavy-weight trucks.

7.      In manufacturing these products, RINA utilizes a patented Colofast Spray® process.  Under this manufacturing process, RINA employees spray a mass-stained polyurethane material (using a patented spray nozzle) on the surface of a particular automotive interior mold that results in skins with the look of natural leather.  Depending upon the ultimate end users' requirements, the skins may be further processed by means of a direct or indirect backfoaming process under which the skin is incorporated into an automotive structure by means of an intermediate foam layer.

8.      RUNA is a manufacturer of light-stable polyurethane Colofast® compounds, which are sold in part to RINA for use in its manufacturing process.  In addition to sales to RINA, the compounds produced by RUNA are sold to the German company, BASF SE ("BASF") for use as a basic material in the manufacture of car window encapsulations.  In late 2008, BASF acquired Recticel's worldwide compounds business for polyurethane systems glass encapsulations.  As a result, BASF now sells the Colofast® compounds to certain of RUNA's former customers.

9.      As of the Petition Date, the Debtors employ approximately 252 employees at various locations.  Specifically, RINA employs approximately 69 employees at its Clarkston manufacturing facility and corporate headquarters, and approximately 175 employees at its Tuscaloosa manufacturing facility.   RUNA employs 12 employees at its Auburn Hills manufacturing facility.   Of the twelve employees employed by RUNA, nine are parties to

separation agreements that provide for the payment of above-market severance in the event of the employee's termination (the "Separation Agreements").[1]

10. RUNA reported gross revenues of $19,635,000 for 2008 and $7,601,000 for the first three quarters of 2009, generating net income/ (losses) of $6,544,002[2] and ($1,473,000) for each of these respective periods. RINA reported gross revenues of $50,026,000 for 2008 and $20,673,000 for the first three quarters of 2009, generating net losses of $13,765,000 and $8,348,000 for each of these respective periods.

### B. Capital and Debt Structure

11. RUNA is the sole member of RINA. All of RUNA's issued and outstanding equity is owned by RUS, Inc. ("RUS"), a Delaware corporation that is a wholly-owned indirect subsidiary of Recticel. RUS is not a debtor in these chapter 11 cases.

12. As of September 30, 2009, RUNA's balance sheet reflected total assets of approximately $6,016,538. Of this amount, approximately $375,190 was composed of cash and cash equivalents, $474,911 was composed of property and equipment, $1,869,235 was composed of real estate, $1,974,616 was composed of contracts receivables, and approximately $1,322,586 was composed of other assets.

13. As of September 30, 2009, RINA's balance sheet reflected total assets of approximately $7,911,943. Of this amount, approximately $390,578 was composed of cash and

---

[1] Certain of RINA's employees are also parties to separation agreements, but the Debtors believe these agreements are at market levels.

[2] This amount includes $8,211,000 of non-recurring revenues derived from the sale of the glass encapsulations business to BASF.

#11252220 v6

cash equivalents, $209,095[3] was composed of property and equipment, $4,860,444 was composed of contracts receivables, and approximately $2,451,826 was composed of other assets.

14.     Each of RINA and RUNA are parties to individual agreements with RUS dated December 28, 2005 and April 28, 2003, respectively, (the "Intercompany Agreements") pursuant to which the Debtors engaged in various intercompany funding transactions with RUS in the ordinary course of their respective businesses.  As of the Petition Date, RUNA and RINA's books and records respectively state liabilities of approximately $54,289,910 and $51,617,986, including liability for amounts advanced under the Intercompany Agreements.

**C.     Events Leading to the Commencement of these Chapter 11 Cases**

15.     Johnson Controls, Inc. ("Johnson Controls") and Inteva Products, LLC ("Inteva") are RINA's largest customers, collectively responsible for approximately 80% of RINA's annual revenues.  Each of Johnson Controls and Inteva is a tier one supplier to Mercedes-Benz U.S. International, Inc. ("Mercedes").  Specifically, RINA is party to a current purchase order agreement with Johnson Controls dated April 27, 2009 pursuant to which RINA sells, as a sole supplier, polyurethane sprayed components for use in the Mercedes-Benz M-Class and R-Class cars (the "Johnson Agreement").  Similarly, RINA is party to various purchase order agreements with Inteva pursuant to which RINA sells, as a sole supplier, polyurethane sprayed skins also for use in the Mercedes M-Class and R-Class cars (the "Inteva Agreement" and collectively with the Johnson Agreement, the "Customer Agreements").

---

[3]   This amount is reported consistent with International Financial Reporting Standards and is exclusive of approximately $25,501,259 in impairments that have been booked by RINA.

#11252220 v6

16.     At the time of the entry into their customer relationships with Johnson Controls and Inteva, the Debtors underestimated the material cost and number of employees required to produce consistently high-quality components.   Additionally, for planning and pricing purposes, the Debtors had anticipated significantly higher sales volumes under these customer relationships than that actually experienced due in large part to the precipitous decline in the sale of automobiles over the last couple of years.  As a consequence, the Debtors estimate that they have been incurring losses, on average, of approximately $600,000 per month on account of the Johnson Agreement and approximately $265,000 per month on account of the Inteva Agreement.  In an effort to curb these mounting losses, over the course of many months, RINA engaged in discussions with Mercedes, Johnson Controls and Inteva in an attempt to negotiate price increases.  Ultimately, RINA was unable to successfully negotiate such increases. While RINA was able to gain significant concessions from Mercedes with respect to funding certain of RINA's losses associated with the Customer Agreements, because Johnson Controls and Inteva were unwilling to agree to any price increases under their respective agreements such concessions were ultimately insufficient to halt the mounting losses.

17.     RUNA has also been adversely affected by RINA's decreased sales volumes.  RINA is RUNA's largest customer, accounting for approximately 65% of its sales. Similarly, RUNA has experienced decreased sales to BASF due to the sharp downturn in the automotive industry and the global recession.

18.     The Debtors also supply polyurethane skins to Consolidated Metco ("ConMet") under a purchase order dated September 25, 2008 (the "ConMet Agreement").  At the time of entry  into the ConMet Agreement, the Debtors manufactured products for ConMet in their now-closed Fountain Inn, South Carolina manufacturing plant.  Due to the loss of other

programs in that facility, the Debtors were forced to close the Fountain Inn plant in September, 2007 and production for ConMet was moved to the Debtors' Clarkston, Michigan facility. As a result of such events, the Debtors are now incurring significant additional freight costs to ship parts from Michigan to ConMet's facility in Bryson City, North Carolina. These additional unanticipated freight costs represent more than 16% of the Debtors' total costs associated with performing under the ConMet Agreement. As a result, the Debtors have incurred losses of approximately $68,000 per month under the ConMet Agreement. The Debtors are engaged in ongoing negotiations with ConMet and are optimistic that they will be able to reach a solution with ConMet that would curb the losses associated with performing under the ConMet Agreement.

19.     Additionally, as mentioned above, nine of RUNA's twelve employees are parties to Separation Agreements which are significantly above market. Each of these Separation Agreements was entered into over the last year by RUNA's former president. Under the Separation Agreements, upon termination, the employee is entitled to receive a single lump sum payment equal to one month of separation pay for each completed year of service and a pro-rated month for the partially completed final year at the employee's highest annual base-wage during employment with RUNA. The Debtors estimate that they are accruing approximately $60,000 per year in contingent obligations under the Separation Agreements. Because there is no cap on the severance pay accumulating under the Separation Agreements, the Debtors could ultimately be subject to significant long-term liability. Accordingly, prior to the Petition Date, the Debtors initiated discussions with these nine employees in an effort to negotiate new agreements that were more commensurate with current market standards. As of the Petition Date, such negotiations were unsuccessful.

20.     As a result of the Debtors' ongoing losses, as well as RINA's failed negotiations with Johnson Controls and Inteva and RUNA's intent to eliminate the unduly burdensome obligations under the Separation Agreements, the Debtors commenced these chapter 11 cases.  Concurrently with the filing of their chapter 11 cases, the Debtors are seeking to reject each of the Customer Agreements and the Separation Agreements.

21.     The Debtors are also concurrently seeking approval of a debtor-in-possession credit facility (the "<u>DIP Agreement</u>") provided by Recticel (the "<u>DIP Lender</u>") in the aggregate amount of $10,000,000, which, upon approval, will be used to fund the Debtors' working capital needs during these chapter 11 cases.

## II.
## <u>FACTS IN SUPPORT OF FIRST DAY MOTIONS</u>

22.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.  The Debtors request that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

### <u>PROCEDURAL MOTIONS</u>

**A.     Debtors' First Day Motion for an Order Directing Joint Administration of their Chapter 11 Cases (the "Joint Administration Motion")**

23.     The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Local Rules</u>").  Joint administration will obviate the need for duplicative notices, motions, applications and orders, and thereby

expedite the administration of these cases and reduce administrative costs for the Debtors, their estates, and this Court without prejudicing the substantive rights of any creditors.

24.     The rights of parties in interest will not be prejudiced by the proposed joint administration of these cases because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

25.     The Debtors believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and all other parties in interest, and should be granted in all respects.

**B.      Debtors' First Day Motion for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules Motion")**

26.     The Debtors seek an extension of the period in which to complete and file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements").

27.     On the Petition Date, the Debtors filed a list of creditors holding the thirty largest unsecured claims, on a consolidated basis, excluding insiders, against the Debtors' estates, the estimated amounts that each such creditor is owed and the basis for each claim.

28.     Due to the volume of material that must be compiled and reviewed by the Debtors' limited staff to complete the Schedules and Statements for each of the Debtors during the early days of this chapter 11 case, the Debtors anticipate being unable to complete their Schedules and Statements within the time provided under Bankruptcy Rule 1007(c).

29.     Completing the requisite Schedules and Statements for each of the Debtors will require the collection, review and assembly of a significant amount of information spread

across different locations, including in Europe, and relates to numerous transactions. Collection and analysis of the necessary information requires an expenditure of substantial time and effort on the part of the Debtors' employees.

30.     Given the significant burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the Debtors request additional time to complete and file the required Schedules and Statements. The Debtors have mobilized their employees to work diligently on the assembly of the necessary information. The Debtors anticipate that they will be able to file their Schedules and Statements, all in the appropriate formats prescribed by the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, within 60 days after the Petition Date.

31.     In view of the size and complexity of the Debtors' chapter 11 cases and the amount of information that must be assembled and compiled, the Debtors believe that ample cause exists for the extension requested in the Schedules Motion.

**C.      Debtors' First Day Motion Pursuant to Sections 105(a) and 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007(a) for Entry of an Order Authorizing the Debtors to (I) Prepare a Consolidated List of Creditors in Lieu of a Mailing Matrix, (II) File a Consolidated List of 30 Largest Unsecured Creditors, and (III) Mail Initial Notices**

32.     The Debtors seek entry of an order authorizing them to (a) prepare a consolidated list of all of the Debtors' creditors in lieu of any required mailing matrix, (b) file a single consolidated list of their 30 largest general unsecured creditors, and (c) mail initial notices.

33.     If each of the Debtors was required to file its own list of creditors, because there is overlap between the creditors of each of the Debtors in these chapter 11 cases, such creditors would needlessly receive multiple duplicate notices from the Court. Additionally, transferring this information in the form of a mailing label matrix would be a time consuming

and expensive task, and the risk of error in transcription would be significant. Consequently, the Debtors believe it is in the best interest of the Debtors' estates and their creditors to avoid the costs and risks associated with preparing and filing the mailing label matrix, and instead prepare a consolidated list of creditors.

34.     Further, because a number of creditors are shared by the Debtors, and the Debtors would have to expend significant resources and effort to reconcile which claims are assertable against which Debtors, the Debtors request authority to file a single, consolidated list of their thirty (30) largest general unsecured creditors. The Debtors have numerous potential unsecured creditors. Requiring each of the Debtors to file a separate top twenty (20) list in each of their respective cases would generate a significant number of names, addresses, and claim amounts. The Debtors do not believe that such a voluminous filing would facilitate the review of creditor claims by the Office of the United States Trustee or any other party in interest. In light of the foregoing, the Debtors submit that authority to file a single, consolidated list of the 30 largest unsecured creditors is in the best interests of the estates and will facilitate the efficient and orderly administration of these bankruptcy cases.

   **D.    Debtors' First Day Motion for Entry of an Order Establishing
          Certain Notice, Case Management and Administrative
          Procedures (the "Case Management Motion")**

35.     The Debtors seek entry of an order establishing certain notice, case management and administrative procedures (the "Case Management Procedures"), all subject to further order of the Court, including: (a) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court pursuant to Local Rule 9013-4; (b) directing that matters requiring notice under Rule 2002(a)(2)-(6) of the Bankruptcy Rules be served only to a shortened mailing list and those creditors who file with the Court a request that they receive

such notices pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1; and (c) allowing electronic service of documents.

36.     The costs and burdens associated with the possibility of frequent and fragmented hearings, plus the costs associated with copying and mailing or otherwise serving all documents filed with the Court to all parties in interest, will impose an administrative and economic burden on the Debtors' estates, the Court and other parties.  Moreover, constant mass mailings will require the Debtors to divert their limited resources from the chapter 11 process.

37.     The Debtors believe that adopting the Case Management Procedures will substantially reduce administrative burdens and result in significant cost savings to the Debtors' estates.  Pursuant to the terms of the Case Management Procedures, all parties in interest that may be directly affected by a request for relief, response, objection or adversary proceeding filed with the Court will receive notice thereof directly from the entity submitting such documents to the Court well in advance of the relevant hearing.  Thus, no party in interest will be adversely affected.

**E.      Debtors' First Day Motion for Entry of an Order Designating Debtors' Chapter 11 Cases as "Large Bankruptcy Cases"**

38.     The Debtors seek entry of an order designating the Debtors' Chapter 11 Cases as "Large Bankruptcy Cases" pursuant to Local Rule 9001-1(a).

39.     For the fiscal year ended December 31, 2008, the Debtors had net sales of nearly $70 million.  The Debtors have approximately 260 employees and are anticipated to have hundreds of creditors in these chapter 11 cases.  In light of the size of the Debtors' operations and their assets and liabilities, the Debtors believe that such chapter 11 cases are properly designated as "Large Bankruptcy Cases" for the purposes of Local Rule 9001-1.  Further, the Debtors believe that designating these Chapter 11 Cases as "Large Bankruptcy Cases" will

substantially reduce administrative burdens and result in significant cost savings to the Debtors' estates as well as promote the efficient and orderly administration of these Chapter 11 Cases.

F.   **Debtors' First Day Motion for Establishment of Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Professionals and Committee Members (the "Interim Compensation Motion")**

40.   The Debtors seek entry of an order pursuant to sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a), and Local Rule 2016-3, establishing an orderly, regular process for allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals (collectively, the "Professionals," or each, a "Professional") whose services are authorized by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.  In addition, the Debtors seek entry of an order establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committee.

41.   The Debtors seek the establishment of a procedure for compensating and reimbursing the Professionals pursuant to monthly interim applications, thereby enabling the Court and all parties in interest to monitor fees incurred more effectively and on a more current basis.  Specifically, the Debtors request that the Professionals be permitted to be compensated for services rendered and reimbursed for expenses incurred pursuant to monthly interim applications in accordance with the procedures set forth in the Interim Compensation Motion (the "Compensation Procedures").

42.   The Debtors propose that the members of any committee be permitted to obtain reimbursement for reasonable out-of-pocket expenses incurred in connection with committee membership (excluding committee member counsel).  Each committee member may

submit statements of expenses and supporting vouchers and receipts to committee counsel, who will collect the same and based thereon submit a comprehensive request for reimbursement to the Debtors in accordance with the above procedures for Professionals.

43.     The Compensation Procedures suggested in the Interim Compensation Motion will enable the Debtors to monitor closely the costs of administration, maintain a level cash flow, and implement efficient cash management procedures.  The Debtors anticipate that a large amount of fees may accrue each month, and failure to adopt the Compensation Procedures will result in hardship to the Debtors by limiting the Debtors' ability to perform these tasks, all of which are essential to the Debtors' estates.  Moreover, these procedures will also allow the Court and the key parties in interest to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.  Nothing in the Compensation Procedures proposed by the Debtors limits any committee member or Professional from disgorging interim payments if required.

**G.     Debtors' Application for Entry of an Order Authorizing the Retention of BMC Group, Inc. as Debtors' Claims, Noticing and Balloting Agent (the "BMC Retention Application")**

44.     The Debtors anticipate that there will be hundreds of individuals or entities that the Debtors will be required to serve with various notices, pleadings, and other documents filed in these cases.  The significant number of parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens on the Court and the Office of the Clerk of the Court (the "Clerk").  To relieve the Clerk of these burdens, the Debtors seek to engage BMC Group, Inc. ("BMC") as an independent third party to act as the Debtors' claims, noticing and balloting agent.  I am familiar with BMC's professional reputation in such capacity, and I believe that BMC will effectively and efficiently perform the tasks of noticing creditors and all other relevant constituencies of the filing of these chapter 11 cases, as

well as transmitting, receiving, docketing and maintaining proofs of claim filed in connection with these chapter 11 cases.

## OPERATIONAL MOTIONS

**H.** **Debtors' First Day Motion for Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms; (II) Authorizing Continued Postpetition Intercompany Sale Transactions, as Modified Herein; and (III) Waiving Investment and Deposit Requirements (the "Cash Management Motion")**

45. The Debtors seek (a) authority to continue to use the Debtors' existing (i) Cash Management System and Bank Accounts (each as defined below) and (ii) business forms; (b) authority to continue postpetition Intercompany Sale Transactions (as defined below), as modified herein; and (c) a waiver of investment and deposit requirements.

46. The Debtors maintain a cash management and disbursement system in the ordinary course of their businesses (the "Cash Management System"). Through the Cash Management System, the Debtors are able to monitor their cash position on a daily basis. Disbursements under the Cash Management System are controlled primarily by the Debtors' financial personnel located at the Debtors' headquarters in Clarkston, Michigan through the Debtors' bank accounts (the "Bank Accounts") which are set forth on **Exhibit A** attached to the Cash Management Motion. Through the Cash Management System, the Debtors are able to monitor the collection and disbursement of funds and maintain control over the administration of the various Bank Accounts required to effect the collection, disbursement and movement of cash related to the Debtors' operations. In addition, the Cash Management System facilitates the Debtors' ability to produce accurate financial reporting.

47. For each Debtor, the Cash Management System consists of a single general operating account at JP Morgan Chase Bank ("JP Morgan") into which are deposited (a)

#11252220 v6

substantially all receipts from that Debtor's business operations and (b) funds received from that Debtor's non-debtor affiliate Recticel International Services N.V./S.A. ("RIS") for working capital needs. Additionally, each of the Debtors uses its respective general operating account to fund its payroll through bi-weekly automatic sweeps to ADP. Each of the Debtors also maintains a controlled disbursement account at JP Morgan from which substantially all operating expenses (except for payroll) are paid, including: (a) accounts payable, (b) taxes, (c) insurance and (d) reimbursable employee-related expenses. The disbursement accounts are maintained at a zero balance and are funded from automatic sweeps from the respective Debtor's operating account in an amount based upon each Debtor's respective daily disbursement needs.

48.     Each of the Debtors maintains a separate operating account in London, United Kingdom with JP Morgan that is utilized for the infrequent circumstance where a vendor or customer requires that the Debtor conduct business in Euros or other foreign currency. Each of these accounts normally contains no more than the *de minimis* amounts required to keep the account open. Funding for payments made from these accounts are typically provided from receipts paid into the account or as needed by the Debtors' non-debtor affiliate RIS.

49.     RUNA also maintains a disbursement account at National City Bank ("National City") from which certain of RUNA's employee benefit expenses are paid, including RUNA-paid employee health insurance deductibles and amounts associated with RUNA's cafeteria plan. On an annual basis, these amounts are funded into the National City account from RUNA's JP Morgan general operating account. The applicable administrative service provider sweeps the accounts from time to time as amounts are needed to fund deductible or cafeteria plan expenses.

50.     Each of the Debtors also invests daily excess funds greater than $175,000 into a JP Morgan Chase Sweep Investment Prime Money Market Fund (the "Overnight Investments").  The Overnight Investments have been selected by the Debtors because the Debtors have determined that such investments strike the proper balance between the need to earn a return on the Debtors' cash holdings and the need to minimize risk to the principal amount.  The Overnight Investments are redeposited to each Debtor's respective JP Morgan general operating account at the beginning of the next business day.

51.     Under the Intercompany Agreements, prior to the Petition Date, the Debtors engaged in various intercompany funding transactions with RUS in the ordinary course of their respective businesses (collectively, the "Intercompany Funding Transactions").  Transfers of cash to and from appropriate Bank Accounts were made on account of the Intercompany Funding Transactions, which typically included payments by RIS for the funding, if necessary, of the Debtors' working capital requirements.  Notwithstanding the payment of these amounts by RIS, the Debtors accounted for these transactions through the recording of an intercompany payable to RUS.  From time to time the Debtors would repay these intercompany payables through excess cash on hand through a payment to RIS.  Similarly, the Debtors accounted for these repayments by crediting the intercompany payable to RUS in the amount of the repayment.  Going forward on a post-petition basis, the Debtors' non-debtor affiliates intend to continue to fund the Debtors' working capital needs pursuant to the terms and conditions of a Court approved debtor-in-possession facility.

52.     Further, prior to the Petition Date, RUNA routinely sold Colofast® compounds to RINA for use in RINA's manufacturing process (collectively, the "Intercompany Sale Transactions").  These transactions were accounted for by RINA increasing its payable

#11252220 v6

balance to RUS and RUNA decreasing its payable balance to RUS. Going forward on a postpetition basis, RINA intends to directly pay to RUNA amounts owed on account of the Intercompany Sale Transactions.

53. <u>Cash Management System</u>. The Debtors request authority to continue to manage their cash consistent with historical prepetition practice, except as modified in the Cash Management Motion. The Debtors submit that the cost and expense of creating a new cash management system or changing bank accounts would not only force the Debtors to incur significant and unnecessary costs and expenses, but would impair the ordinary operation of the Debtors' businesses.

54. Forcing the Debtors to employ a new cash management system and new bank accounts would cause confusion, disrupt payroll, introduce inefficiency at a time when efficiency is most critical and place a strain on the Debtors' relationships with customers and vendors. Naturally, these relationships must be maintained if the Debtors are to be given the opportunity to reorganize successfully. Indeed, asking customers to remit payments to new and different accounts will result in a significant slowdown in the Debtors' collection of receipts just at the time when prompt collection is most critical.

55. Furthermore, the Debtors' Cash Management System is similar to those utilized by other corporate enterprises operating both in and outside of chapter 11. The Cash Management System permits the Debtors to (a) provide availability of funds when and where necessary and (b) develop timely and accurate accounting information. The Debtors intend to continue to maintain strict accounting records, including receipts, disbursements and Intercompany Sale Transactions so that the United States Trustee and parties in interest may readily monitor the Debtors' financial activity.

#11252220 v6
-18-

56.    <u>Bank Accounts</u>.    Integrally related to the Debtors' Cash Management System is the continued existence of the Bank Accounts.   The Debtors, their employees and vendors would suffer great hardship if the Debtors were required to substitute new debtor-in-possession bank accounts for their existing Bank Accounts.   Substitution of the Debtors' Bank Accounts would essentially render this Court's approval of the continuation of the cash management procedures, if granted, meaningless, and inevitably lead to the same delays, confusion and disruption of the Debtors' businesses, including significant slowdown in the collection of payments from customers, that would result from a discontinuation of the cash management procedures.   All parties in interest will be best served and the Debtors will benefit considerably by preserving business continuity and avoiding the operational and administrative paralysis that closing the Bank Accounts and opening new ones would necessarily entail.

57.    Other than as authorized by the Court, the Debtors do not seek authority to pay any prepetition claims that have not yet been honored by the applicable drawee bank.   To the contrary, with the exception of payments the Debtors are seeking to pay that are otherwise authorized by the Court (the "<u>Allowed Payments</u>"), the Debtors seek to prohibit and enjoin their banks from honoring prepetition checks.

58.    The Debtors intend to work with their banks to identify, by check number or other appropriate means, the specific checks, drafts, wires or ACH Transfers that are designated as Allowed Payments.   The Debtors request that this Court direct their banks, as the applicable drawee bank, to continue to receive, process and honor and pay any and all checks, drafts, wires or ACH Transfers drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, for the Allowed Payments (to the extent sufficient funds are on deposit to honor such checks) without regard to when such checks were issued.

Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtors in their First Day Motions seeking authority to, among other things, pay prepetition wages owing to the Debtors' employees.

59.     Moreover, the Debtors request that the Bank Accounts held by the Debtors be deemed to be "debtor-in-possession" accounts.  The Debtors intend to provide notice of entry of the order granting the Cash Management Motion to all banks with Bank Accounts held by the Debtors listed on **Exhibit A** thereto within three (3) business days of the entry of such order. The Debtors propose that any new accounts be established with a bank that is organized under the laws of the United States or any state therein and is insured with the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation.  The Debtors also propose that the checks for such new accounts contain a "debtor-in-possession" of "DIP" designation.

60.     <u>Business Forms</u>.  In addition, the Debtors request permission to use their existing business forms and stationery without alteration.   Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as chapter 11 debtors in possession. The Debtors do not print their own business forms and stationery.  Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationery merely to indicate "debtor in possession."  Changing the business forms at this critical, early stage of their chapter 11 cases would be expensive and burdensome to the Debtors' estates and present an unnecessary distraction, extremely disruptive to the Debtors' business operations.

61.     <u>Investment and Deposit Requirements</u>.  Additionally, the Debtors request a waiver of the strict application of the requirements of section 345 of the Bankruptcy Code. Except for the Bank Accounts maintained in the United Kingdom, which hold *de minimis*

amounts, all of the Bank Accounts are federally insured, but may on occasion exceed the federally insured limit of $250,000. Given that these are business accounts, however, and considering the stability of the Debtors' banks, such funds are not at risk. The Debtors respectfully request authority to maintain their cash in the Bank Accounts in a safe and prudent manner, in accordance with their existing practices.

62. By preserving business continuity and avoiding the operational and administrative paralysis that changing the Cash Management System, Bank Accounts, and business forms would necessarily entail, all parties in interest will be best served and the Debtors will benefit considerably from the relief requested in the Cash Management Motion.

I. **Debtors' First Day Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wage Motion")**

63. Pursuant to the Wage Motion, the Debtors seek authority to pay certain prepetition obligations owing to the Debtors' employees (as specifically set forth and defined in the Wage Motion, the "<u>Prepetition Employee Obligations</u>"). The Debtors seek authority to honor the Prepetition Employee Obligations as payment of such obligations is critical and essential to employee morale and future business needs.

### *<u>Employees</u>*

64. The Debtors employ approximately 252 employees, including approximately 191 hourly-paid skilled and non-skilled non-union employees, and approximately 61 mid-level to executive management personnel on salary. As noted above, the Debtors employ 12 employees at RUNA's Auburn Hills manufacturing facility, 69 employees at RINA's Clarkston manufacturing facility and corporate headquarters and 175 employees at RINA's Tuscaloosa manufacturing facility. Additionally, through a third-party agency, the Debtors employ approximately five employees (the "<u>Contract Employees</u>") who assist with product

manufacturing and are paid on an hourly basis. These Contract Employees also play a critical role in inspecting finished parts with the Debtors' customers.

### *Wages, Salaries, and Other Compensation*

65.     <u>Payroll Obligations</u>.   The Debtors seek to be authorized to honor all outstanding payroll obligations.   Approximately 3% of the Debtors' payroll costs represent compensation paid to "Senior Executives,"[4] with the remaining 97% representing compensation to middle management or rank and file employees.

66.     The Debtors' employees are paid bi-weekly on every other Friday. Salaried employees are paid current through the applicable pay day, while hourly employees are paid in arrears, current through the Sunday prior to the applicable pay day.   All hourly and non-exempt employees are eligible for overtime compensation at time-and-a-half for hours worked in excess of forty hours per week.   The Debtors' bi-weekly payroll averages approximately $460,000 in the aggregate.   The Debtors' last regular payroll date was October 23, 2009 (the "<u>Last Payroll</u>").   The next payroll dates is scheduled for November 6, 2009.   Due to the lag in payroll, the Debtors estimate that as of the Petition Date approximately $310,000 in the aggregate has accrued but is not yet due to their employees until the next pay date, with no employees owed in excess of $10,950.

67.     Due to the timing of the Last Payroll, payroll checks for some employees who may receive manual payroll checks likely remain in float.   Checks relating to employee reimbursements may also remain in float.   In addition, although the Debtors believe that most manual payroll checks, if any, relating to payroll periods prior to the Last Payroll have been

---

[4]       As of the Petition Date, the Debtors employed only two "Senior Executives," which, solely for the purposes of this Motion, is defined to include corporate officers, presidents and chief operating officers.

presented to and honored by the applicable drawee banks, certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition and that banks will not honor them absent explicit authority and direction to do so. Furthermore, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors believe that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. The Debtors believe that no employee is owed in excess of $10,950 on account of payroll checks in float.

68. _Paid Time Off_. In addition to wages and salary, certain of the Debtors' employees accrue paid time off based on length of service. The rate of accrual ranges from approximately 3-6 hours per week of employment. The Debtors intend to permit employees to continue to use any such accrued but unused time off in the ordinary course. Employees who are terminated would normally be entitled to receive cash for accrued but unused paid time off upon separation.

69. _Contract Employees_. As noted, the Debtors retain approximately five Contract Employees through a third-party agency that assist with the product manufacturing process. The Debtors believe that the agency will likely terminate services if it is not paid amounts owing and that such termination would be significantly detrimental to the Debtors' businesses. The Debtors estimate that no more than $12,000 in the aggregate has accrued but not yet been paid on account of the Contract Employees' services.

### _Reimbursable Business Expenses_

70. Prior to the Petition Date and in the ordinary course of their businesses, the Debtors reimbursed employees for certain business expenses incurred in the scope of their employment. Historically, approximately 45 employees incurred expenses aggregating on

average $20,000 per month, relating to, among other things, business related travel expenses, business meals, car rentals and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses"). More recently, however, only approximately ten of the Debtors' employees have been incurring Reimbursable Expenses. All of the Reimbursable Expenses were incurred on the Debtors' behalf in connection with employment by the Debtors and in reliance by the Debtors' employees that such expenses would be reimbursed. Although the Debtors believe they are current on prepetition Reimbursable Expenses, it is likely that a modest amount of Reimbursable Expenses remains owing due to the lag time between when an employee incurs an expense and when the employee submits a request for reimbursement.

### *Educational Assistance*

71.     The Debtors provide tuition and textbook reimbursement (the "Educational Assistance") for full-time employees who have been employed for at least six months. Education Assistance is limited to $4,000 per calendar year for RINA salaried employees, $2,000 per calendar year for RINA hourly employees and $2,000 per calendar year for RUNA employees. The Debtors project to spend approximately $12,000 on account of Educational Assistance in 2009.

### *Employee Benefits*

72.     In the ordinary course of their businesses, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, dental, prescription, disability and life insurance, and other similar benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below.

#11252220 v6

73.     <u>Health, Dental, and Vision Insurance</u>.  An important element of the Employee Benefits is medical, dental and similar insurance.  RUNA maintains a premium-based medical plan (which includes prescription drug benefits) for all its employees administered by Humana Insurance Company.  The average monthly cost of the plan is approximately $7,600. RUNA also provides all of its eligible full-time employees with fully funded dental insurance administered by HumanaDental Insurance Company, for an average monthly cost of $900.

74.     RUNA maintains a disbursement account at National City Bank from which certain of RUNA's employee benefit expenses are paid including RUNA-paid employee health insurance deductibles.  The applicable administrative service provider sweeps the account from time to time as amounts are needed to fund deductibles or cafeteria plan expenses.

75.     The Debtors believe that they are current on all payments under RUNA's medical and dental plans.  However, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtors seek to be authorized to pay such amounts.

76.     RINA maintains self-insured medical (including prescription drug benefits) and dental plans (collectively, the "<u>Self-Insured Plans</u>") for all its employees, which plans are administered by Employee Benefit Concepts (the "<u>Self-Insured Administrator</u>").  In conjunction with the Self-Insured Plans, the Debtors maintain a stop-loss policy that limits liability under the Self-Insured Plans to a maximum of $50,000 per employee incident and $2,000,000 in the aggregate.  The cost of the stop-loss policy is approximately $360,000 per year and is paid monthly within the first two weeks of each current month.  The average monthly cost of the Self-Insured Plans is approximately $172,000, of which approximately $18,000 is paid by the employees through direct payroll deductions with the remainder borne by the Debtors.

77.     After a claim has been filed with the Self-Insured Plan Administrator and processed, the Debtors, through the Self-Insured Plan Administrator, either (a) reimburse the employee for the cost of the services, or (b) pay the health benefits provider for services rendered to the employee (together, the "Self-Insured Claims").  Payments of the Self-Insured Claims are made by the Self-Insured Plan Administrator through an account that is funded monthly by the Debtors.

78.     Ordinarily, there is lag time between the time when an employee submits a claim and the time when a claim is paid by the Self-Insured Plan Administrator (the "Pipeline Claims").  If the Debtors fail to pay any Self-Insured Claim, the employee is generally directly liable to the provider.  Based upon an average of the most recent months prior to the Petition Date, the projected Self-Insured Claims, including any Pipeline Claims, paid by the Debtors total in the aggregate approximately $180,000 on a monthly basis.[5]  Due to the historical lag in the payment of Pipeline Claims, the Debtors estimate that approximately $50,000 of accrued but unpaid Pipeline Claims remain owing as of the Petition Date.

79.     Additionally, RUNA and RINA each provide all of their eligible full-time employees with vision coverage, which is administered by Vision Service Plan and AIG, respectively, for approximate average monthly costs of $300 and $2,400, respectively.

80.     Life, AD&D, Short and Long Term Disability Insurance.  The Debtors provide all of their employees with fully funded life and accidental death and dismemberment insurance.  Additionally, the Debtors provide their employees with short and long term disability

---

[5]     Unpaid Self-Insured Claims, Pipeline Claims, or other health benefits include the claims of former employees, many of which have elected to continue coverage under COBRA.  Solely for the purposes of paying Self-Insured Claims and Pipeline Claims, the Debtors believe that it is appropriate to include the claims of former employees.

#11252220 v6

insurance and long term care. The approximate average monthly costs to the Debtors are as follows: $9,200 for life and accidental death and dismemberment insurance, $6,200 for short term disability, $3,500 for long term disability insurance, and $1,500 for long term care. The Debtors believe that they are current on all such payments.

### *401(k) Contributions*

81.     The Debtors offer all eligible employees an opportunity to participate in a 401(k) profit-sharing plan (the "401(k) Plan"). Under the 401(k) Plan, the Debtors' employees, subject to certain limitations, may contribute up to $16,500 per year. All full-time employees are eligible to participate in the 401(k) Plan.

82.     The Debtors have established a limited matching program of 75 cents for every dollar invested in the 401(k) Plan for full-time employees with at least one year of service, up to the first 6% of gross pay contributed (the "Matching Obligations"). The average amount of monthly Matching Obligations is approximately $15,000. The Debtors estimate that as of the Petition Date, no more than $5,100 in Matching Obligations have accrued but not yet been contributed to the 401(k) Plan.

83.     The Debtors submit that it is essential for the morale and maintenance of trust of the employees that necessary steps are taken to protect the employees' 401(k) Plan, including Matching Obligations.

### *Workers' Compensation*

84.     The Debtors maintain a guaranteed issue premium-based workers' compensation policy to cover injuries sustained by their employees during the policy year. The policy has an annual premium of $367,507 and no deductible. The Debtors are current with their 2009 premium.

### *Administrative Service Providers*

85.     As is customary in the case of most large companies in the ordinary course of their businesses, the Debtors use third parties to administer employee benefits, the 401(k) Plan, workers' compensation and payroll services (the "Administrative Service Providers"). For example, the Debtors use ADP to process their bi-weekly payrolls. The Debtors estimate that the average monthly cost of Administrative Service Providers services is approximately $4,500 in the aggregate. The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors believe that they are current with respect to amounts owing to Administrative Service Providers.

### *Withholdings From Employee Paychecks*

86.     The Debtors deduct certain amounts from their employees' paychecks for the payment of the employee portion of medical insurance premiums; voluntary life insurance; voluntary pre-paid legal insurance, voluntary accident, sick and cancer insurance, 401(k) deductions; and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

87.     The Debtors may also be in possession of various withholdings, such as payroll taxes, social security, garnishments, child support payments, etc. (together with the Employee Deductions, the "Deductions"). It is likely that funds have been deducted from employee wages but have not yet been forwarded to the appropriate third-party recipients. Without authority to forward the Deductions to the appropriate parties, the Debtors expose their officers and directors to personal liability.

#11252220 v6

88.     The Debtors' employees are an essential component of a successful reorganization.   Any deterioration in employee morale and welfare at this critical time undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize.   For the foregoing reasons, the Debtors believe that it is in the best interests of the estate to grant the relief requested by the Wage Motion.

J.      **Debtors' First Day Motion for Authority to Remit and Pay Sales, Use, Franchise and Single Business Taxes (the "Tax Motion")**

89.     In the ordinary course of the Debtors' businesses, the Debtors collect sales taxes from their customers and incur taxes, including, but not limited to, sales, use, franchise, and single business taxes (collectively, the "Taxes")[6] on behalf of various taxing, licensing, governmental and regulatory authorities (collectively, the "Authorities"), and pay fees to such Authorities relating to licenses and permits required to conduct the Debtors' businesses (the "Fees").[7]   The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

90.     The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $10,000 on account of Taxes and Fees that have accrued but have not yet become due.   The Debtors also believe that certain Debtor entities may be entitled to credits for overpaid taxes from the Authorities to which those Debtor entities may currently owe taxes.   The Debtors are not, by their Tax Motion, asking

---

[6]   The Debtors have a taxable presence in Michigan and Alabama.

[7]   The Debtors do not seek authority to collect and pay state and federal withholding taxes under this Motion, which relief was requested as part of the Debtors' First Day Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits.

permission to effectuate setoffs at this time, but are providing this disclosure for informational purposes only, and reserve all rights with respect to tax payments claimed to be owing by specific Authorities.

91.     It is possible, that without the authority requested in this motion, the Authorities may audit the Debtors, or seek to lift the automatic stay to file tax liens against the Debtors' property. These actions will unnecessarily divert the Debtors' attention away from their chapter 11 cases and the administration thereof. Additionally, some of the Taxes relate to trust fund taxes that the Debtors collect and hold in trust for the benefit of the applicable Authority. Therefore, such funds do not constitute property of the estates and could not otherwise be used by the estates. In all cases, the Debtors' failure to pay the Taxes and Fees could have an adverse impact on their ability to operate in the ordinary course of business and would be distracting at this critical early stage of the Debtors' chapter 11 cases.

92.     Therefore, the Debtors seek the authority, in their sole discretion, to pay the Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date. The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the foregoing, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to the Tax Motion.

**K.     Debtors' First Day Motion for an Interim and Final Order (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtors, (II) Deeming Utility Companies Adequately Assured of Future Payment and (III)**

-30-

**Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

93.     The Debtors seek entry of an order (a) prohibiting the Utility Companies (defined below) from altering, refusing or discontinuing service to the Debtors, (b) deeming the Utility Companies adequately assured of future payment and (c) establishing procedures for determining requests for additional adequate assurances of payment.

94.     In connection with the operation of their businesses and management of their properties, the Debtors procure electricity, telephone and similar services (together, the "Utility Services") from a number of different utility companies (the "<u>Utility Companies</u>").  A list identifying the Utility Companies providing services to the Debtors is annexed to the Debtors' Utility Motion as **<u>Exhibit A</u>**.

95.     Historically, the Debtors paid all amounts owing to the Utility Companies on a timely basis.  To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services, except where the commencement of these chapter 11 cases may have interrupted some of these payments.  Prior to the Petition Date, the average aggregate monthly cost of Utility Services for the Debtors was approximately $180,270.

96.     If the Utility Companies are permitted to terminate Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized. Accordingly, to provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, or $90,135 (except as limited under the Utility Motion) (the "<u>Utility Deposit</u>"), into a segregated account maintained by the Debtors (the "<u>Utility Deposit Account</u>") to provide adequate assurance of payment for future services to the Utility Companies.  The Debtors submit that the Utility Deposit Account (the

-31-

#11252220 v6

"Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Companies of payment for post-petition Utility Services. If a Utility Company does not request additional adequate assurance, pursuant to the motion, it will be deemed to be adequately assured within the meaning of section 366 of the Bankruptcy Code.

97.     Through the Utility Motion, the Debtors have also sought to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that such Utility Companies believe that its Utility Deposit is insufficient.

98.     The Debtors submit that granting the relief requested in the Utility Motion is both necessary and appropriate to avoid any harm to their businesses.  The relief requested in the Utility Motion will afford the Debtors an opportunity to successfully reorganize and will not prejudice the rights of any of the Utility Companies.

L.     **Debtors' First Day Motion for Authority to Pay Certain Prepetition Claims of Lien Claimants (the "Lien Claimant Payment Motion")**

99.     The Debtors need to preserve and maximize the value of the their estates by sustaining their enterprise as a going concern as they transition into chapter 11.  Providing seamless service to their customers is key.  The Debtors have highly sensitive supply chains that easily could be disrupted by a recalcitrant vendor.  Any disruption could jeopardize the Debtors' ability to fulfill commitments to customers going forward, impair the Debtors' ability to collect on accounts receivables, and undermine the Debtors' hard earned reputation for reliability. Missed or late deliveries would have an immediate and deleterious effect on the Debtors' chapter 11 prospects.  To avoid such a result, the Debtors must secure an uninterrupted supply of necessary goods.  To do so will require the Debtors to satisfy certain prepetition payables to vendors early in the case.

100. As a critical component of the Debtors' manufacturing operations, procurement of goods, and ultimate delivery of products to the Debtors' customers, the Debtors rely on, and routinely contract with, a number of third-party contractors, common carriers, shippers and truckers, as well as various third party warehousemen to store goods while in transit (collectively, the "Lien Claimants"). The Debtors seek authorization, but not direction, to pay, in their sole discretion, all or part of the prepetition claims of these Lien Claimants, in an aggregate amount not to exceed $21,000, to ensure that the Lien Claimants provide necessary services to the Debtors on a post-petition basis.

101. It is my understanding that, under applicable state law, the Lien Claimants may be entitled to possessory liens on the goods in their possession to secure payment for their services (the "Liens"). Consequently, these Lien Claimants may argue that they are entitled to secured claims on account of any unpaid prepetition invoices (the "Lien Claims"). These Lien Claimants may be unwilling to release the Debtors' goods in their possession until their Lien Claims are satisfied.

102. I further understand that, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting a lien expressly does not violate the automatic stay to the extent that such a lien is immune from avoidance under section 546(b) of the Bankruptcy Code. Therefore, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, Lien Claimants may be entitled to assert and perfect Liens against the Debtors' property after the Petition Date with respect to their prepetition claims against the Debtors.

103. As of the Petition Date, the Debtors estimate that the aggregate amount of outstanding claims that may be secured by Liens is approximately $21,000. The Debtors further believe that certain of the Lien Claimants may refuse to continue to perform their obligations

#11252220 v6

under their existing agreements with the Debtors until their Liens are satisfied. This is of particular concern, given that the Debtors have contracted with many of the Lien Claimants to transport goods to multiple customers, and their refusal to continue to provide goods could adversely affect the Debtors' ability to complete obligations to their customers.

104.     Accordingly, the Debtors request that the Court authorize them to pay, in their sole discretion, all or part of the prepetition claims of these Lien Claimants, in an aggregate amount not to exceed $21,000.

105.     By ensuring continued deliveries and credit from the Debtors' suppliers, the relief sought in this Motion will prevent the Debtors' bankruptcy cases from having a "domino effect" up and down its customer and supplier base, and is in the best interests of the Debtors, their creditors and all parties in interest.

## M. Debtors' First Omnibus Motion Pursuant to §§ 105(a), 363(b) and 365(a) to (I) Reject Certain Executory Contracts and (II) Enter into Certain Agreements for the Orderly Completion of Work in Progress (the "First Omnibus Rejection Motion") and First Day Motion for Emergency Expedited Hearing on the First Omnibus Rejection Motion

106.     The Debtors have determined in an exercise of their sound business judgment that the Customer Agreements are unduly burdensome and not valuable assets of the Debtors' estates. As such, by the First Omnibus Rejection Motion and pursuant to sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006, the Debtors request authority to reject the executory contracts identified on **Exhibit A** to the First Omnibus Motion (collectively, the "Rejected Customer Contracts"). The Rejected Customer Contracts include the Customer Agreements and certain related agreements and purchase orders, terms and conditions.

107.     The Debtors believe that each of the Rejected Customer Contracts is "executory" pursuant to section 365 of the Bankruptcy Code because both the Debtors and each

of the counterparties to the Rejected Customer Contracts have continuing obligations to perform thereunder. Further, ample business justification exists to merit judicial approval of the proposed rejection of the Rejected Customer Contracts. Such rejection will allow the Debtors to relieve themselves of burdensome and unnecessary obligations, thereby maximizing value for their estates and creditors.

108. As explained above, compared with the costs and sales originally estimated for planning and pricing purposes, the Debtors' costs under the Customer Agreements are now significantly higher, while their sales under these agreements have dropped precipitously. As a consequence, the Debtors estimate that they have been incurring losses, on average, of approximately $600,000 per month on account of the Johnson Agreement and $265,000 per month on account of the Inteva Agreement. Further, given the uniqueness of the products and the manufacturing capabilities necessary to produce such products, the Debtors do not believe they will be able to locate any party willing to accept assignment of any of the Customer Agreements on terms that would provide value to the Debtors' estates.

109. Prior to the Petition Date, the Debtors engaged in extensive, good faith discussions with each of the counterparties to the Rejected Customer Contracts, but were ultimately unable to renegotiate the burdensome terms. The Debtors have determined that the Rejected Customer Contracts are not a source of potential value for the Debtors' future operations, creditors or other parties-in-interest. To the contrary, because the obligations pursuant to the Rejected Customer Contracts carry ongoing obligations on the part of the Debtors without providing the Debtors with reasonably equivalent value, the Rejected Customer Contracts constitute an unnecessary drain on the Debtors' resources. Accordingly, to avoid incurring unnecessary expenses and obligations during these chapter 11 cases and to provide

#11252220 v6

clarification and finality as to certain executory contracts for the Debtors and other parties-in-interest, the Debtors have determined in their exercise of sound business judgment that the Contracts must be rejected.

110.    Nevertheless, the Debtors recognize that the products manufactured by RINA are the result of a unique, patented and highly customized process that only the Debtors are capable of producing. The Debtors' inability to deliver products under the Customer Agreements may have a substantial impact on the business objectives of the Customers. Indeed, notwithstanding the Debtors' rejection of the Customer Agreements as burdensome, the Debtors believe that the Customers may still desire delivery of the Products and be prepared to make the necessary financial accommodations to ensure such delivery.

111.    Accordingly, the Debtors seek to be authorized, but not directed, to enter into one or more agreements with the Customers for the orderly completion of work in progress under the Customer Agreements (each a "Completion Agreement"). While the Debtors intend to seek the best possible terms for each Completion Agreement, at a minimum, any Completion Agreement entered into between the Debtors and a Customer would require such Customer to agree to (a) fund not less than all actual costs of completion on terms acceptable to the Debtors, including, without limit, all outstanding and future costs owed to vendors in connection with that Customer's Agreement, and (b) upon the Debtors' delivery of the Products, waive any and all claims against the Debtors relating to the Customer's Agreement, including all rejection damage claims.

112.    The Debtors seek an expedited hearing on the First Omnibus Rejection Motion on an emergency basis. The Debtors, in their discretion, may agree to continue to supply

products under the Customer Agreements for up to 10 days, pending entry of an order by the Court with respect to the First Omnibus Rejection Motion.

### N. Debtors' Second Omnibus Motion to Reject Certain Executory Contracts Pursuant to Section 365(a) of the Bankruptcy Code, *Nunc Pro Tunc* to the Petition Date (the "<u>Second Omnibus Rejection Motion</u>")[8]

113.    The Debtors have determined in an exercise of their sound business judgment that the Separation Agreements are unduly burdensome and not valuable assets of the Debtors' estates. As such, by the Second Omnibus Rejection Motion and pursuant to sections 105 and 365 of the Bankruptcy Code and Bankruptcy Rule 6006, the Debtors request authority to reject the executory contracts identified on **<u>Exhibit A</u>** to the Second Omnibus Rejection Motion, *nunc pro tunc* to the Petition Date (collectively, the "<u>Rejected Separation Agreements</u>").

114.    The Debtors believe that each of the Separation Agreements is "executory" pursuant to section 365 of the Bankruptcy Code because both the Debtors and the counterparties to the Separation Agreements have continuing obligations to perform thereunder. Further, ample business justification exists to merit judicial approval of the proposed rejection of the Separation Agreements. Such rejection will allow the Debtors to relieve themselves of burdensome and unnecessary obligations, thereby maximizing value for their estates and creditors.

115.    The Debtors have determined that the nine Separation Agreements with RUNA employees are significantly above market and provide no ongoing benefits to the Debtors' businesses. Indeed, the Debtors estimate that they are accruing approximately $60,000 per year in contingent obligations under the Separation Agreements. Because there is no cap on

---

[8]     The Debtors do not seek expedited consideration of the Second Omnibus Rejection Motion.

-27-

#11252220 v6

the severance pay accumulating under the Separation Agreements, the Debtors could ultimately be subject to significant long-term liability if the agreements are not rejected.

116.    Prior to the Petition Date, the Debtors engaged in extensive, good faith discussions with each of the counterparties to the Separation Agreements, but were ultimately unable to renegotiate the burdensome terms.  The Debtors have determined that the Separation Agreements are not a source of potential value for the Debtors' future operations, creditors or other parties-in-interest.  To the contrary, because the obligations pursuant to the Separation Agreements carry ongoing obligations on the part of the Debtors without providing the Debtors with reasonably equivalent value, the Separation Agreements constitute an unnecessary drain on the Debtors' resources.  Accordingly, to avoid incurring unnecessary expenses and obligations during these chapter 11 cases and to provide clarification and finality as to certain executory contracts for the Debtors and other parties-in-interest, the Debtors have determined in their exercise of sound business judgment that the Separation Agreements must be rejected.

## FINANCING MOTION

**O.      Debtors' First Day Motion Pursuant to 11 U.S.C. §§ 105, 363, 364(c) and 364(e), Bankruptcy Rule 4001(c) and Local Rule 4001-2 for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and (II) Scheduling a Final Hearing on the Motion (the "DIP Motion")**

117.    The ability of the Debtors to finance their operations and the availability of sufficient working capital and liquidity is vital to their ability to maintain their operations. The preservation and maintenance of the Debtors' going concern value are of utmost significance and importance to the Debtors' successful reorganization pursuant to the provisions of chapter 11 of the Bankruptcy Code.

#11252220 v6

118. The DIP Credit Facility[9] is required to enable the Debtors to preserve and maintain their assets and property and to fulfill their working capital and general corporate requirements during the Cases. Approval of the DIP Credit Facility is also critical to the Debtors' ability to weather any unexpected challenges they may face during the chapter 11 process, including possible further dislocation in the automobile market and deterioration in general economic conditions. Moreover, employees, customers and trade creditors will all expect the Debtors to have more than ample access to liquidity in order to continue operations.

119. If the Debtors are unable to obtain approval of the proposed DIP Credit Facility, the recoveries to all creditors will be greatly reduced since, under a liquidation scenario, the value of the Debtors' estates would decline dramatically. It is essential that the Debtors obtain immediate post-petition financing to enable them to continue their ordinary course, day-to-day operations, service their customers, and effectuate their chapter 11 goals. Without immediate access to credit under the DIP Facility, the Debtors will not have sufficient liquidity to provide working capital during these chapter 11 cases to provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course. Absent this new liquidity, the Debtors' ability to maximize the value of their estates would be jeopardized, and the Debtors would risk the loss of their going-concern value to the direct detriment of all parties in interest.

120. As it became clear that the Debtors would be unable to renegotiate the Customer Agreements and the Separation Agreements on more favorable terms, the Debtors endeavored to obtain potential postpetition financing from the DIP Lender. Given the recent

---

[9] Capitalized terms in this subsection not otherwise defined shall have the meanings ascribed to them in the DIP Motion.

#11252220 v6

descent of the automobile industry and the deterioration in general economic conditions, obtaining the financing needed by the Debtors as unsecured debt on an administrative priority basis was not a viable option at the time, especially from a third party who did not already have a financial interest in the Debtors to protect. Moreover, the Debtors could not obtain adequate alternative financing terms more favorable than those to be provided by the DIP Lender under the DIP Credit Facility.

121.    The Debtors made a concerted good faith effort to obtain credit on the most favorable terms available from the DIP Lender. The Debtors carefully evaluated the proposed financing structure from the DIP Lender, engaged in extensive negotiations with the DIP Lender regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lender, and, eventually, agreed to the DIP Lender's proposal as the proposal best suited to the Debtors' needs. Indeed, the Debtors believe that the interest rates provided under the DIP Credit Agreement are very favorable for today's market. The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arms' length and were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and preserve their going concern status.

122.    Without access to postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets, to the detriment of all creditor constituencies. By obtaining the DIP Credit Facility, the Debtors will be in a position to preserve the value of their assets during the chapter 11 process for the benefit of all creditors. Moreover, the terms of the DIP Credit Facility are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties and constitute reasonably equivalent value and

fair consideration.

123. The Debtors request:

- authorization to obtain postpetition financing under the DIP Credit Facility, consisting of a loan facility in an aggregate principal amount of up to $500,000 on an interim basis, and up to $10 million upon entry of a Final Order, from Recticel N.V./S.A. (the "DIP Lender");

- authorization to use the proceeds of the DIP Credit Facility for, among other things, working capital requirements and general corporate purposes, payment of costs of administration of the Cases and any other payments permitted by the Court, and subject to a budget agreed to by the DIP Lender;

- authorization to grant, as security for the repayment of the borrowings and all other Obligations arising under the DIP Credit Agreement: (i) first priority liens on all unencumbered assets constituting the Debtors' prepetition and postpetition property, including, upon entry of a Final Order, all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "DIP Collateral"),[10] and (iii) liens on encumbered property constituting the DIP Collateral junior in priority to valid, enforceable and non-voidable liens and security interests held by parties in interest, which liens and security interests existed as of the Petition Date or as may be perfected pursuant to section 546(b) of the Bankruptcy Code after the Petition Date, in each case, subject to the Carve-Out and to any liens (as defined in section 101 of the Bankruptcy Code) and security interests expressly permitted to be senior under the Credit Documents and the terms of the DIP Order;

- the granting of a superpriority administrative expense claim (the "Superpriority Claim") to the DIP Lender payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out;

- authorization of the Carve-Out; and

- the scheduling of a final hearing on the relief requested in the DIP Motion.

---

[10] The Debtors believe that the DIP Collateral is generally unencumbered. Nevertheless, to protect any valid, enforceable and non-voidable liens and security interests held by parties in interest with respect to the DIP Collateral, the DIP Lender has agreed to provide postpetition financing without priming any such liens or security interests.

#11252220 v6

124.     Absent the protections and liens proposed to be granted in the Interim and Final Orders, the Debtors would be unable to obtain credit.  The Debtors believe that no other lender would have been willing to make a post-petition loan on an unsecured basis in an amount necessary for the Debtors' business operations and other financing needs.  The Debtors were thus not able to obtain credit from the DIP Lender, or any other party, on a solely unsecured or administrative priority basis.  Therefore, the terms of the proposed DIP Agreement are fair and reasonable in that they provide protections to the DIP Lender while providing the Debtors critical access to crucial liquidity and that they are also comparable to similar debtor-in-possession financing facilities.

125.     Because the DIP Lender is familiar with the Debtors, their operations, and their financing structure, the proposed DIP Agreement presented the best financing available to the Debtors.

126.     If entry of the Interim Order or the Final Order is denied or delayed, the Debtors will likely experience business disruptions in the short term, which will diminish stakeholder confidence and may irreparably damage the value of the Debtors' estates. Without immediate access to new borrowing relief, the Debtors' business operations would grind to an almost immediate halt, which would seriously jeopardize, and might destroy, the going-concern value of the Debtors' businesses.  The new liquidity under the proposed interim portion of the DIP Facility will ensure that the Debtors can make the payments requested by the various pleadings discussed herein, pay the administrative claims incurred in the ordinary course of these chapter 11 cases and instill confidence in the Debtors' stakeholders.

127.     The requested interim availability under the DIP Facility will help provide assurances to the Debtors' suppliers, vendors and employees that they will be paid for post-

petition services and to the Debtors' customers that the Debtors will be able to deliver products during these chapter 11 cases. These assurances are essential to the Debtors' efforts to persuade their vendors to continue shipping goods and providing services to the Debtors on customary trade credit. Thus, approval of interim borrowing under the DIP Facility is crucial to maximizing the value of the Debtors' estates.

## Conclusion

The Debtors hope to confirm a plan of reorganization and emerge from chapter 11 in as short a time as is necessary. The Debtors believe that the protections afforded by chapter 11 will enable them to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests, and preserve the value of their assets for the benefit of creditors and equity security holders alike.

**[remainder of page intentionally left blank]**

#11252220 v6

I declare the foregoing to be true under penalty of perjury under the laws of the United States of America.

By: _____

Derek Strehl
Secretary and Treasurer of the Debtors

Dated: October 29, 2009