## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RECTICEL NORTH AMERICA, INC. | ) | Case No. 09-[        ] |
| | ) | |
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| RECTICEL INTERIORS NORTH AMERICA, LLC | ) | Case No. 09-[        ] |
| Debtors. | ) | |
| | ) | |

## DEBTORS' FIRST DAY MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, 364(c) AND 364(e), BANKRUPTCY RULE 4001(c) AND LOCAL RULE 4001-2 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II) SCHEDULING A FINAL HEARING ON THE MOTION

Recticel North America, Inc. a/k/a Recticel UREPP North America, Inc. ("RUNA") and Recticel Interiors North America, LLC ("RINA," together with RUNA, the "Debtors") hereby file this motion (the "Motion") for the entry of an interim and final order (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Order"), pursuant to sections 105, 363, 364(c) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") authorizing the Debtors to enter into a superpriority debtor-in-possession financing arrangement (as amended, modified and otherwise in effect from time to time, the "DIP Credit Facility") as provided for in that certain Credit Agreement, substantially in the form attached hereto as **Exhibit A** (as amended, supplemented,

or otherwise modified and in effect from time to time, the "DIP Credit Agreement,"[1] together with any and all other related documents and agreements entered into in connection with or related to the DIP Credit Facility, the "Credit Documents"), and scheduling a final hearing with respect to the relief requested herein. In support of the Motion, the Debtors rely upon and refer this Court to the Declaration of Derek Strehl in Support of the First Day Motions, dated as of October 29, 2009 (the "Strehl Declaration") and respectively represent as follows:

## PRELIMINARY STATEMENT

1.      As set forth more fully below and in the Strehl Declaration, RINA is a leading manufacturer of polyurethane sprayed skins and components for car interior trim such as dashboards, glove boxes, and door panels. The interior trim manufactured by the RINA is installed in various premium car models as well as heavy-weight truck models. In short, RINA's business is to produce and sell components to automobile interior manufacturers. In manufacturing these products, RINA utilizes a patented Colofast Spray® process which consists of chemical compounds that RINA purchases from RUNA, a manufacturer of light-stable polyurethane Colofast® compounds.

2.      As explained below, RINA has incurred, and continues to incur, heavy losses on account of its sales of polyurethane sprayed skins pursuant to certain sales agreements with two of its primary customers – Johnson Controls, Inc. and Inteva Products, LLC. In order to curb mounting losses, the Debtors attempted to renegotiate more favorable terms for these agreements. As of the Petition Date, such renegotiations proved to be unsuccessful.

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

3.     Additionally, nine of RUNA's employees are parties to separation agreements that provide above-market severance in the event of the employee's termination. Under the separation agreements, there is no cap on the accumulation of severance pay and, therefore, RUNA could ultimately be subject to significant long-term liability. Accordingly, prior to the Petition Date, RUNA initiated discussions with these employees in an effort to negotiate new agreements to reflect the current market standards. As of the Petition Date, such negotiations were unsuccessful.

4.     As a result of RINA's failed negotiations with respect to its customer sales agreements and RUNA's intent to eliminate the unduly burdensome obligations under the separation agreements, the Debtors commenced these chapter 11 cases (the "Cases"). Concurrently with the Cases, the Debtors are seeking to reject the Customer Agreements and the Separation Agreements (as defined below).

5.     During the Cases, the Debtors require proceeds of the DIP Credit Facility to permit, among other things, the orderly continuation of their day-to-day operations and the completion of the restructuring process for the benefit of the Debtors' estates and creditors. Accordingly, the Debtors now seek authorization to enter into the DIP Credit Facility on the terms set forth in the DIP Credit Agreement and the DIP Order.

6.     The Debtors propose to secure their obligations under the DIP Credit Facility (the "Obligations") by, among other things, granting to the DIP Lender (defined below) (i) liens on all of the Debtors' unencumbered property and (ii) junior liens on all of the Debtors' encumbered property, which do not prime any other liens on such collateral existing as of the Petition Date. The DIP Order also provides the DIP Lender with allowed superpriority administrative expense claims.

7.     In connection with the Debtors' consummation of the transactions under the DIP Credit Facility, the DIP Credit Agreement and the DIP Order provide for, among other things, budgetary constraints on the use of the proceeds of the DIP Credit Facility, payment of current non-default rate interest and continued financial and other reporting.  All postpetition liens and superpriority claims granted to the DIP Lender are subject to a "carve-out" described below for U.S. Trustee fees and costs, and fees and expenses of professionals retained by the Debtors.

8.     The ability of the Debtors to finance their operations and the availability of sufficient working capital and liquidity is vital to their ability to maintain their operations. (Strehl Declaration ¶ 95.)  The preservation and maintenance of the Debtors' going concern value are of utmost significance and importance to the Debtors' successful reorganization pursuant to the provisions of chapter 11 of the Bankruptcy Code.  (Id.)  The DIP Credit Facility is required to enable the Debtors to preserve and maintain their assets and property and to fulfill their working capital and general corporate requirements during the Cases.  (Id. at ¶ 96.) Approval of the DIP Credit Facility is also critical to the Debtors' ability to weather any unexpected challenges they may face during the chapter 11 process, including possible further dislocation in the automobile market and deterioration in general economic conditions.  (Id.) Moreover, employees, customers and trade creditors will all expect the Debtors to have more than ample access to liquidity in order to continue operations.  (Id.)

9.     If the Debtors are unable to obtain approval of the proposed DIP Credit Facility, the recoveries to all creditors will be greatly reduced since, under a liquidation scenario, the value of the Debtors' estates would decline dramatically.  (Id. at ¶ 97.)  Entry of the DIP Order is therefore (i) critical to the Debtors' ability to reorganize pursuant to the Bankruptcy

Code, (ii) in the best interests of the Debtors and their estates, and (iii) necessary to avoid irreparable harm to the Debtors, their creditors, and their assets, business, goodwill, reputation and employees. The Debtors, therefore, respectfully request that this Motion be granted.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     The Bankruptcy Cases

11.     On October 29, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their respective businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.     Overview of Business Operations

12.     Each of the Debtors is a wholly-owned indirect subsidiary of Recticel N.V./S.A. ("Recticel"), a global manufacturer of a wide range of foams and synthetic compounds that are primarily used in the automotive, bedding, and building industries. RUNA's corporate headquarters and manufacturing facility are located in Auburn Hills, Michigan. RINA's corporate headquarters is located in Clarkston, Michigan, with manufacturing facilities in Clarkston and Tuscaloosa, Alabama.

13.     RINA is a leading manufacturer of polyurethane sprayed skins and components for car interior trim including dashboards, glove boxes and door panels. The interior trim manufactured by RINA is utilized in various premium car models including the Mercedes-

Benz M-Class and R-Class, Cadillac STS and Buick Enclave, as well as various models of heavy-weight trucks.

14.    In manufacturing these products, RINA utilizes a patented Colofast Spray® process.  Under this manufacturing process, RINA employees spray a mass-stained polyurethane material (using a patented spray nozzle) on the surface of a particular automotive interior mold that results in skins with the look of natural leather.  Depending upon the ultimate end users' requirements, the skins may be further processed by means of a direct or indirect backfoaming process under which the skin is incorporated into an automotive structure by means of an intermediate foam layer.

15.    RUNA is a manufacturer of light-stable polyurethane Colofast® compounds, which are sold in part to RINA for use in its manufacturing process.  In addition to sales to RINA, the compounds produced by RUNA are sold to the German company, BASF SE ("BASF") for use as a basic material in the manufacture of car window encapsulations.  In late 2008, BASF acquired Recticel's worldwide compounds business for polyurethane systems glass encapsulations.  As a result, BASF now sells the Colofast® compounds to certain of RUNA's former customers.

16.    As of the Petition Date, the Debtors employ approximately 252 employees at various locations.  Specifically, RINA employs approximately 69 employees at its Clarkston manufacturing facility and corporate headquarters, and approximately 175 employees at its Tuscaloosa manufacturing facility.   RUNA employs 12 employees at its Auburn Hills manufacturing facility.   Of the twelve employees employed by RUNA, nine are parties to

separation agreements that provide for the payment of above-market severance in the event of the employee's termination (the "Separation Agreements").[2]

17.     RUNA reported gross revenues of $19,635,000 for 2008 and $7,601,000 for the first three quarters of 2009, generating net income/ (losses) of $6,544,002[3] and ($1,473,000) for each of these respective periods. RINA reported gross revenues of $50,026,000 for 2008 and $20,673,000 for the first three quarters of 2009, generating net losses of $13,765,000 and $8,348,000 for each of these respective periods.

### C.     Capital and Debt Structure

18.     RUNA is the sole member of RINA. All of RUNA's issued and outstanding equity is owned by RUS, Inc. ("RUS"), a Delaware corporation that is a wholly-owned indirect subsidiary of Recticel. RUS is not a debtor in these chapter 11 cases.

19.     As of September 30, 2009, RUNA's balance sheet reflected total assets of approximately $6,016,538. Of this amount, approximately $375,190 was composed of cash and cash equivalents, $474,911 was composed of property and equipment, $1,869,235 was composed of real estate, $1,974,616 was composed of contracts receivables, and approximately $1,322,586 was composed of other assets.

20.     As of September 30, 2009, RINA's balance sheet reflected total assets of approximately $7,911,943. Of this amount, approximately $390,578 was composed of cash and

---

[2]     Certain of RINA's employees are also parties to separation agreements, but the Debtors believe these agreements are at market levels.

[3]     This amount includes $8,211,000 of non-recurring revenues derived from the sale of the glass encapsulations business to BASF.

cash equivalents, $209,095[4] was composed of property and equipment, $4,860,444 was composed of contracts receivables, and approximately $2,451,826 was composed of other assets.

21.     Each of RINA and RUNA are parties to individual agreements with RUS dated December 28, 2005 and April 28, 2003, respectively, (the "Intercompany Agreements") pursuant to which the Debtors engaged in various intercompany funding transactions with RUS in the ordinary course of their respective businesses.  As of the Petition Date, RUNA and RINA's books and records respectively state liabilities of approximately $54,289,910 and $51,617,986, including liability for amounts advanced under the Intercompany Agreements.

**D.     Events Leading to the Commencement of these Chapter 11 Cases**

22.     Johnson Controls, Inc. ("Johnson Controls") and Inteva Products, LLC ("Inteva") are RINA's largest customers, collectively responsible for approximately 80% of RINA's annual revenues.  Each of Johnson Controls and Inteva is a tier one supplier to Mercedes-Benz U.S. International, Inc. ("Mercedes").  Specifically, RINA is party to a current purchase order agreement with Johnson Controls dated April 27, 2009 pursuant to which RINA sells, as a sole supplier, polyurethane sprayed components for use in the Mercedes-Benz M-Class and R-Class cars (the "Johnson Agreement").  Similarly, RINA is party to various purchase order agreements with Inteva pursuant to which RINA sells, as a sole supplier, polyurethane sprayed skins also for use in the Mercedes M-Class and R-Class cars (the "Inteva Agreement" and collectively with the Johnson Agreement, the "Customer Agreements").

23.     At the time of the entry into their customer relationships with Johnson Controls and Inteva, the Debtors underestimated the material cost and number of employees

---

[4]     This amount is reported consistent with International Financial Reporting Standards and is exclusive of approximately $25,501,259 in impairments that have been booked by RINA.

required to produce consistently high-quality components. Additionally, for planning and pricing purposes, the Debtors had anticipated significantly higher sales volumes under these customer relationships than that actually experienced due in large part to the precipitous decline in the sale of automobiles over the last couple of years. As a consequence, the Debtors estimate that they have been incurring losses, on average, of approximately $600,000 per month on account of the Johnson Agreement and approximately $265,000 per month on account of the Inteva Agreement. In an effort to curb these mounting losses, over the course of many months, RINA engaged in discussions with Mercedes, Johnson Controls and Inteva in an attempt to negotiate price increases. Ultimately, RINA was unable to successfully negotiate such increases. While RINA was able to gain significant concessions from Mercedes with respect to funding certain of RINA's losses associated with the Customer Agreements, because Johnson Controls and Inteva were unwilling to agree to any price increases under their respective agreements such concessions were ultimately insufficient to halt the mounting losses.

24.     RUNA has also been adversely affected by RINA's decreased sales volumes. RINA is RUNA's largest customer, accounting for approximately 65% of its sales. Similarly, RUNA has experienced decreased sales to BASF due to the sharp downturn in the automotive industry and the global recession.

25.     The Debtors also supply polyurethane skins to Consolidated Metco ("ConMet") under a purchase order dated September 25, 2008 (the "ConMet Agreement"). At the time of entry into the ConMet Agreement, the Debtors manufactured products for ConMet in their now-closed Fountain Inn, South Carolina manufacturing plant. Due to the loss of other programs in that facility, the Debtors were forced to close the Fountain Inn plant in September, 2007 and production for ConMet was moved to the Debtors' Clarkston, Michigan facility. As a

result of such events, the Debtors are now incurring significant additional freight costs to ship parts from Michigan to ConMet's facility in Bryson City, North Carolina. These additional unanticipated freight costs represent more than 16% of the Debtors' total costs associated with performing under the ConMet Agreement. As a result, the Debtors have incurred losses of approximately $68,000 per month under the ConMet Agreement. The Debtors are engaged in ongoing negotiations with ConMet and are optimistic that they will be able to reach a solution with ConMet that would curb the losses associated with performing under the ConMet Agreement.

26. Additionally, as mentioned above, nine of RUNA's twelve employees are parties to Separation Agreements which are significantly above market. Each of these Separation Agreements was entered into over the last year by RUNA's former president. Under the Separation Agreements, upon termination, the employee is entitled to receive a single lump sum payment equal to one month of separation pay for each completed year of service and a pro-rated month for the partially completed final year at the employee's highest annual base-wage during employment with RUNA. The Debtors estimate that they are accruing approximately $60,000 per year in contingent obligations under the Separation Agreements. Because there is no cap on the severance pay accumulating under the Separation Agreements, the Debtors could ultimately be subject to significant long-term liability. Accordingly, prior to the Petition Date, the Debtors initiated discussions with these nine employees in an effort to negotiate new agreements that were more commensurate with current market standards. As of the Petition Date, such negotiations were unsuccessful.

27. As a result of the Debtors' ongoing losses, as well as RINA's failed negotiations with Johnson Controls and Inteva and RUNA's intent to eliminate the unduly

burdensome obligations under the Separation Agreements, the Debtors commenced these chapter 11 cases. Concurrently with the filing of their chapter 11 cases, the Debtors are seeking to reject each of the Customer Agreements and the Separation Agreements.

## **RELIEF REQUESTED**

28.     By this Motion and pursuant to sections 105, 363, 364(c) and 364(e) of the Bankruptcy Code, the Debtors seek entry of the DIP Order, inter alia:

(a)     under Bankruptcy Code sections 364(c) and (e), authorizing the Debtors to obtain postpetition financing under the DIP Credit Facility, consisting of a loan facility in an aggregate principal amount of up to $500,00 on an interim basis, and up to $10 million upon entry of a Final Order, from Recticel N.V./S.A. (the "DIP Lender");

(b)     under Bankruptcy Code sections 363 and 364, authorizing the Debtors to use the proceeds of the DIP Credit Facility for, among other things, working capital requirements and general corporate purposes, payment of costs of administration of the Cases and any other payments permitted by the Court, and subject to a budget agreed to by the DIP Lender;

(c)     under Bankruptcy Code sections 364(c)(2) and (c)(3), as security for the repayment of the borrowings and all other Obligations arising under the DIP Credit Agreement, authorizing the Debtors to grant to the DIP Lender: (i) first priority liens on all unencumbered assets constituting the Debtors' prepetition and postpetition property (the "DIP Collateral"),[5] including, upon entry of a Final Order, all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and (iii) liens on encumbered property constituting the DIP Collateral junior in priority to valid, enforceable and non-voidable liens and security interests held by parties in interest, which liens and security interests existed as of the Petition Date or as may be perfected pursuant to section 546(b) of the Bankruptcy Code after the Petition Date (the DIP Lender's liens set forth in clauses (i) and (ii) of this subsection (c), collectively, the "DIP Liens"), in each case, subject to the Carve-Out (as defined below) and to any liens (as defined in section 101 of the Bankruptcy Code) and security interests expressly permitted to be senior under the Credit Documents and the terms of the DIP Order;

---

[5]     The Debtors believe that the DIP Collateral is generally unencumbered. Nevertheless, to protect any valid, enforceable and non-voidable liens and security interests held by parties in interest with respect to the DIP Collateral, the DIP Lender has agreed to provide postpetition financing without priming any such liens or security interests.

(d) under Bankruptcy Code section 364(c)(l), the granting of a superpriority administrative expense claim (the "Superpriority Claim") to the DIP Lender payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out; and

(e) authorizing the Carve-Out.

## TERMS OF THE DIP CREDIT FACILITY

29. The principal terms of the DIP Credit Facility are as follows:[6]

**Borrowers:** Recticel North America, Inc. and Recticel Interiors North America, LLC (together, the "Borrowers").

RUNA is appointed as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") and has authority to (i) provide the DIP Lender with all notices with respect to the borrowings obtained for the benefit of any Borrower and all other notices and instructions under the DIP Credit Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain borrowings and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of the DIP Credit Agreement.

**DIP Lender:** Recticel N.V./S.A.

**DIP Credit Facility:** Superpriority debtor-in-possession facility in the aggregate principal amount of $10 million (the "Commitment").

**Term:** Borrowings under the DIP Credit Facility shall be repaid in full, and the Commitment shall terminate, at the earliest of (i) April 30, 2010 (the "Maturity Date"), (ii) 30 days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 30-day period (the "Prepayment Date"), (iii) the date on which the substantial consummation (as defined in section 1101 of the Bankruptcy Code) occurs with respect to a plan of reorganization of each Borrower that is confirmed pursuant to an order entered by the Bankruptcy Court in the Cases (the "Consummation Date"), (iv) the closing of a sale of all or substantially all of the capital stock or assets of either of the Borrowers, unless such sale has been approved in writing by the DIP Lender in advance and

---

[6] This summary is not intended to limit the terms of the DIP Credit Facility and the DIP Order. Reference should be made to the DIP Credit Agreement and the DIP Order for the full terms thereof.

(v) the acceleration of the loans and the termination of the Commitment in accordance with the DIP Credit Agreement (together with the Maturity Date, the Prepayment Date and the Consummation Date, the "<u>Termination Date</u>").

The Borrowers may borrow, repay, and reborrow the Commitment amount at any time prior to the Termination Date.

**Use of Proceeds:** The proceeds of the DIP Credit Facility will be used by the Borrowers as specifically set forth in the Initial Budget (as defined below) for the applicable calendar month. The Borrowers' monthly aggregate expenditures may exceed the aggregate expenditures projected in the Initial Budget for such month; provided that, such excess is less than the sum of (a) 20% of the aggregate amount set forth in the Initial Budget for such month plus (b) the amount by which the aggregate projected expenditures for all prior months exceeds the actual aggregate expenditures for such prior months; provided further that, such expenditures are otherwise permitted by the DIP Credit Agreement.

**Interest Rate:** On outstanding loans under the DIP Credit Facility, a rate *per annum* which shall be equal to the sum of (i) LIBOR (as defined in the DIP Credit Agreement) in effect from time to time, plus (ii) ½ % per annum.

On overdue principal, overdue interest, and any other overdue amount payable by the Borrowers under the Credit Documents, a rate *per annum* equal to the sum of (i) LIBOR in effect from time to time, plus (ii) 1%.

**DIP Credit Facility Claims and Liens:** All borrowings and other Obligations under the DIP Credit Facility, shall at all times:

(a) Pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Cases;

(b) Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Borrowers' estates in the Cases that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases; and

(c) Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected lien on all property of the Borrowers' estates in the Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement

of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code;

provided, however, that any liens granted under clauses (b) and (c) above shall be subject to liens permitted under the Credit Documents, and subject in each case only to the Carve-Out (as defined below).

**Carve-Out:**

"Carve-Out" is defined as (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) subject to the terms of the Interim Order and the Budget (as defined below), all allowed fees and expenses of the professionals retained under section 327 and 328 of the Bankruptcy Code or otherwise by the Borrowers accrued or incurred on or before the first business day (the "Carve-Out Effective Date") following the delivery by the DIP Lender of a Default Notice (as defined below), whether approved by the Bankruptcy Court before or after the Carve-Out Effective Date; and (iii) on and after the Carve-Out Effective Date, an amount not exceeding $350,000 in the aggregate, which amount may be used (subject to the terms of the Interim Order and the Budget) to pay any allowed fees or expenses incurred by the professionals retained under sections 327 or 328 of the Bankruptcy Code by the U.S. Debtors and Committee, on or after the Carve-Out Effective Date, *provided* that (x) the dollar limitation in this clause (iii) on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid on or prior to the Carve-Out Effective Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to the DIP Lender (or its attorneys or agents under the DIP Credit Facility or otherwise), and (y) nothing herein shall be construed to impair the ability of any entity to object to the fees, expenses, reimbursement or compensation described above.

**Conditions to Initial Borrowings:**

The obligation to provide the initial extension of credit shall be subject to the satisfaction of the following conditions, as determined by the DIP Lender:

(a)    Not later than 10 business days following the Petition Date, entry of the Interim Order in the form attached as an exhibit to the DIP Credit Agreement as may be modified only with the approval of the DIP Lender, which shall remain in

full force and effect, and shall not have been stayed, reversed, amended or modified in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such loans nor the performance by the Borrowers of any of their Obligations thereunder shall be the subject of a presently effective stay pending appeal;

(b) All of the "first day orders" entered at the time of the Petition Date shall be reasonably satisfactory in form and substance to the DIP Lender;

(c) Receipt of closing documents (including promissory note and security agreement) satisfactory in form and substance to the DIP Lender;

(d) Receipt of a notice of borrowing from the Borrowers;

(e) No litigation, action, suit, investigation, claim or proceeding shall be pending or threatened with respect to the DIP Credit Agreement or any other Credit Document, or the transactions contemplated thereby;

(f) All corporate and legal proceedings and all instruments and agreements in connection with the transactions between the Borrowers and the DIP Lender contemplated by the DIP Credit Agreement shall be satisfactory in form and substance to the DIP Lender, and the DIP Lender shall have received all information and copies of all documents or papers requested by the DIP Lender;

(g) The DIP Lender shall have received from the Borrowers an initial budget detailing the Borrowers' anticipated cash receipts and disbursements for the period through the Maturity Date and setting forth anticipated uses of the Commitment and such budget shall be satisfactory in form and substance to the DIP Lender in its sole discretion (the "Initial Budget");

(h) No material adverse change shall have occurred since September 30, 2009 in the condition (financial or otherwise), business, operations, assets, revenues, properties or prospectus of the Borrowers, and the DIP Lender shall not have become aware of any facts or circumstances not previously known by it, which the DIP Lender shall reasonably determine has, or could reasonably be expected to have, a material adverse effect;

(i) Not later than ten (10) days after the Petition Date, an order (the "Rejection Order") in form and substance

satisfactory to the DIP Lender in its sole and absolute discretion authorizing the rejection of all Customer Agreements shall have been entered by the Court, which order shall be in full force and effect, and shall not have been stayed, reversed, amended, or modified in any respect; and, nor shall such order be the subject of any appeal.

(j)     Such other conditions set forth in the DIP Credit Agreement.

**Conditions Precedent to Additional Loans:**     The obligation to provide additional loans shall be subject to the satisfaction of the following conditions, as determined by the DIP Lender:

(a)   No Default or Event of Default shall exist;

(b)   Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to a given date;

(c)   Receipt of a notice of borrowing from the Borrowers;

(d)     No litigation, action, suit, investigation, claim or proceeding shall be pending or threatened with respect to the DIP Credit Agreement or any other Credit Document, or the transactions contemplated thereby;

(e)     Since the immediate preceding borrowing date, no material adverse change shall have occurred in the condition (financial or otherwise), business, operations, assets, revenues, properties or prospectus of the Borrowers, and the DIP Lender shall not have become aware of any facts or circumstances not previously known by it, which the DIP Lender shall reasonably determine has, or could reasonably be expected to have, a material adverse effect;

(f)   The DIP Lender shall have received the most recent Comparative Budget (as defined below);

(g)   Not later than 30 days following the entry of the Interim Order, an order in the form and substance satisfactory to the DIP Lender in its sole and absolute discretion authorizing the loans under the DIP Credit Agreement (the "<u>Final Order</u>") shall have been entered by the Bankruptcy Court, which order shall remain in full force and effect, and shall not have been stayed, reversed, amended or modified in any respect; and, if the Final Order is subject of a pending appeal in any respect,

neither the making of such loans nor the performance by the Borrowers of any of their Obligations thereunder shall be the subject of a presently effective stay pending appeal;

(h)  Not later than ten (10) days after the Petition Date, the Rejection Order shall have been entered by the Court, which order shall be in full force and effect, and shall not have been stayed, reversed, amended, or modified in any respect; and, nor shall such order be the subject of any appeal.

(i)    Such other conditions set forth in the DIP Credit Agreement.

The request by the Borrowers for, and the acceptance by the Borrowers of, each extension of credit under the DIP Credit Agreement shall be deemed to be a representation and warranty by the Borrowers that the conditions specified above have been satisfied or waived.

The DIP Lender has no obligation to make any loan to the Borrowers if, after giving effect to any such loan, the aggregate amount of the loans outstanding exceed the lesser of (i) Budgeted Amount Outstanding (as defined in the DIP Credit Agreement) for the calendar month in which Borrowers request any such loan, and (ii) the Commitment.

**Periodic Reports:**    The Borrowers shall provide to the DIP Lender periodic reports in such reasonable detail and form as the DIP Lender may from time to time require:

(i)  Within 10 days after the end of each month a budget for each Borrower and on a consolidated basis which shall compare all actual cash receipts and expenditures in the aggregate for the previous month to the cash receipts and expenditures set forth in the Initial Budget for such month and on a cumulative basis (each a "<u>Comparative Budget</u>," together with the Initial Budget, the "<u>Budget</u>").  The Borrowers shall deliver to the DIP Lender with each Comparative Budget a reasonably detailed analysis of the variances between the actual cash receipts and expenditures and the cash receipts and expenditures set forth in the Initial Budget;

(ii)    Within 10 days after the end of each month, a consolidated balance sheet as of the end of such month and the related consolidated statement of income for such month and on a year to date basis;

(iii)   Within 30 days of the end of each fiscal year, on a consolidated basis, a balance sheet as at the end of such year and the related statements of income, cash flows and changes in stockholders' equity for such year; and

(iv)   Such other information or documents (financial or otherwise) as the DIP Lender may reasonably request from time to time.

**Events of Default:**          "Events of Default" will consist of the following:

(a)   Failure by the Borrowers to pay principal, interest, or other amounts when due;

(b)   Breach by a Borrower to provide Notice of Default or litigation pending or threatened against the Borrowers as set forth in more detail in section 6.1(a) of the DIP Credit Agreement, or any of the covenants set forth in sections 6.1(b)(i), 6.9, 6.11 or  7.1 through 7.11 of the DIP Credit Agreement;

(c)   Breach by a Borrower of any other covenant or agreement contained in the DIP Credit Agreement, if such breach is capable of being remedied and such default continues unremedied for more than 10 days;

(d)   Any representation or warranty made by the Borrowers shall prove to be untrue in any material respect when made or at any time thereafter in which any of the Obligations remain outstanding;

(e)   Either Case shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee, a responsible officer or examiner shall be appointed in either Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; or any other superpriority claim (other than the Carve-Out) which is pari passu with or senior to the claims of the DIP Lender shall be granted in either Case;

(f)   The Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the assets of the Borrowers which have an aggregate value in excess of $ 20,000;

(g)   A Change of Control (as defined in the DIP Credit

Agreement) shall occur;

(h)    Any Credit Document shall cease to in full force and effect or shall cease to grant to the DIP Lender its liens as described therein, or any Borrower shall so assert in any pleading filed in any court;

(i)    An order shall be entered reversing, amending, supplementing, staying for a period in excess of 10 days, vacating or otherwise modifying the Interim Order or the Final Order without the prior written consent of the DIP Lender;

(j)    Any judgment in excess of $20,000 as to any postpetition obligation shall be rendered against any Borrower and the enforcement thereof shall not be stayed or there shall be rendered against any Borrower a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a Material Adverse Effect;

(k)    Any Borrower files a chapter 11 plan, or supports any filed chapter 11 plan which is not supported by the DIP Lender or which does not repay all Obligations to the DIP Lender in full in cash on or before the Termination Date; or

(l)    The Borrowers' actual cumulative aggregate expenditures for the period beginning on the date hereof and ending on the last day of each calendar month exceed the cumulative aggregate amount projected in the Initial Budget for such period by more than twenty percent (20%).

(m)    Such other Events of Default set forth in the DIP Credit Agreement.

**Joint and Several Liability:**    Each Borrower is jointly and severally liable, as a co-debtor, for the payment and performance of the loans and other Obligations under the Credit Documents.  If and to the extent that any Borrower fails to make any payment with respect to such loans or other obligations as and when due or to perform any of the obligations in accordance with the terms of the Credit Documents, then in each such event the other Borrower will make such payment with respect to, or perform, such loan or other Obligation.

After the occurrence and during the continuance of any Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  After the occurrence and during

the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower, and such Borrower shall deliver any such amounts to the DIP Lender for application to the Obligations in accordance with this DIP Credit Agreement.

## THE DIP CREDIT FACILITY SHOULD BE APPROVED

30.     The Debtors propose to obtain financing under the terms of the DIP Credit Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.

**A.      Standard for Obtaining Credit Under
Section 364(c) of the Bankruptcy Code**

31.     Section 364(c) of the Bankruptcy Code allows the obtaining of credit or incurrence of debt on an unsecured superpriority basis, or secured by liens on unencumbered property and junior liens on encumbered property. <u>See</u> 11 U.S.C. § 364(c). The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); <u>see</u> <u>In re Garland Corp.</u>, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) must prove it was unable to obtain

unsecured credit pursuant to section 364(b)).  Courts have applied the following three-part test to

determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

> (a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

> (b)     the credit transaction is necessary to preserve the assets of the estate; and

> (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Crouse Group, Inc., 71 B.R. at 549.  As discussed below, each of these elements is satisfied.

### B.     The Debtors Satisfy the Standard for Obtaining Credit Under Section 364(c) of the Bankruptcy Code

32.     As it became clear that the Debtors would be unable to renegotiate the

Customer Agreements and the Separation Agreements on more favorable terms, the Debtors

endeavored to obtain potential postpetition financing from the DIP Lender.  (Strehl Declaration ¶

98)  Without access to postpetition financing, the Debtors would be unable to operate their

businesses as a going concern, which would significantly impair the value of the Debtors' assets,

to the detriment of all creditor constituencies.  (Id. at ¶ 100)   By obtaining the DIP Credit

Facility, the Debtors will be in a position to preserve the value of their assets during the chapter

11 process for the benefit of all creditors.  (Id.)   Moreover, the terms of the DIP Credit Facility

are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties and constitute reasonably equivalent value and

fair consideration.  (Id.)

### 1.     No Adequate Alternative to the DIP Credit Facility is Currently Available

33.     A debtor need only demonstrate that, notwithstanding its good faith

efforts, credit was unavailable without the protections afforded to potential lenders by section

364(c) of the Bankruptcy Code.  See Bray v. Shenandoah Fed. Savs. and Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming district court's grant of a priming lien, where "the trustee had demonstrated by a good faith effort that credit was not available without the senior lien."); In re 495 Central Park Ave. Corp., 136 at 630-31 (noting that, although "the debtor must make an effort to obtain credit without priming a senior lien," it does not need "to seek alternate financing from every possible lender.").  Given the recent descent of the automobile industry and the deterioration in general economic conditions, obtaining the financing needed by the Debtors as unsecured debt on an administrative priority basis was not a viable option at the time, especially from a third party who did not already have a financial interest in the Debtors to protect.  Moreover, the Debtors could not obtain adequate alternative financing terms more favorable than those to be provided by the DIP Lender under the DIP Credit Facility.  (Strehl Declaration ¶ 98)  Accordingly, the Debtors have satisfied the requirement of section 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

### 2. The DIP Credit Facility Is Necessary to Preserve the Assets of the Estates

34.    As discussed more fully below and in the Strehl Declaration, the proceeds of the DIP Credit Facility are necessary to preserve and maintain the value of the Debtors' estates and the creditors' interests therein.  (Id. at ¶¶ 96-97.)   In short, the Debtors need sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.  See In re Sun Healthcare Group, Inc., 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to, "permit the Debtors to continue to operate to preserve their estates").

### 3. The DIP Credit Agreement Terms

35.     The proposed terms of the DIP Credit Agreement are fair and reasonable under the circumstances.  (Strehl Declaration ¶ 100)   First and foremost, as discussed more fully above and in the Strehl Declaration, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available.  (Id. at ¶ 99)   The Debtors do not believe any other lender would be willing to provide an adequate financing facility as unsecured debt on an administrative priority basis.  (Id. at ¶ 98)   The Debtors carefully evaluated the proposed financing structure from the DIP Lender, engaged in extensive negotiations with the DIP Lender regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lender, and, eventually, agreed to the DIP Lender's proposal as the proposal best suited to the Debtors' needs.  (Id. at ¶ 99)   Indeed, the Debtors believe that the interest rates provided under the DIP Credit Agreement are very favorable for today's market. (Id.)  The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and preserve their going concern status.  (Id.)

36.     To illustrate further that the terms are fair, reasonable and adequate, the security interests and administrative expense claims granted to the DIP Lender will be subject to the Carve-Out.  In In re Ames Dep't Stores, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990) (requiring addition of a carve-out for professionals prior to approving the debtors' financing arrangement).

**MODIFICATION OF AUTOMATIC STAY ON LIMITED BASIS**

37.     The DIP Order provides for a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code, upon the occurrence of and during the continuation of an Event of Default, to permit the DIP Lender, by notice to the Debtors, the United States Trustee and any statutory committees appointed in the Cases, to take all or any of the following actions: (i) terminate the Financing and thereafter cease to make Loans to the Debtors (the date of any such termination, the "Termination Date"); (ii) declare the Loans then outstanding and all other DIP Obligations hereunder to be forthwith due and payable, whereupon the principal of the Loans together with accrued interest thereon and all other DIP Obligations of the Borrowers accrued hereunder and under any other Credit Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Credit Document to the contrary notwithstanding; and (iii) exercise any and all remedies under the Credit Documents and under applicable law available to the DIP Lender.  The Debtors respectfully submit that stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

38.     Should the Court grant the Motion and enter the DIP Order, to implement the DIP Credit Facility successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## INTERIM AUTHORIZATION

39.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to

obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after service of such motion. Fed. R. Bankr. P. 4001(c)(2). Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates, based on the business exigencies of individual cases. Id. In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames, 115 B.R. at 36 n.2. The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition financing on an interim basis as requested in this Motion is necessary to enable the Debtors to maintain ongoing operations and avert immediate and irreparable harm to their businesses.

## NOTICE

40.     Notice of this Motion has been provided to the Office of the United States Trustee for the Eastern District of Michigan, the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), counsel to the proposed DIP Lender, and all parties requesting notices pursuant to Bankruptcy Rule 2002. The Debtors submits that no other or further notice need be provided.

41.     No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  October 29, 2009

PEPPER HAMILTON LLP

/s/ Robert S. Hertzberg
Robert S. Hertzberg (P30261)
Ross A. Hoogerhyde (P72559)
100 Renaissance Center
Suite 3600
Detroit, MI 48243
Telephone:  313.259.7110
Facsimile:  313.259.7926
herzbergr@pepperlaw.com
hoogerhr@pepperlaw.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*