CREDIT AGREEMENT

between

RECTICEL INTERIORS NORTH AMERICA, LLC

and

RECTICEL NORTH AMERICA, INC.

as Borrowers,

and

RECTICEL N.V./S.A.

as Lender

Dated as of October 29, 2009

# TABLE OF CONTENTS

Section 1.    Definitions and Principles of Construction...............................................................1

    1.1    Defined Terms ..........................................................................................1
    1.2    Principles of Construction...........................................................................7

Section 2.    Amount and Terms of Credit. ...................................................................................7

    2.1    The Loans.................................................................................................7
    2.2    Notice of Borrowing ..................................................................................7
    2.3    Amount of Borrowings. ..............................................................................7
    2.4    Disbursement of Funds...............................................................................8
    2.5    Evidence of Obligations; Note.....................................................................8
    2.6    Interest....................................................................................................8
    2.7    Voluntary Termination of Unutilized Commitment ..........................................8

Section 3.    Scheduled Repayment; Prepayments; Net Payments. ....................................................8

    3.1    Scheduled Repayment.................................................................................8
    3.2    Voluntary Prepayments...............................................................................9
    3.3    Mandatory Prepayments; Commitment Termination. ........................................9
    3.4    Method and Place of Payment .....................................................................9
    3.5    Net Payments ...........................................................................................9

Section 4.    Conditions Precedent to the Initial Loan ...................................................................10

    4.2    Conditions Precedent to Loans ...................................................................11

Section 5.    Representations, Warranties and Agreements. ...........................................................12

    5.1    Legal Status.............................................................................................12
    5.2    Power and Authority .................................................................................13
    5.3    No Violation............................................................................................13
    5.4    Governmental Approvals ...........................................................................13
    5.5    Liens......................................................................................................13
    5.6    Litigation................................................................................................13
    5.7    Material Adverse Change ...........................................................................13
    5.8    Accounts ................................................................................................13
    5.9    Patents, Licenses, Franchises and Formulas. .................................................13
    5.10   Use of Proceeds.......................................................................................14
    5.11   Employee Benefit Plans .............................................................................14
    5.12   Labor Relations........................................................................................14
    5.13   Subsidiaries.............................................................................................14
    5.14   True and Complete Disclosure.....................................................................14
    5.15   Investment Company Act ...........................................................................14

5.16   Insurance ........................................................................................................14

Section 6.   Affirmative Covenants. ....................................................................................15

6.1   Information Covenants. .................................................................................15
6.2   Books and Records .......................................................................................15
6.3   Maintenance of Properties and Insurance ...................................................16
6.4   Maintenance of Existence; Corporate Franchises.......................................16
6.5   Compliance with Law ..................................................................................16
6.6   ERISA...........................................................................................................16
6.7   Performance of Obligations .........................................................................16
6.8   Taxes ............................................................................................................16
6.9   Use of Proceeds...........................................................................................16
6.10   Cash Concentration Requirements..............................................................17
6.11   Compliance with the Budget.......................................................................17
6.12   Further Assurances.......................................................................................17

Section 7.   Negative Covenants. ........................................................................................17

7.1   Liens.............................................................................................................17
7.2   Dividends .....................................................................................................17
7.3   Indebtedness.................................................................................................18
7.4   Capital Expenditures....................................................................................18
7.5   Advances, Investments and Loans ..............................................................18
7.6   Consolidations, Mergers, Purchases, Sales of Assets, etc ..........................18
7.7   Limitations on Modifications of Certain Agreements .................................18
7.8   ERISA ..........................................................................................................18
7.9   Nature of Business .......................................................................................18
7.10   Chapter 11 Claims.......................................................................................19
7.11   Use of Funds in Existing Accounts.............................................................19

Section 8.   Events of Default. ............................................................................................19

8.1   Payments......................................................................................................19
8.2   Representations.............................................................................................19
8.3   Notice of Event of Default; Negative Covenants ......................................19
8.4   Covenants.....................................................................................................19
8.5   Dismissal; Conversion ................................................................................19
8.6   Lifting of the Automatic Stay ......................................................................20
8.7   Credit Documents ........................................................................................20
8.8   The Orders....................................................................................................20
8.9   Chapter 11 Plan ...........................................................................................20
8.10   Judgments ....................................................................................................20
8.11   Change of Control........................................................................................20

Section 9.   Miscellaneous. .................................................................................................21

9.1   Payment of Expenses, etc ...........................................................................21
9.2   Appointment of Administrative Borrower....................................................21

| | | |
|---|---|---|
| 9.3 | Joint and Several Liability of the Borrowers. | 22 |
| 9.4 | Right of Setoff | 23 |
| 9.5 | Notices | 24 |
| 9.6 | Benefit of Agreement | 25 |
| 9.7 | Assignment of the Loans, etc | 25 |
| 9.8 | No Waiver; Remedies Cumulative | 25 |
| 9.9 | Calculations; Computations. | 26 |
| 9.10 | Governing Law; Submission to Jurisdiction; Venue. | 26 |
| 9.11 | Usury | 26 |
| 9.12 | Counterparts | 26 |
| 9.13 | Headings Descriptive | 27 |
| 9.14 | Amendment or Waiver | 27 |
| 9.15 | Entire Agreement | 27 |
| 9.16 | Survival | 27 |
| 9.17 | Waiver of Trial by Jury | 27 |

## CREDIT AGREEMENT

CREDIT AGREEMENT, dated as of October 29, 2009 between RECTICEL INTERIORS NORTH AMERICA, LLC, a Michigan limited liability company, ("RINA"), and RECTICEL NORTH AMERICA, INC., a Michigan corporation ("RUNA"; RINA and RUNA are individually a "Borrower" and collectively the "Borrowers"), and Recticel N.V./S.A., a corporation organized and existing under the laws of Belgium (the "Lender").

## W I T N E S S E T H:

WHEREAS, on October 29, 2009 (the "Filing Date"), the Borrowers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (as hereinafter defined) thereby commencing a chapter 11 Case (individually a "Case", collectively the "Cases") and each Borrower has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested authorization from the Bankruptcy Court to obtain post-petition financing pursuant to Section 364(c)(1), (2) and (3) of the Bankruptcy Code; and

WHEREAS, subject to and upon the terms and conditions herein set forth, the Lender is willing to make available to the Borrowers the credit facility provided for herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.     Definitions and Principles of Construction.

1.1     Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Administrative Borrower" shall have the meaning set forth in Section 9.2.

"Agreement" shall mean this Credit Agreement, as modified, supplemented, amended, or replaced from time to time.

"Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of Michigan or any other court having jurisdiction over the Cases from time to time.

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowers" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the incurrence of a Loan pursuant hereto.

"Borrowing Date" shall mean a date occurring on or after the Effective Date on which a Borrowing hereunder occurs.

"Budgeted Amount Outstanding" means, at any time of determination, the product of (a) the aggregate principal amount of the Loans projected to be outstanding in the Initial Budget for the applicable calendar month, multiplied by (b) 1.2; provided that in no event shall such amount exceed four million six hundred thirty one thousand dollars ($4,631,000).

"Business Day" shall mean for all purposes, any day except Saturday, Sunday and any day which shall be in New York, a legal holiday or a day on which banking institutions are authorized or required by Law or other government action to close in any such city.

"Case" shall have the meaning set forth in the Recitals.

"Cases" shall have the meaning set forth in the Recitals.

"Carve-Out" shall have the meaning provided in the Orders.

"Cash Receipts" shall mean all cash (including, without limitation, cash received in respect of checks, drafts, bank credits and other similar instruments, and receivables) received by the Borrowers from any source.

"Change of Control" shall mean that Lender fails to directly or indirectly (i) beneficially own and control at least 51% or more of the membership interests of the Borrowers (ii) be able to elect a majority of the managers of the Borrowers, or (iii) control the operations of the Borrowers.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean the "Collateral" under the Security Agreement.

"Commitment" shall mean $10,000,000, to be used pursuant to the terms hereof.

"Comparative Budget" shall have the meaning set forth in Section 6.1(b).

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Reorganization Plan of each Borrower that is confirmed pursuant to an order of the Bankruptcy Court.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner,

whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the holder of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Credit Documents" shall mean and include (i) this Agreement, (ii) the Note, (iii) the Security Agreement, and (iv) all other documents and instruments executed and delivered by the Borrowers in connection with any of the foregoing.

"Customer Contracts" shall mean and include any all agreements, purchase orders and terms and conditions related to the sale of manufactured goods by any of the Borrowers to Johnson Controls, Inc. and/or Inteva Products, LLC or any of their affiliates.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Effective Date" shall mean the date on which this Agreement is executed and delivered by the Borrowers and the Lender.

"Employment Benefits Plan" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA subject to Title I of ERISA or any "plan" subject to Section 4975 of the Code.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" shall have the meaning set forth in Section 8.

"Existing Accounts" shall have the meaning set forth in Section 5.8.

"Final Order" shall have the meaning set forth in Section 4.2(f).

"Filing Date" shall have the meaning set forth in the Recitals.

"GAAP" shall mean generally accepted accounting principles in the United States, from time to time, consistently applied during a relevant period.

"Governmental Approval" shall mean any authorization, approval, consent, license, concession, ruling, permit, tariff, rate, certification, order, validation, exemption, waiver or variance of or from any Governmental Authority, or any registration, filing or recording with, or any notification to, any Governmental Authority.

"Governmental Authority" shall mean any administrative department, agency, commission, bureau, board, regulatory authority, instrumentality, corporation or other governmental body, entity, judicial or administrative body or court (including, without limitation, banking and taxing authorities), of, or owned or controlled by the United States, any state thereof or any other foreign or domestic jurisdiction or any political subdivision of any of the foregoing.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person (x) evidenced by any notes, bonds, debentures or similar instruments made or issued by such Person, (y) for borrowed money or (z) for the deferred purchase price of property or services, (ii) the face amount of all letters of credit issued for the account of such Person and all drafts drawn thereunder, (iii) all liabilities secured by any Lien on any property owned by such Person, whether or not such liabilities have been assumed by such Person, (iv) the aggregate amount required to be capitalized under GAAP under leases under which such Person is the lessee, (v) all obligations and liabilities of such Person arising under or pursuant to any interest rate 'swap', 'cap', 'collar' or other interest rate protection arrangement, and (vi) all Contingent Obligations of such Person.

"Initial Budget" shall have the meaning set forth in Section 4.1(h).

"Interest Margin" shall mean ½ % per annum.

"Interim Order" shall have the meaning set forth in Section 4.1(b).

"Law" shall mean any constitution, treaty, convention, statute, law, code, act, ordinance, decree, order, injunction, rule, regulation, resolution, guideline, interpretation, direction, policy, restriction, request (whether or not in any such case having the force of law), or judicial, administrative or arbitral decision, whether foreign or domestic.

"Lender" shall have the meaning provided in the first paragraph of this Agreement, and shall include any Person to whom the Lender assigns all or any portion of its interest as Lender in respect of any Loan or the Credit Documents.

"LIBOR" means the rate per annum, determined by the Lender utilizing such electronic or other quotation sources as it considers appropriate, to be the rate at which U.S Dollar deposits (for delivery on the first day of the requested Borrowing) are offered to major banks in the London interbank market two (2) Business Days prior to the commencement of the requested Borrowing, for a six (6) month period and in the amount of the Borrowing requested by Administrative Borrower in accordance with this Agreement, which determination shall be conclusive in the absence of manifest error.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Loan" shall have the meaning set forth in Section 2.1.

"Material Adverse Effect" shall mean any material adverse effect (other than an orderly liquidation of the Borrowers approved by the Lender and other than those which customarily occur as a result of events leading up to and following the commencement of a case under chapter 11 of the Bankruptcy Code and the commencement of the Case) on (i) the condition (financial or otherwise), business, operations, assets, revenues, properties or prospects of the Borrowers, or any material impairment of the value of the Borrowers or the ability of the Borrowers to conduct their business as conducted on the date hereof, in each case, taken as a whole, or (ii) the ability of either of the Borrowers to perform any of its respective obligations under the Credit Documents, or (iii) the validity or enforceability of any of the Credit Documents or the rights or remedies of the Lender thereunder.

"Material Adverse Change" shall mean any facts, circumstances, occurrence or event that could reasonably be expected to result in a Material Adverse Effect.

"Maturity Date" shall mean April 30, 2010.

"Net Proceeds" shall mean, in respect of any sale of assets outside the ordinary course of a Borrower's business, the proceeds of such sale after the payment of or reservation for expenses that are directly related to (or the need for which arises as a result of) the sale, including, but not limited to, related severance costs, taxes payable, brokerage commissions, professional expenses, other similar costs that are directly related to the sale, and the amount secured by valid and perfected Liens, if any, that are senior to the Liens on such assets held by the Lender.

"Note" shall have the meaning set forth in Section 2.5(a).

"Notice of Borrowing" shall have the meaning set forth in Section 2.2.

"Orders" shall mean the Interim Order and the Final Order.

"Obligations" shall mean all amounts owing to the Lender pursuant to the terms of this Agreement or any other Credit Document (including, without limitation, principal, interest, fees, expenses and indemnities).

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Liens" shall have the meaning set forth in Section 7.1.

"Person" shall mean any individual, partnership, limited partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) either of the Borrowers or any Subsidiary of a Borrower, and each such plan for the five year period immediately following the latest date on which a Borrower, or a Subsidiary of a Borrower maintained, contributed to or had an obligation to contribute to such plan.

"Prepayment Date" shall mean the thirtieth day following the entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such thirty (30) day period.

"Reorganization Plan" shall mean a chapter 11 plan in the Cases.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"Responsible Officer" shall mean each Borrower's chief executive officer, and its Chief Financial Officer.

"Restricted Account" shall have the meaning set forth in Section 6.10(b).

"Security Agreement" shall have the meaning set forth in Section 4.1(g).

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"Superpriority Claim" shall mean a claim against either or both of the Borrowers in the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" shall have the meaning set forth in Section 3.5.

"Termination Date" shall mean the earlier to occur of (i) the Prepayment Date, (ii) the Maturity Date, (iii) the Consummation Date, (iv) the date of consummation of a sale of all or substantially all of the capital stock or assets of either of the Borrowers, unless such sale has

MIAMI 825430 v10 (2K)

been approved in writing by the Lender in advance and (v) the date on which the maturity of the Loans shall be accelerated as a result of the occurrence of an Event of Default.

"United States" and "U.S." shall each mean the United States of America.

"Unutilized Commitment" shall mean, at any time, the Commitment of the Lender at such time less the aggregate principal amount of the Loans outstanding at the relevant date of determination.

1.2 Principles of Construction. All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

Section 2.    Amount and Terms of Credit.

2.1 The Loans. Subject to and upon the terms and conditions set forth herein, the Lender agrees, at any time and from time to time prior to the Termination Date, to make loans (each, a "Loan"; and together with all other Loans hereunder, the "Loans"). The Lender shall not have any obligation to make any Loan to the Borrowers if, after giving effect to any such Loan, the aggregate amount of all Loans outstanding would exceed the lesser of (a) the Budgeted Amount Outstanding for the calendar month in which Borrowers request any such Loan, and (b) the Commitment. The Lender may (at the Lender's sole and complete discretion), but shall not be required to, make Loans to the Borrowers in excess of the Budgeted Amount Outstanding up to the Commitment, if requested by the Borrowers. The Loans are available only on the terms and subject to the conditions specified hereunder. Within the foregoing limit and subject to the terms and conditions of this Agreement, the Borrowers may borrow, repay, and reborrow the principal amount of the Loans at any time prior to the Termination Date.

2.2 Notice of Borrowing. Whenever the Borrowers desire to make a Borrowing hereunder, the Administrative Borrower shall give the Lender not less than one Business Day prior notice thereof; provided that such notice shall be deemed to have been given on a certain day only if given before 12:00 noon (New York time) on such day. Each such notice (each, a "Notice of Borrowing") shall be irrevocable and shall be given by the Administrative Borrower in the form of Exhibit A, appropriately completed to specify: (a) the principal amount of the Loan to be made pursuant to such Borrowing; and (b) the date of such Borrowing (which shall be a Business Day).

2.3 Amount of Borrowings.

(a) The principal amount of each Borrowing pursuant hereto shall be in an amount not less than $250,000, and in integral multiples of $50,000 in excess thereof.

(b) The principal amount of each Borrowing pursuant hereto shall not exceed the lesser of the (i) then Unutilized Commitment, and (ii) Budgeted Amount Outstanding for the month in which the Borrowers request such Borrowing minus the aggregate amount of all Loans then outstanding.

2.4     Disbursement of Funds.  Subject to the terms and subject to the conditions hereof, no later than 12:00 noon (New York time) on each Borrowing Date, the Lender shall make available the amount of the requested Loans to the Borrowers by deposit to _____ account, or to such other account as the Borrowers shall have requested pursuant to a written notice to the Lender not later than one Business Day prior to the relevant Borrowing Date.

2.5     Evidence of Obligations; Note.

(a) The Borrowers' joint and several obligation to pay the principal of, and interest on, the Loans shall be evidenced by a promissory note duly executed and delivered by the Borrowers substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (the "Note").

(b) The Lender will note on its internal records the amount of the indebtedness of the Borrowers to the Lender as a result of the Loans, including the amounts of principal, interest and other amounts payable and paid to the Lender from time to time under this Agreement and the Note.  Such internal records shall constitute *prima facie* evidence of the existence and amounts of the Loans and other Obligations therein noted and, absent manifest error shall be deemed true and correct; provided, however, that the failure of the Lender to make such notations, or any error therein, shall not in any manner affect the obligations of the Borrowers to repay or pay the Loans in accordance with the terms of this Agreement.

2.6     Interest.

(a) The Borrowers agree to pay interest as set forth in clause (c) below in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made available to the Borrowers until such Loans are indefeasibly paid in full, at a rate *per annum* which shall be equal to the sum of (i) LIBOR in effect from time to time, plus (ii) the Interest Margin.

(b) Overdue principal and, to the extent permitted by Law, overdue interest in respect of each Loan and any other overdue amount payable by the Borrowers hereunder or under any other Credit Document shall bear interest at a rate *per annum* equal to the sum of (i) LIBOR in effect from time to time, plus (ii) 1%.

(c) Accrued (and theretofore unpaid) interest shall be payable in respect of each Loan (i) on the Termination Date, (ii) to the extent set forth in Section 3.3, on any prepayment, and (iii) at any time on demand after the Termination Date.

2.7     Voluntary Termination of Unutilized Commitment.  The Borrowers shall have the right upon the delivery of written notice to the Lender to terminate the then Unutilized Commitment in whole or in part.  Such notice shall be irrevocable.

Section 3.     Scheduled Repayment; Prepayments; Net Payments.

3.1     Scheduled Repayment.  On the Termination Date, the Borrowers shall pay to the Lender all outstanding principal of the Loans, together with all accrued and unpaid interest

thereon and all other Obligations, in cash and the Commitment shall be terminated without the need of any further action or writing.

3.2     Voluntary Prepayments.  The Borrowers shall have the right to prepay the Loans, without premium or penalty, in whole or in part, at any time and from time to time.

3.3     Mandatory Prepayments; Commitment Termination.

(a) On the date of receipt of any Net Proceeds from the sale of any assets of either of the Borrowers, the Borrowers shall pay to the Lender an amount equal to such Net Proceeds, which amount shall be applied to the Obligations as follows: (i) first, to the payment of any fees or expenses owed to the Lender, (ii) second, to the payment of accrued and unpaid interest on the Loans, and (iii) third, to the prepayment of the principal amount of the Loans.

(b) If on each Monday of any month, commencing on November 16, 2009, the aggregate cash of the Borrowers as of such date (net of float), whether held in the Existing Accounts or in the Restricted Account, as the case may be, shall exceed one hundred thousand dollars ($100,000), the Borrowers shall pay to the Lender an amount equal to 100% of the excess thereof.  Such prepayment amount shall be applied to the Obligations as follows: (i) first, to the payment of any fees or expenses owed to the Lender, (ii) second, to the payment of accrued and unpaid interest on the Loans, and (iii) third, to the prepayment of the principal amount of the Loans.

3.4     Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement or the Note shall be made to the Lender not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at such place as the Lender shall from time to time specify in writing to the Borrowers.  Whenever any payment to be made hereunder or under the Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall continue to accrue and be payable on the date of such payment.

3.5     Net Payments.  All payments made by the Borrowers hereunder or under the Note will be made without setoff, counterclaim or other defense of any kind.  All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income or profits of the Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of the Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect thereto (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").  If any Taxes are so levied or imposed, the Borrowers agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under the Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in the Note.  If any

amounts are payable in respect of Taxes pursuant to the preceding sentence, the Borrowers agree to reimburse the Lender, upon the written request of the Lender, for taxes imposed on or measured by the net income or profits of the Lender pursuant to the laws of the jurisdiction in which the principal office or applicable lending office of the Lender is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which the principal office or applicable lending office of the Lender is located and for any withholding of income or similar taxes as the Lender shall determine are payable by, or withheld from, the Lender in respect of such amounts so paid to or on behalf of the Lender pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of the Lender pursuant to this sentence. The Borrowers will furnish to the Lender within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by the Borrowers. The Borrowers jointly and severally agree to indemnify and hold harmless the Lender, and to reimburse the Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by the Lender.

Section 4.   <u>Conditions Precedent</u>.

4.1   <u>Conditions Precedent to the Initial Loan</u>. The obligation of the Lender to make the initial Loan hereunder is subject, at the time of such initial Loan, to the satisfaction of the following conditions, as determined by the Lender:

(a) <u>Execution of Agreement; Note</u>. The Effective Date shall have occurred and there shall have been delivered to the Lender the Note duly executed by the Borrowers in the amount, with the maturity and as otherwise provided herein.

(b) <u>Interim Order</u>. An interim order in the form of <u>Exhibit C</u> hereto, as may be modified only with the approval of the Lender, (the "<u>Interim Order</u>") shall have been entered by the Bankruptcy Court (which Interim Order shall have been entered no later than 10 Business Days after the commencement of the Cases), shall remain in full force and effect, and shall not have been stayed, reversed, amended, vacated or modified in any respect without the prior written consent of the Lender; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their obligations hereunder or under the Credit Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c) <u>First Day Orders</u>. All of the "first day orders" entered by the Bankruptcy Court at or around the commencement of the Case shall be satisfactory in form and substance to the Lender.

(d) <u>No Default; Representations and Warranties</u>. At the time of the initial Borrowing and after giving effect thereto, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in any other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Borrowing (except for representations or warranties made expressly as of a given date, which shall continue to be true and correct in all material respects as of such given date).

(e) <u>Notice of Borrowing</u>. The Lender shall have received a Notice of Borrowing with respect to the initial Loans to be made.

(f) <u>Proceedings</u>. All corporate and legal proceedings and all instruments and agreements in connection with the transactions contemplated in this Agreement and the other Credit Documents shall be satisfactory in form and substance to the Lender, and the Lender shall have received all information and certified copies of all documents and papers and Governmental Approvals, if any, which the Lender reasonably may request in connection therewith, such documents and papers where appropriate to be certified by proper corporate, or Governmental Authorities, as the case may be.

(g) <u>Security Agreement</u>. The Borrowers shall have duly authorized, executed and delivered a Security Agreement substantially in the form of <u>Exhibit D</u> (as modified, supplemented or amended from time to time, the "<u>Security Agreement</u>").

(h) <u>Initial Budget</u>. The Lender shall have received from the Borrowers an initial budget substantially in the form of <u>Exhibit E</u>, which shall be satisfactory in form and substance to the Lender in its sole discretion (the "<u>Initial Budget</u>"). The Initial Budget shall set forth in reasonable detail (i) the Borrowers' anticipated Cash Receipts and disbursements for the period through the Maturity Date and (ii) the anticipated uses of the Commitment.

(i) <u>Litigation</u>. No litigation, action, suit, investigation, claim or proceeding shall be pending or threatened with respect to this Agreement or any other Credit Document, or the transactions contemplated hereby or thereby.

(j) <u>No Material Adverse Change</u>. No Material Adverse Change shall have occurred since September 30, 2009, and the Lender shall not have become aware of any facts or circumstances not previously known by it which the Lender shall reasonably determine has, or could reasonably be expected to have, a Material Adverse Effect.

(k) <u>Rejection Order</u>. Not later than ten (10) days after the Filing Date, an order in form and substance satisfactory to the Lender in its sole and absolute discretion authorizing the rejection of the Customer Contracts (the "<u>Rejection Order</u>") shall have been entered by the Bankruptcy Court, which order shall be in full force and effect, and shall not have been stayed, reversed, amended, vacated or modified in any respect; and, nor shall such order be the subject of any appeal, motion for reconsideration, motion to vacate or similar request for relief.

4.2     <u>Conditions Precedent to Loans</u>. The obligation of the Lender to make any Loan other than the initial Loan hereunder is subject, at the time of such Loan, to the satisfaction of the following conditions, as determined by the Lender:

(a) <u>No Default; Representations and Warranties</u>. At the time of the Borrowing and also after giving effect thereto, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Borrowing (except for representations or warranties made expressly as of a given date, which shall continue to be true and correct in all material respects as of such given date).

(b) <u>Litigation</u>. No litigation, action, suit, investigation, claim or proceeding shall be pending or threatened with respect to this Agreement or any other Credit Document, or the transactions contemplated hereby or thereby.

(c) <u>Notice of Borrowing</u>. The Lender shall have received a Notice of Borrowing with respect to the Loans to be made on such Borrowing Date.

(d) <u>No Material Adverse Change</u>. No Material Adverse Change shall have occurred since the immediate preceding Borrowing Date and the Lender shall not have become aware of any facts or circumstances not previously known by it, which the Lender shall reasonably determine has, or could reasonably be expected to have, a Material Adverse Effect.

(e) <u>Comparative Budget</u>. The Lender shall have received the most recent Comparative Budget required to be delivered by the Borrowers pursuant to Section 6.1(b).

(f) <u>Final Order</u>. Not later than thirty (30) days after the date of entry of the Interim Order, an order in form and substance satisfactory to the Lender in its sole and absolute discretion authorizing the Loans under this Agreement (the "<u>Final Order</u>") shall have been entered by the Bankruptcy Court, which order shall be in full force and effect, and shall not have been stayed, reversed, amended, vacated or modified in any respect without the prior written consent of the Lender; and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrowers of any of their obligations hereunder or under the Credit Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(g) <u>Rejection Order.</u> Not later than ten (10) days after the Filing Date, the Rejection Order shall have been entered by the Bankruptcy Court, which order shall be in full force and effect, and shall not have been stayed, reversed, amended, vacated, or modified in any respect; and, nor shall such order be the subject of any appeal, motion for reconsideration, motion to vacate or similar request for relief.

The request by the Borrowers for, and the acceptance by the Borrowers of, any Loan shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.2 have been satisfied at that time.

Section 5.     <u>Representations, Warranties and Agreements.</u>

In order to induce the Lender to enter into this Agreement and to make the Loans, the Borrowers, hereby make the following representations, warranties and agreements as of the date hereof and as of the date of each Loan, each of which shall survive the execution and delivery of this Agreement and the Note and the making of the Loans.

5.1     <u>Legal Status</u>. Each Borrower is a duly organized and validly existing company in good standing under the laws of the state of its organization or incorporation. Each Borrower has the power and authority to own its property and assets, transact the business in which it is engaged, do all things necessary or appropriate in respect of the business in which it is engaged, and consummate the transactions contemplated by the Credit Documents.

5.2     Power and Authority.   Each Borrower has the power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary corporate action to authorize the execution, delivery and performance by it of each such Credit Document.   Each Borrower has duly executed and delivered this Agreement, and this Agreement constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization or other similar laws relating to or limiting creditors' rights generally or by general equity principles.   Each Borrower has duly executed and delivered each of the Credit Documents to which it is party, and each such Credit Document, constitutes, its legal, valid and binding obligation enforceable in accordance with its terms.

5.3     No Violation.   Neither the execution, delivery nor performance by the Borrowers of the Credit Documents to which they are a party, nor compliance by the Borrowers with the terms and provisions thereof, nor the use of the proceeds of the Loans as contemplated herein, will contravene any provision of any Law.

5.4     Governmental Approvals.   No Governmental Approval (except as have been obtained or made and are in full force and effect), is required to authorize, or is required in connection with (i) the execution, delivery and performance by the Borrowers of any Credit Document to which they are party or (ii) the legality, validity, binding effect or enforceability against the Borrowers of any such Credit Document.

5.5     Liens.   Except as permitted by Section 7.1, there are no Liens of any nature whatsoever on any assets of the Borrowers.   The Borrowers are not party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a Lien on any asset of the Borrowers or otherwise result in a violation of this Agreement other than the Liens granted to the Lender pursuant to the Credit Documents.

5.6     Litigation.   There is no litigation, action, suit, investigation, claim or proceeding pending or threatened with respect to this Agreement or any other Credit Document or the transactions contemplated hereby or thereby.

5.7     Material Adverse Change.   Nothing has occurred, or has been disclosed to the Lender by the Borrowers since the Filing Date, which would indicate that a Material Adverse Change has occurred.

5.8     Accounts.   Other than the accounts listed on Schedule 5.8 hereto (the "Existing Accounts"), the Borrowers have no other bank accounts or similar arrangements with any Person.

5.9     Patents, Licenses, Franchises and Formulas.

(a) The Borrowers own all the patents, trademarks, permits, service marks, trade names, copyrights, licenses, franchises and formulas, or rights with respect to the foregoing, and have obtained assignments of all leases and other rights of whatever nature, necessary for the present conduct of its respective business, without any known conflict with the rights of others

which, or the failure to obtain which, as the case may be, could result in a Material Adverse Effect.

(b) Without limiting the foregoing, the Borrowers own all of the right, title and interest in the Collateral described in the Security Agreement, without any conflict with the rights of any other Person and has not assigned, licensed, transferred, conveyed, pledged, hypothecated or granted a security interest in such Collateral to any Person other than the Lender, except for Permitted Liens. All of the Collateral described therein has been to the extent indicated in the Security Agreement, registered (or registration has been applied for) in the name of the Borrowers with the appropriate Governmental Authority. To the knowledge of the Borrowers, no Person is infringing upon the rights of the Borrowers in or to any of the Collateral described therein.

5.10  Use of Proceeds. The net proceeds of the Loans will be used by the Borrowers as set forth in Section 6.9.

5.11  Employee Benefit Plans. Except as set forth on Schedule 5.11, the Borrowers have never maintained or contributed to (or had an obligation to contribute to) any Employment Benefits Plan.

5.12  Labor Relations. The Borrowers are not engaged in any unfair labor practice that could be expected to have a Material Adverse Effect.

5.13  Subsidiaries. Other than RUNA's ownership of RINA, the Borrowers do not have any Subsidiaries or own any other equity interest in any Person other than capital stock of a publicly traded corporation representing less than 5% of the outstanding capital stock of such corporation.

5.14  True and Complete Disclosure. All factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of the Borrowers (including, without limitation, information in the Credit Documents), for purposes of or in connection with this Agreement or any transaction contemplated herein or in any Credit Document is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of any Borrower to the Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not materially incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading at such time in light of the circumstances under which such information was provided.

5.15  Investment Company Act. Neither of the Borrowers is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

5.16  Insurance. All policies of insurance of any kind or nature owned by or issued to the Borrowers, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect and are of a nature and provide such coverage (including self insurance) as is customarily carried by companies of the size and character of the Borrowers.

Section 6.    Affirmative Covenants.

Except as otherwise agreed to by the Lender in writing in advance, from and after the date hereof and until the Loans and the Note, together with interest and all other Obligations incurred hereunder and thereunder, are paid in full:

6.1    Information Covenants.

(a) Notice of Default or Litigation, etc. The Borrowers will promptly, but in no event later than three Business Days after an officer of either Borrower obtains knowledge thereof, furnish, or cause to be furnished, to the Lender notice of (i) the occurrence of any event which constitutes a Default or Event of Default, (ii) a Reportable Event, (iii) any litigation or governmental proceeding pending or threatened against the Borrowers which, if determined adversely, materially impairs the rights of the Lender under any of the Credit Documents or has or may reasonably be expected to have a Material Adverse Effect or (iv) any other event which could have a Material Adverse Effect.

(b) Periodic Reports. The Borrowers shall provide to the Lender the following reports in such reasonable detail and form as the Lender may from time to time require:

(i) within 10 days after the end of each month a budget for each Borrower and on a consolidated basis which shall compare all actual Cash Receipts and expenditures on a line item basis for the previous month to the Cash Receipts and expenditures set forth for each such line item in the Initial Budget for such month and on a cumulative basis (each a "Comparative Budget"). The Borrowers shall deliver to the Lender with each Comparative Budget a reasonably detailed analysis of the variances between the actual Cash Receipts and expenditures and the Cash Receipts and expenditures set forth in the Initial Budget;

(ii) within 10 days after the end of each month, a consolidated balance sheet as of the end of such month and the related consolidated statement of income for such month and on a year to date basis;

(iii) within 30 days of the end of each fiscal year, on a consolidated basis, a balance sheet as at the end of such year and the related statements of income, cash flows and changes in stockholders' equity for such year; and

(iv) such other information or documents (financial or otherwise) as the Lender may reasonably request from time to time including, without limitation, information relative to the withdrawal and application of funds from the Existing Accounts and Restricted Account (if applicable) and compliance by the Borrowers with the Budget.

6.2    Books and Records. Each Borrower will keep proper books of record and account in which full, true and correct entries, in conformity with applicable Law and in conformity with GAAP, will be made of all business dealings and transactions in relation to its financial activities. In particular, the Borrowers shall maintain proper books of record and account of Borrowings and the use by the Borrowers of the proceeds of any Borrowing. The

Borrowers will, and will cause each of its respective agents and representatives to meet with officers and designated representatives or agents of the Lender at all reasonable times and to such reasonable extent as the Lender may request, to discuss the affairs, finances and accounts of the Borrowers, and be advised as to the same by, the officers, representatives and agents of the Borrowers.

6.3     Maintenance of Properties and Insurance.  Each Borrower will keep all of its non-financial properties and assets in good and working order and condition and insured with financially sound and reputable insurance companies in such amounts and against such risks (including, without limitation, insurance with respect to environmental hazards) as is generally maintained in accordance with good business practices by businesses similarly situated and furnish to the Lender, upon written request, full information as to the insurance carried.

6.4     Maintenance of Existence; Corporate Franchises.  Each Borrower will do or cause to be done, all things necessary to (i) preserve and maintain its existence and good standing in the jurisdiction of its organization, (ii) qualify and remain qualified in each jurisdiction in which such qualification is required and in which failure to do so would result in a Material Adverse Effect, and (iii) keep in full force and effect its existence and its material rights, franchises, licenses and patents.

6.5     Compliance with Law.  Each Borrower will comply with all applicable Laws of, and all applicable restrictions imposed by, all Governmental Authorities, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect.

6.6     ERISA.  Each Plan maintained by the Borrowers (and each related trust, insurance contract or fund) shall be in substantial compliance with its terms and with all applicable Laws, including without limitation ERISA and the Code.

6.7     Performance of Obligations.  The Borrowers will perform all of their obligations under (i) each Credit Document to which it is a party, and (ii) except where failure to so perform could not reasonably be expected to result in a Material Adverse Effect, the terms of each other agreement, mortgage, indenture, security agreement, and other debt instrument by which they are bound.

6.8     Taxes.  Subject to any limitation imposed by the Bankruptcy Code, the Borrowers will pay and discharge or cause to be paid and discharged all applicable post-petition taxes (including stamp taxes), assessments and governmental charges or levies imposed upon them or upon their income or profits or upon any of its property, real, personal or mixed or upon any part thereof, when due.

6.9     Use of Proceeds.  The Borrowers shall use the proceeds of the Loans made hereunder as set forth in the Initial Budget for the applicable calendar month.  The Borrowers may make monthly aggregate expenditures in excess of the aggregate expenditures projected in the Initial Budget for such month up to the sum of (a) 20% of the aggregate amount set forth in the Initial Budget for such month plus (b) the amount by which the aggregate projected

expenditures for all prior months exceeds the actual aggregate expenditures for such prior months; provided that, such expenditures are otherwise permitted by this Agreement.

6.10 <u>Cash Concentration Requirements</u>.

(a) The Borrowers shall maintain and deposit all Cash Receipts in one or more of the Existing Accounts.

(b) Upon request of the Lender, the Borrowers shall (i) create a centralized account (the "<u>Restricted Account</u>") into which all Cash Receipts of the Borrowers shall be deposited on a daily basis, (ii) instruct all account debtors of the Borrowers to make payment in respect of all accounts receivable owing to the Borrowers directly to the Restricted Account, and (iii) instruct all of the Responsible Officers of each Borrower to make daily deposits of all Cash Receipts of the Borrowers in the Restricted Account. Upon request of the Lender, the Borrowers shall provide to the Lender any bank statements or other information for the Restricted Account.

(c) Except as provided in this Section 6.10, the Borrowers shall not establish any other bank account or similar arrangement with any Person without the prior written consent of the Lender.

6.11 <u>Compliance with the Initial Budget</u>. Subject to Section 6.9, the Borrowers will conduct their business in accordance with the Initial Budget.

6.12 <u>Further Assurances</u>. The Borrowers will, at their own expense, (i) make, execute, endorse, acknowledge, file and/or deliver to the Lender from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments relating to, and (ii) take or cause to be taken such further actions and steps relating to, (x) the Collateral, and/or (y) the other agreements, covenants and transactions provided for or contemplated herein or in the other Credit Documents, in any such case, as the Lender may reasonably require.

Section 7. <u>Negative Covenants</u>.

Except as otherwise agreed to by the Lender in writing and in advance, from and after the date hereof and until the Loans and the Note, together with interest and all other Obligations (other than contingent indemnification obligations) incurred hereunder and thereunder, are paid in full:

7.1 <u>Liens</u>. The Borrowers shall not agree to create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real, personal or mixed, tangible or intangible) of the Borrowers, whether now owned or hereafter acquired, except for Liens set forth in <u>Schedule 7.1</u> hereto and Liens that have been validly created and perfected under applicable Law prior to the Effective Date (collectively, the "<u>Permitted Liens</u>") and the Liens created pursuant to the Credit Documents.

7.2 <u>Dividends</u>. The Borrowers will not declare or pay any dividends, or return any capital, to its respective shareholders or authorize or make any other distribution, payment or

delivery of property or cash to their respective shareholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for any consideration, any shares of any class of its capital stock or interest of any of its shareholders, in each case now or hereafter outstanding (or any options or warrants issued by the Borrowers with respect to its capital stock) or set aside any funds for any of the foregoing purposes.

7.3    Indebtedness.  The Borrowers will not contract, create, incur, assume or suffer to exist any Indebtedness other than operating leases and trade liabilities incurred in the ordinary course of business.

7.4    Capital Expenditures.  The Borrowers will not make any new expenditure for fixed or capital assets (including, without limitation, expenditures for new maintenance and repairs which should be capitalized, including new capitalized lease obligations, in each case, in accordance with GAAP) without prior written approval from the Lender.

7.5    Advances, Investments and Loans.  The Borrowers will not, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person or otherwise form, organize or operate any Subsidiaries, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, except that the Borrowers may acquire and hold receivables owing to it, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary commercial practice.

7.6    Consolidations, Mergers, Purchases, Sales of Assets, *etc.*  The Borrowers will not wind up, liquidate or dissolve their affairs or enter into any transaction of consolidation or merger with or into any other Person, sell, convey, assign, transfer, lease or otherwise dispose of, directly or indirectly, all or any material part of their property or assets (or agree to do any of the foregoing at any future time).

7.7    Limitations on Modifications of Certain Agreements.  No Borrower shall (i) amend, modify or change, or permit the amendment, modification or change of, any provision of its respective articles of incorporation, bylaws, articles of organization or operating agreement, (ii) amend, modify or change, or permit the amendment, modification or change of, any provision of any agreement entered into by the Borrowers, with respect to its membership interests or shares of stock, or (iii) enter into any new agreement with respect to its membership interests or shares of stock.

7.8    ERISA.  The Borrowers shall not establish or permit to be established any new Employment Benefits Plan or amend or modify any existing Employment Benefit Plan.

7.9    Nature of Business.  The Borrowers will not modify or alter in any material respect the nature and type of their business as conducted as of the Filing Date or the manner in which such business is conducted, except as otherwise required by the Bankruptcy Code or an orderly liquidation of the Borrowers' assets with the prior written consent of the Lender.

7.10    Chapter 11 Claims. The Borrowers will not incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Lender against the Borrowers hereunder, except for the Carve-Out.

7.11    Use of Funds in Existing Accounts. The Borrowers will not withdraw or otherwise utilize any funds held in the Existing Accounts or the Restricted Account (if applicable) for any purpose other than to pay bona fide working capital, business, professional and reorganization expenses incurred by the Borrowers in the ordinary course of business and as specifically set forth in the Initial Budget. Notwithstanding the preceding sentence, the Borrowers monthly aggregate expenditures may exceed the aggregate expenditures projected in the Initial Budget for such month up to the sum of (a) 20% of the aggregate amount set forth in the Initial Budget for such month plus (b) the amount by which the aggregate projected expenditures for all prior months exceeds the actual aggregate expenditures for such prior months; provided that, such expenditures are otherwise permitted by this Agreement.

Section 8.    Events of Default.

Upon the occurrence of any of the following specified events (each an "Event of Default"):

8.1    Payments. The Borrowers shall default in the payment when due of any principal or interest of any Loan or the Note, or default in the payment when due of any other Obligation under the Credit Documents; or

8.2    Representations. Any representation, warranty or statement made by the Borrowers in any Credit Document or in any certificate delivered pursuant to any Credit Document shall prove to be untrue in any material respect on the date as of which made or at any time thereafter in which any of the Obligations remains outstanding; or

8.3    Notice of Event of Default; Negative Covenants. A Borrower shall default in the due performance or observance by it of any covenant, condition or agreement contained in Sections 6.1(a), 6.1(b)(i), 6.9, 6.11, or 7.1 through 7.11.

8.4    Covenants. Except as otherwise provided in this Section 8, a Borrower shall default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document and, if such default is capable of being remedied, such default continues unremedied for more than ten (10) days; or

8.5    Dismissal; Conversion. Either Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a Responsible Officer or an examiner under Section 1106(b) of the Bankruptcy Code shall be appointed in either Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; or an application shall be filed by a Borrower for the approval of any other Superpriority Claim (other than the Carve-Out) in either Case which is pari passu with or senior to the claims of the Lender against the Borrowers hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim; or

8.6     Lifting of the Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrowers which has a value in excess of $20,000 in the aggregate; or

8.7     Credit Documents. Any Credit Document shall cease to be in full force and effect or shall cease to grant to the Lender the Liens, rights, powers and privileges purported to be created thereby, or any Borrower shall so assert in any pleading filed in any court; or

8.8     The Orders. An order shall be entered reversing, amending, supplementing, staying for a period in excess of 10 days, vacating or otherwise modifying the Interim Order or the Final Order without the prior written consent of the Lender; or

8.9     Chapter 11 Plan. Any Borrower shall file any chapter 11 plan, or support any filed chapter 11 plan, which is not supported by the Lender or which does not repay all Obligations to the Lender in full in cash on or before the Termination Date; or

8.10     Judgments. One or more judgments, awards or decrees by any court, arbitrator or Governmental Authority as to any post-petition obligation shall be entered on or after the Effective Date against any Borrower involving in the aggregate a liability (not paid or fully covered by insurance) in excess of $20,000 and the enforcement thereof shall not be stayed; there shall be rendered against the Borrowers a non-monetary judgment with respect to a post-petition event which causes or would reasonably be expected to cause a Material Adverse Effect; or

8.11     Variance from Initial Budget. The Borrowers actual cumulative aggregate expenditures for the period beginning on the date hereof and ending on the last day of each calendar month exceed the cumulative aggregate amount projected in the Initial Budget for such period by more than twenty percent (20%).

8.12     Change of Control. A Change of Control shall occur;

then, and in every such event and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, the Lender may by notice to the Borrowers (with a copy to counsel for the Official Creditors' Committee appointed in each Case and to the United States Trustee for the Eastern District of Michigan), take one or more of the following actions, at the same or different times: (i) terminate forthwith the Commitment; (ii) declare the Loans then outstanding and all other Obligations hereunder to be forthwith due and payable, whereupon the principal of the Loans together with accrued interest thereon and all other Obligations of the Borrowers accrued hereunder and under any other Credit Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Credit Document to the contrary notwithstanding; and (iii) exercise any and all remedies under the Credit Documents and under applicable Law available to the Lender. Additionally, after notice of an Event of Default under Sections 8.1, 8.2 or 8.3 has

been given to the Borrowers by the Lender, the Borrowers shall not use any cash Collateral of the Lender without the Lender's prior written consent.

Section 9. Miscellaneous.

9.1 Payment of Expenses, etc. The Borrowers hereby agree to:

(a) pay all reasonable out-of-pocket costs and expenses as determined by the Bankruptcy Court (i) of the Lender (including, without limitation, the reasonable fees and disbursements of White & Case LLP) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto and thereto, and (ii) of the Lender in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (including, without limitation, the reasonable fees and disbursements of counsel of White & Case LLP); provided, that the foregoing obligations shall be included in the Obligations and become due and payable by the Borrowers on the Termination Date;

(b) pay and hold the Lender harmless from and against any and all present and future stamp and other similar taxes with respect to the foregoing matters and save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes; and

(c) indemnify the Lender, its directors, officers, managers, employees, representatives, attorneys and agents from and hold each of them harmless against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements incurred by any of them as a result of, or arising out of, or in any way related to, or by reason of, any investigation, litigation or other proceeding (whether or not the Lender is a party thereto) related to the entering into and/or performance of this Agreement, any other Credit Document or any other document or instrument entered into in connection therewith, or the use of the proceeds of the Loans hereunder, including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding (but excluding any such liabilities, obligations, losses to the extent incurred solely by reason of the gross negligence or willful misconduct of the Person to be indemnified).

9.2 Appointment of Administrative Borrower. Each Borrower hereby irrevocably appoints RUNA as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Lender shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide the Lender with all notices with respect to Borrowings obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Borrowings and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loans and Collateral of

the Borrowers in a combined fashion, as more fully set forth herein and in the Credit Documents, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that the Lender shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Lender to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify the Lender and hold the Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan and Collateral of the Borrowers as herein provided or (b) the Lender's relying on any instructions of the Administrative Borrower.

    9.3    <u>Joint and Several Liability of the Borrowers</u>.

    (a) Each Borrower is accepting joint and several liability hereunder and under the other Credit Documents in consideration of the financial accommodations to be provided by the Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Loans and all other Obligations.

    (b) Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of the Loans and all of the other Obligations, it being the intention of the parties hereto that all the Loans and other Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

    (c) If and to the extent that any Borrower shall fail to make any payment with respect to any of the Loans or other Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Loan or other Obligation.

    (d) The Loans to, and other Obligations of, each Borrower under the provisions of this Section 9.3 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against the other Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

    (e) Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Borrowing under this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by the Lender under or in respect of any of the Loans or other Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable Law, all demands, notices and other formalities of every kind in connection with this Agreement (except

as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of the Loans or any of the other Obligations, the acceptance of any payment of any of the Loans or other Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Lender at any time or times in respect of any default by a Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Lender in respect of any of the Loans or other Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Loans or other Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the Lender with respect to the failure by a Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable Laws, which might, but for the provisions of this Agreement afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 9.3, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 9.3 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 9.3 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or the Lender.

(f) The provisions of this Section 9.3 are made for the benefit of the Lender and their respective successors and assigns, and may be enforced by it or them from time to time against any or both Borrowers as often as occasion therefor may arise and without requirement on the part of the Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against a Borrower or to exhaust any remedies available to it or them against the Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 9.3 shall remain in effect until all of the Loans and other Obligations shall have been paid in full or otherwise fully satisfied.

(g) Each Borrower hereby agrees that, after the occurrence and during the continuance of any Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Lender, and such Borrower shall deliver any such amounts to the Lender for application to the Obligations in accordance with this Agreement.

9.4    Right of Setoff. In addition to any rights now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuation of an Event of Default, the Lender is hereby authorized at

any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrowers or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any Indebtedness at any time held or owing by the Lender to or for the credit or the account of the Borrowers against and on account of the Obligations and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

9.5    Notices. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including facsimile) and mailed, faxed, or delivered:

If to the Borrowers:

RECTICEL INTERIORS NORTH AMERICA, LLC
Bow Pointe Drive 5600
Clarkston, MI 48346
Facsimile: _____
Attention: Derek Strehl

with a copy to:


Pepper Hamilton LLP
Suite 3600
100 Renaissance Center
Detroit, Michigan 48243-1157
Facsimile: 313-259-7926
Attention: Dennis Kayes;

and

RECTICEL NORTH AMERICA, INC
Bow Pointe Drive 5600
Clarkston, MI 48346
Facsimile: _____
Attention: Derek Strehl

with a copy to:

Pepper Hamilton LLP
Suite 3600
100 Renaissance Center
Detroit, Michigan 48243-1157
Facsimile: 313-259-7926
Attention: Dennis Kayes;

If to the Lender:

RECTICEL N.A./S.A.
Avenue des Olympiades
2 — B-1140 Brussels
Facsimile: 32 (0)2 775 19 90
Attention: Pierre Warrant

With a copy to:

White & Case LLP
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Attention: John K. Cunningham, Esq.
Facsimile: (305) 358-5744

in each such case at such other address as any party shall designate in a written notice to the other parties hereto. All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails, upon receipt of a confirmation if faxed or delivered to the overnight courier, as the case may be, except that notices and communications to the Lender shall not be effective until received by the Lender.

9.6     Benefit of Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided that the Borrowers may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lender.

9.7     Assignment of the Loans, etc. The Lender may at any time transfer or assign, any of its rights hereunder, under the Note or any other Credit Document. If the Lender transfers or assigns any portion or all of its rights hereunder, under the Note or any other Credit Document, any reference to the Lender in this Agreement, the Note and such other Credit Documents shall thereafter refer to the assignee to the extent of the interest assigned or transferred.

9.8     No Waiver; Remedies Cumulative. No failure or delay on the part of the Lender or the holders of the Note in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrowers and the Lender or the holders of the Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. In furtherance, and not in limitation, of the foregoing, no waiver of any condition to the making of any Loan shall be deemed to be a waiver of any of the conditions to the making of any subsequent Loan. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or

remedies which the Lender or the holders of the Note would otherwise have. No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender or the holders of the Note to any other or further action in any circumstances without notice or demand.

9.9  Calculations; Computations.

(a) The financial statements to be furnished to the Lender pursuant to Sections 6.1(b) shall be made and prepared in accordance with GAAP.

(b) All computations of interest hereunder shall be made on the basis of a year of 365 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

9.10  Governing Law; Submission to Jurisdiction; Venue.

(a) This Agreement and the other Credit Documents and the rights and obligations of the parties hereunder and thereunder shall be construed in accordance with and be governed by the Laws of the State of New York, exclusive of its conflicts of laws principals, and/or the Bankruptcy Code, as applicable. The Bankruptcy Court shall retain jurisdiction in the Orders to enforce and interpret the Orders and the Credit Documents.

(b) The Borrowers hereby irrevocably waive any objection which they may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Credit Document brought in the Bankruptcy Court and hereby further irrevocably waive and agree not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

9.11  Usury. The Lender and the Borrowers each intend that the interest (as defined under applicable Law) on all amounts evidenced by the Note which may be charged to, or collected or received from, the Borrowers shall not exceed the maximum rate permissible under applicable Law; provided, however, that nothing herein shall be construed to limit the Lender to presently existing maximum rates of interest, if an increased interest rate is hereafter permitted by reason of applicable Law. Accordingly, anything herein or in the Note to the contrary notwithstanding, should any interest (as so defined) be charged to, or collected or received from, the Borrowers, or any other Person by the Lender pursuant hereto or thereto in excess of the applicable maximum legal rate, then such excess payment shall be applied to the reduction of the aggregate outstanding principal balance of the Loans and any portion of the excess payment remaining after payment in full thereof shall be returned by the Lender to such Person.

9.12  Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

9.13 <u>Headings Descriptive</u>. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

9.14 <u>Amendment or Waiver</u>. Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Lender and the Borrowers.

9.15 <u>Entire Agreement</u>. This Agreement, together with the exhibits and schedules hereto, and the other Credit Documents contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

9.16 <u>Survival</u>. All representations, warranties and indemnities of the Borrowers set forth herein shall survive the execution and delivery of this Agreement and the Note and the making and repayment of the Obligations.

9.17 <u>Waiver of Trial by Jury</u>. THE BORROWERS AND THE LENDER HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OBLIGATION UNDER THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS AGREEMENT.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**BORROWERS:**

RECTICEL INTERIORS NORTH AMERICA, LLC

By:

Title:

RECTICEL NORTH AMERICA, INC

By:

Title:

**LENDER:**

RECTICEL N.V./S.A..

By:_____

Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**BORROWERS:**

RECTICEL INTERIORS NORTH AMERICA, LLC

By:_____
Title:

RECTICEL NORTH AMERICA, INC

By:_____
Title:

**LENDER:**

RECTICEL N.V./S.A.

By:_____
Title: Company Secretary

## Schedule 5.8 Existing Accounts

**JP Morgan Chase Bank**
**MI1-9126**
**38105 Mound Road, Suite 201**
**Sterling Heights, MI 48310**
**Attn: William C. Goodhue**

| Legal Entity | Account No. | Account Type |
|---|---|---|
| Recticel Interiors North America, LLC | XXXXXX686 <br> XXXXXX694 | General Account <br><br> Controlled Disbursements – Zero Balance Account |
| Recticel North America, Inc. | XXXX354 <br> XXX146 | General Account <br><br> Controlled Disbursements – Zero Balance Account |

**JP Morgan Chase Bank, N.A.**
**125 London Wall**
**London EC2Y 5AJ**

| Legal Entity | Account No. | Account Type |
|---|---|---|
| Recticel Interiors North America, LLC | XXXXXXX101 | European Payments or Receipts |
| Recticel North America, Inc. | XXXXXX001 | European Payments or Receipts |

**National City Bank**
**3111 Baldwin Road**
**Orion, MI 48359**
**Attn: Rene Bryce**

| Legal Entity | Account No. | Account Type |
|---|---|---|
| Recticel North America, Inc. | XXXXXX912 | General Account (Employee Health Care Expenses) |

## Schedule 5.11 Employee Benefit Plans

| Plan | Description |
|---|---|
| Recticel Interiors North America Employee Benefit Concepts | Self-insured plan for health, dental and short term disability for employees and dependents. |
| Recticel Interiors North America AIG | Company provided and voluntary life/accidental death and dismemberment for employees, spouse and children; Company provided vision insurance and long term disability insurance. |
| Recticel Interiors North America UNUM | Company and voluntary long term care for employees and spouse. |
| Recticel Interiors North America Prepaid Legal | Voluntary benefit for prepaid legal insurance for employee. |
| Recticel Interiors North America Colonial Insurance | Voluntary benefit for accident, sickness and cancer insurance for employees and dependents. |
| Recticel Interiors North America Vacation Plan | Employees receive 20 paid vacations days per year for the first four years of employment, in the fifth year employees receive 25 paid vacations days per year. |
| Recticel North America Humana | Self-insured plan for health, dental and short term disability for employees and dependents. |
| Recticel North America Humana and UNUM | Company provided and voluntary life/accidental death and dismemberment for employees, spouse and children; Company provided vision insurance and long term disability insurance. |
| Recticel North America UNUM | Company and voluntary long term care for employees and spouse. |
| Recticel North America VSP | Vision insurance for employees and dependents. |
| Recticel North America Vacation Plan | Employees receive 20 paid vacations days per year for the first four years of employment, in the fifth year employees receive 25 paid vacations days per year. |

#11652706 v1

## EXHIBIT A

## NOTICE OF BORROWING

_____ __, 2009

_____
_____
_____
_____

Ladies and Gentlemen:

This Borrowing Notice is being delivered to you pursuant to Section 2.1(b) of the Credit Agreement dated as of _____, 2009 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), between Recticel N.A./S.A., a company organized under the laws of Belgium (the "Lender"), and Recticel Interiors North America, LLC, a Michigan limited liability company and Recticel North America, Inc., a Michigan corporation. Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the Credit Agreement.

The Borrowers hereby request a Borrowing of $_____ to be funded to the following account on _____ ___, 200__.

> ABA Number:
> Account Number:
> SWIFT:

RECTICEL NORTH AMERICA, INC.

_____

By:
Its:

## SECURED REVOLVING PROMISSORY NOTE

Amount: Up to $10,000,000                                    October ___, 2009

FOR VALUE RECEIVED, RECTICEL INTERIORS NORTH AMERICA, LLC, a Michigan limited liability company, ("RINA"), and RECTICEL NORTH AMERICA, INC., a Michigan corporation ("RUNA"; RINA and RUNA are individually a "Borrower" and collectively the "Borrowers"), jointly and severally promise to pay to the order of RECTICEL N.V./S.A., a company organized under the laws of Belgium (the "Holder") or its registered assigns, the principal sum of Ten Million Dollars ($10,000,000) or, if less, the aggregate principal amount of the Loans made pursuant to the Credit Agreement (as defined below), together with accrued and unpaid interest on the outstanding principal balance hereof at the rate provided herein, on the Termination Date. Capitalized terms used herein shall have the meaning set forth in the Credit Agreement (as defined below). This Note shall be governed by the following provisions:

1.    Interest.

The Borrowers promise to pay the Holder interest on the unpaid principal amount of all Loans from the date each such Loan is made available to the Borrowers until paid at the rates and at the times provided in the Credit Agreement. The total liability of the Borrowers and any endorsers or guarantors hereof for payment of interest shall not exceed any limitations imposed on the payment of interest by applicable usury Laws.

2.    Credit Agreement. This Note is being issued to the Holder pursuant to that certain Credit Agreement, of even date herewith (as amended, restated, modified, supplemented or replaced from time to time, the "Credit Agreement"), by and between the Borrowers and the Holder. The Credit Agreement contains additional rights of the Holder of this Note.

3.    Rights of Holder Upon Default. Upon the occurrence or the existence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Holder may declare the principal of and any accrued interest in respect of this Note and all Obligations owing hereunder to be, and the same shall thereupon become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and interest on the unpaid balance of this Note shall accrue at the rate set forth in the Credit Agreement plus 1% on the amount of principal and/or accrued but unpaid interest then due and owing. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Holder may exercise any other right, power or remedy granted to it under the Credit Agreement or otherwise permitted to it by Law, either by suit in equity or by action at Law, or both.

4.    Voluntary Prepayment. The Borrowers may, at any time prepay in whole or in part this Note pursuant to the Credit Agreement without penalty.

5.    Security. The repayment of this Note shall be secured by the assets of the Borrowers as provided for under the Security Agreement.

6.    Successors and Assigns. Subject to the restrictions on transfer described in Section 8 below, the rights and obligations of the Borrowers and the Holder of this Note shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

7.    Waiver and Amendment. Any provision of this Note may be amended or modified only upon the written consent of the Borrowers and the Holder, or if applicable, waived in writing by the affected party. Any amendment or waiver effected in accordance with this Section 7 shall be binding upon the Borrowers, Holder and each transferee of this Note.

8.    Assignment by the Borrowers. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of Law or otherwise, in whole or in part, by the Borrowers, without the prior written consent of the Holder.

9.    Expenses; Waivers. The Borrowers jointly and severally promise to pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, stamp taxes, and all other fees and expenses incurred in connection with enforcement of this Note. The Borrowers hereby waive notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

10.    Governing Law. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the Laws of the State of New York, without regard to the conflicts of Law provisions of the State of New York or of any other state.

* * *

IN WITNESS WHEREOF, the Borrowers have caused this Note to be issued as of the date first written above.

RECTICEL INTERIORS NORTH AMERICA, LLC

By:_____
    Name:
    Title:

RECTICEL NORTH AMERICA, INC

By:_____
    Name:
    Title: