<u>EXHIBIT C</u>

INTERIM ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| RECTICEL NORTH AMERICA, INC. | ) | Case No. 09-[            ] |
|  | ) |  |
|  | ) |  |
| In re | ) | Chapter 11 |
|  | ) |  |
| RECTICEL INTERIORS NORTH AMERICA, LLC | ) | Case No. 09-[            ] |
| Debtors. | ) |  |
|  | ) |  |

**INTERIM FIRST DAY ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 364(c)
AND 364(e), BANKRUPTCY RULE 4001(c) AND LOCAL RULE
4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING AND (II) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion") of Recticel North America, Inc. a/k/a Recticel

UREPP North America, Inc. ("RUNA") and Recticel Interiors North America, LLC ("RINA,"

together with RUNA, the "Debtors" or "Borrowers"), for the entry of interim and final orders

(respectively, this "Interim Order" and the "Final Order," and collectively, the "DIP Order"),

pursuant to sections 105, 363, 364(c) and 364(e) of title 11 of the United States Code, 11 U.S.C.

§§ 101, et seq. (the "Bankruptcy Code"), Rule 4001(c) and (d) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the

United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules")

authorizing the Debtors to enter into a senior secured, debtor-in-possession financing facility of

up to $500,000 on an interim basis, and up to $10 million upon entry of a Final Order (as

amended, modified and otherwise in effect from time to time, the "DIP Credit Facility") as

MIAMI 822499 (2K)

provided for in that certain Credit Agreement, substantially in the form attached to the Motion as

**Exhibit A** (as amended, supplemented, or otherwise modified and in effect from time to time, the "<u>DIP Credit Agreement</u>,"[1] together with any and all other related documents and agreements entered into in connection with or related to the DIP Credit Facility, the "<u>DIP Credit Documents</u>"), seeking, among other things:

(1) authorization for the Borrowers to obtain secured postpetition financing (the "<u>DIP Financing</u>") consisting of a credit facility in the aggregate principal amount of up to $10 million, subject to the terms and conditions set forth in the DIP Credit Documents and an agreed upon budget (the "<u>Budget</u>"), from Recticel N.V./S.A. (the "<u>DIP Lender</u>"), and for the Debtors to enter into and execute, and perform all of their obligations under the DIP Credit Documents;

(2) to grant the DIP Lender, pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, senior first priority liens (the "<u>DIP Liens</u>") on all of the Debtors' prepetition and postpetition assets and property of any kind or nature, and all products and proceeds thereof, subject only to (i) any valid, perfected, enforceable and non-avoidable security interest or lien in existence as of the Petition Date, (ii) any valid, enforceable and non-avoidable lien perfected (but not granted) after the Petition Date to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code, (iii) the Carve-Out and (iv) any liens and security interests (as such terms are defined in

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement or the Motion, as applicable.

2

section 101 of the Bankruptcy Code) expressly permitted to be senior under the DIP Credit Documents and the terms of the DIP Order;

(3) to grant the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (the "Superpriority Claim") to the DIP Lender, which, as set forth in paragraph 8, shall have priority over any or all administrative expenses in the above-captioned chapter 11 cases (the "Cases") and shall be payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve-Out;

(4) a preliminary hearing (the "Preliminary Hearing") on the Motion to consider the entry of an Interim Order pursuant to Bankruptcy Rule 4001 authorizing the Debtors, inter alia, to utilize the Financing for up to an aggregate of $500,000 upon the terms and conditions set forth in the DIP Credit Documents and the Interim Order and subject to the Budget, pending the Final Hearing referred to below;

(5) modification by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Facility, this Interim Order, the DIP Credit Agreement and the other DIP Credit Documents;

(6) a final hearing (the "Final Hearing"), and the establishment of notice procedures in respect of the Final Hearing, to consider entry of a Final Order authorizing, inter alia, the DIP Financing; and

3

(7) the Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of this Interim Order.

The Court having considered the Motion, the terms of the DIP Financing and the DIP Credit Documents, the Declaration of Derek Strehl in Support of the First Day Motions, dated as of October 29, 2009, and the evidence submitted at the Preliminary Hearing held before this Court on [_____], 2009, to consider entry of this Interim Order; and in accordance with Bankruptcy Rules 2002 and 4001(c), and the local rules of the Court, due and proper notice of the Motion and the Preliminary Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefore;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    The Debtors duly commenced these Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on October 29, 2009 in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

2.    The Debtors are operating their business and managing their affairs as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Cases.

4

3.     *Jurisdiction and Venue.*  This Court has core jurisdiction over the Cases, the

Motion, the documents and agreements referred to herein, and the parties and property affected

hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409.

4.     *Notice.*  The notice given by the Debtors of the Motion, the relief requested

therein and the Preliminary Hearing to the Office of the United States Trustee for the Eastern

District of Michigan, the Debtor's 30 largest unsecured creditors on a consolidated basis

(including counsel if known), counsel to the DIP Lender, and all parties requesting notices

pursuant to Bankruptcy Rule 2002, constitutes due and sufficient notice thereof and complies

with Bankruptcy Rule 4001(c).

5.     *Findings Regarding the Financing.*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors have an immediate need to obtain the DIP Financing to permit,

among other things, the orderly continuation of the operation of their businesses, to maintain

business relationships with vendors, suppliers and customers, to make payroll, to make capital

expenditures, and to satisfy other working capital and operational needs.  The access of the

Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness

for borrowed money and other financial accommodations is vital to the preservation and

maintenance of the going concern values of the Debtors and to a successful reorganization of the

Debtors.  In the absence of the DIP Financing, the continued operation of the Debtors'

businesses would not be possible, and immediate and irreparable harm to the Debtors and their

estates would occur.

5

(c)     The Debtors have been unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Credit Documents and have been unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Given the current capital markets environment, alternative financing may not be available to the Debtors at all and is unlikely to be available on terms more favorable than set forth in the DIP Credit Documents.

(d)     The terms of the DIP Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Financing has been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Financing and the DIP Credit Documents shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.

6.     *Motion Granted.* The Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Credit Documents. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby overruled.

7.     *Authorization of the DIP Financing and the DIP Credit Documents.*

(a)     The Debtors are hereby expressly authorized and empowered to execute and deliver the DIP Credit Documents. The Debtors are authorized to comply with and perform all

6

of the terms and conditions contained in the DIP Credit Documents, and the Debtors are directed to repay amounts borrowed with interest to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Credit Documents and this Interim Order. All loans made under the DIP Credit Agreement (the "DIP Loans") and interest thereon, and all fees, costs, expenses, indebtedness, obligations and liabilities of the Debtors to the DIP Lender under the DIP Credit Documents and this Interim Order, including all indemnification and similar obligations and liabilities, are hereinafter referred to as the "DIP Obligations."

(b)     Pending the Final Hearing, the Debtors are expressly authorized to obtain DIP Loans from the DIP Lender in the aggregate principal amount up to $500,000 (plus interest, fees and other expenses and amounts provided for in the DIP Credit Documents), in accordance with the terms of this Interim Order and the DIP Credit Documents, which may be used in accordance with the Budget and for all purposes not prohibited under the DIP Credit Documents, including, without limitation, to provide working capital for the Borrowers, to pay interest, fees and expenses in accordance with this Interim Order and the DIP Credit Documents and any other payments permitted by the Court to be made until the date that this Order becomes a Final Order.

8.     *Superpriority Claims.* In accordance to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority in payment over any and all administrative expenses (the "Superpriority Claims") of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) of the Bankruptcy Code and in accordance with section 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or

7

any creditor, in the Cases or any subsequent proceedings under the Bankruptcy Code. Subject only to the Carve-Out, no cost or expense of administration under sections 105, 364(c)(1), 503(b), 506(c), 507(b) of the Bankruptcy Code or otherwise, including those resulting from the conversion of the Cases pursuant to section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the Superpriority Claims of the DIP Lender.

9. *DIP Liens*. As security for the DIP Obligations and subject only to the Carve-Out, the DIP Lender shall have and is hereby granted (effective upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors or the DIP Lender of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents) the DIP Liens, which constitute valid and perfected, security interests in, and liens upon, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all assets and property pledged under the DIP Credit Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, trade names, other intellectual

8

MIAMI 822499 (2K)

property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing, and including, upon entry of the Final Order, all of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law, and the proceeds thereof, whether received by judgment, settlement or otherwise (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral") as follows:

(a) First Lien on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior lien upon all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a valid, perfected, enforceable and non-avoidable security interest or lien as of the Petition Date; and

(b) Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected and non-avoidable lien upon all of the DIP Collateral which is subject to (i) any valid, perfected, enforceable and non-avoidable security interest or lien in existence as of the Petition Date, or (ii) any valid, enforceable and non-avoidable lien perfected (but not granted) after the Petition Date to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code or (iii) any Permitted Lien (as defined in the DIP Credit Agreement) and which is expressly permitted in the DIP Credit Agreement to be senior to the DIP Liens.

(c) Liens Senior to Certain Other Liens. Except as set forth herein, the DIP Liens shall be prior and senior to all liens and encumbrances of all other secured creditors, if any,

9

MIAMI 822499 (2K)

in and to such DIP Collateral granted, or arising after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor).

10. *Carve-Out.* The Debtors' obligations to the DIP Lender and the DIP Liens and Superpriority Claim granted herein shall be subject and subordinate only to, after a Carve-Out Effective Date (defined below), payment of the Carve-Out. For purposes of this Order, "Carve-Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); (ii) subject to the terms of this Interim Order and the Budget, all allowed fees and expenses of the professionals retained under section 327 and 328 of the Bankruptcy Code or otherwise by the Debtors accrued or incurred on or before the first business day (the "Carve-Out Effective Date") following the delivery by the DIP Lender of a Default Notice (as defined below), whether approved by the Bankruptcy Court before or after the Carve-Out Effective Date; and (iii) on and after the Carve-Out Effective Date, an amount not exceeding $350,000 in the aggregate, which amount may be used (subject to the terms of this Interim Order and the Budget) to pay any allowed fees or expenses incurred by the professionals retained under sections 327 or 328 of the Bankruptcy Code by the Debtors and statutory committee appointed in the Cases, on or after the Carve-Out Effective Date, *provided* that (x) the dollar limitation in this clause (iii) on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid on or prior to the Carve-Out Effective Date in respect of which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to the DIP Lender (or its attorneys or agents under the DIP Credit Facility or otherwise), and (y)

10

nothing herein shall be construed to impair the ability of any entity to object to the fees, expenses, reimbursement or compensation described above. "<u>Default Notice</u>" means a written notice delivered by the DIP Lender to the Borrowers and their counsel, the U.S. Trustee, and counsel to any statutory committee appointed in the Cases, which notice may be delivered following the occurrence and during the occurrence of an Event of Default, expressly stating that it is a Default Notice hereunder. No portion of the Carve-Out and no proceeds of the DIP Credit Facility or the DIP Loans may be used for the payment of the fees and expenses of any person incurred (i) in challenging, or in relation to the challenge of, any of the DIP Lender's liens or claims (or the value of its DIP Collateral), or the initiation or prosecution of any claim or action against the DIP Lender, including any claim under chapter 5 of the Bankruptcy Code, or any state law or foreign law, in respect of the DIP Credit Facility, or in preventing, hindering or delaying the realization by the DIP Lender upon any DIP Collateral, respectively, or the enforcement of its rights under the DIP Credit Facility, this Interim Order, the Final Order, the DIP Credit Agreement or any other DIP Credit Document, (ii) in requesting authorization, or supporting any request for authorization, to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lender or (iii) in connection with any claims or causes of actions against the DIP Lender, including formal or informal discovery proceedings in anticipation thereof, and/or in challenging any DIP Obligations or the DIP Liens.

11. *Limitation on Charging Expenses Against Collateral.* Subject to the entry of the Final Order, as a further condition of the DIP Credit Facility and any obligation of the DIP Lender to make DIP Loans, the Debtors (and any successors thereto or any representatives

11

thereof, including any trustees appointed in the Cases or any successor cases) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens or the DIP Collateral. Nothing contained in this Interim Order, in the Final Order, in the DIP Credit Agreement or in the other DIP Credit Documents shall be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12. *Perfection of DIP Liens.* The DIP Liens granted pursuant to this Interim Order (and any Final Order and any DIP Credit Document) shall constitute valid and duly perfected security interests and liens, and the DIP Lender shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, record leasehold mortgages, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the DIP Lender to take any of the foregoing or similar actions or the failure by the Debtors to execute any documentation relating to the DIP Liens shall in no way affect the validity, perfection or priority of such DIP Liens. If, however, the DIP Lender, in its sole discretion, shall determine to file any such financing statement, notices of liens or similar instruments, record leasehold mortgages, or to otherwise confirm perfection of such DIP Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code section 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Interim Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

12

MIAMI 822499 (2K)

13. *Limitation on Release.* Effective upon entry of the Final Order, the DIP Lender is hereby released and discharged from any and all claims and causes of action of the Debtors arising prior to the Petition Date; except to the extent (a) a party in interest has properly filed an adversary proceeding or contested matter asserting any claims or causes of action against the DIP Lender and such adversary proceeding or contested matter is filed no later than the date that is sixty (60) days after the earlier of (i) the date of appointment of a statutory committee or (ii) entry of the Final Order, and (b) the Court rules (whether prior to or after such sixty (60) day period) in favor of the plaintiff in any such adversary proceeding or contested matter properly filed within such sixty (60) day period.

14. *Proof of Claim.* The DIP Lender will not be required, as a condition to repayment of the DIP Obligations or to assert its rights under the DIP Credit Documents, to file a proof of claim in the Cases or upon the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, appointment of a trustee, or in any other proceedings related to any of the foregoing.

15. *Event of Default.* Upon the occurrence of and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), the DIP Lender may, by notice to the Debtors, the U.S. Trustee and any statutory committees appointed in the Cases, take all or any of the following actions: (i) terminate the DIP Financing and thereafter cease to make DIP Loans to the Debtors (the date of any such termination, the "Termination Date"); (ii) declare the DIP Loans then outstanding and all other DIP Obligations hereunder to be forthwith due and payable, whereupon the principal of the DIP Loans together with accrued interest thereon and all other DIP Obligations of the Borrowers accrued hereunder and under any other DIP Credit Document,

13

shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other DIP Credit Document to the contrary notwithstanding; and (iii) exercise any and all remedies under the DIP Credit Documents and under applicable law available to the DIP Lender. The Debtors waive any right to seek relief under the Bankruptcy Code, including without limitations, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Lender set forth in this Order and in the DIP Credit Documents. All proceeds of the DIP Collateral and any other payments received by the DIP Lender, after the Termination Date or pursuant to the exercise of any such rights and remedies upon the occurrence and during the continuance of an Event of Default, shall be applied to the DIP Obligations in the manner set forth in the DIP Credit Documents. The automatic stay of section 362(a) is hereby modified to allow the DIP Lender to take any and all of the foregoing actions.

16.    *Authorization to Effectuate Terms of the DIP Credit Documents.*  The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the DIP Credit Documents, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Credit Documents, as the case may be. The Debtors and the DIP Lender are hereby authorized and directed to implement, in accordance with the terms of the DIP Credit Agreement, any non-material modifications of the DIP Credit Agreement without further order of this Court.

14

17. *Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.* Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Credit Facility as approved by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens or of the Superpriority Claim granted to or for the benefit of the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the Superpriority Claim granted herein, with respect to any such claim. Because the DIP Loans are made in reliance on this Interim Order, the DIP Obligations incurred by the Debtors or owed the DIP Lender prior to the effective date of any stay, modification or vacation of this Interim Order shall not, as a result of any subsequent order in the Cases or in any successor cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Interim Order.

18. *Survival of the Interim Order.* The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i)

15

MIAMI 822499 (2K)

confirming any plan in the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court. The terms and provisions of this Interim Order, including the DIP Liens and Superpriority Claim granted pursuant to this Interim Order, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and Superpriority Claim shall maintain their priority as provided by this Interim Order and the DIP Credit Documents, until all of the DIP Obligations have been indefeasibly paid and satisfied in full in cash and discharged.

19. *No Waiver.* The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or the DIP Credit Documents or otherwise, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Lender (i) to request conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Cases, or the appointment of a trustee in the Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan, or (iii) to exercise any such rights, claims or privileges (whether legal, equitable or otherwise).

16

20.     *No Third Party Rights.* Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

21.     *No Marshaling.* The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

22.     *Amendment.* Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Lender, and approved by the Court after notice to parties in interest.

23.     *Enforceability.* This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

24.     *No Waivers or Modification of Interim Order.* The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

25.     *Order Governs.* In the event of any inconsistency between the provisions of this Interim Order and the DIP Credit Documents, the provisions of this Interim Order shall govern. This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Interim Order.

26.     *Binding Effect; Successors and Assigns.* The DIP Credit Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in

17

MIAMI 822499 (2K)

interest in this Cases, including, without limitation, the DIP Lender and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors) and shall inure to the benefit the DIP Lender and the Debtors and their respective successors and assigns, *provided, however,* that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

27.     *Final Hearing.*  A final hearing on the Motion, pursuant to Bankruptcy Rule 4001, shall be held by the Court on _____ __, 2009 at _____ _.m. at the United States Bankruptcy Court for the Eastern District of Michigan.

28.     *Service of the Order.*  Within 24 hours of this Interim Order's entry, the Debtors shall serve a copy of this Interim Order (including notice of the date, time and place of the Final Hearing), the Motion and the exhibits attached to the Motion on the Office of the United States Trustee for the Eastern District of Michigan, the Debtors' 30 largest unsecured creditors on a consolidated basis (including counsel if known), counsel to the DIP Lender, and all parties requesting notices pursuant to Bankruptcy Rule 2002, as required by Bankruptcy Rule 4001(d).

29.     *Local Rule Provisions.*  Objections, if any, to this Interim Order shall be filed 15 days from the entry of the Interim Order, except that an official committee may file objections within 15 days after it is served with the Interim Order.  If an objection is timely filed, the Final Hearing will be held.  If no objection is timely filed, this Interim Order will become the Final Order.

18

MIAMI 822499 (2K)

SECURITY AGREEMENT

## SECURITY AGREEMENT

SECURITY AGREEMENT (the "Agreement"), dated as of October 29, 2009, between RECTICEL INTERIORS NORTH AMERICA, LLC, ("RINA"), and RECTICEL NORTH AMERICA, INC ("RUNA"; RINA and RUNA each a "Grantor" and collectively the "Grantors"), and RECTICEL N.V./S.A., a company organized and existing under the laws of the Netherlands (the "Lender").

WHEREAS, contemporaneously with the execution and delivery of this Agreement, the Lender and the Grantors are entering into a Credit and Guaranty Agreement dated as of the date hereof (as amended, modified, supplemented or replaced from time to time, the "Credit Agreement");

WHEREAS, unless otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined;

WHEREAS, it is a condition precedent to the making of Loans under the Credit Agreement that the Grantors shall have granted a security interest, pledge and lien on substantially all real and personal property of the Grantors and the proceeds thereof pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

WHEREAS, the grant of such security interest, pledge and lien has been authorized pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code by the Interim Order, and, after the entry thereof, will have been so authorized by the Final Order (collectively, the "Orders");

WHEREAS, to supplement the Orders without in any way diminishing or limiting the effect of the Orders or the security interest, pledge and lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge and lien; and

WHEREAS, this Agreement has been approved by the Orders;

NOW, THEREFORE, in consideration of the premises and in order to induce the Lender to make Loans, the Grantors hereby agree with the Lender as follows:

SECTION 1.     Grant of Security.  Each Grantor hereby transfers, grants, bargains, sells, conveys, hypothecates, assigns, pledges and sets over to the Lender and hereby grants to the Lender, a perfected pledge and security interest in all of such Grantors' right, title and interest in and to all of such Grantor's property and assets, whether real or personal, including, without limitation, the following (collectively, the "Collateral") which pledge and security interest shall have the priorities set forth in the Orders and shall be subject to the Carve-Out:

(a)     all present and future accounts, accounts receivable and other rights of the Grantors to payment for goods sold or leased or for services rendered (except those evidenced by instruments or chattel paper), whether now existing or hereafter arising and wherever arising, and whether or not they have been earned by performance (collectively, the "Accounts");

(b)     all goods and merchandise now owned or hereafter acquired by the Grantor wherever located, whether in the possession of the Grantor or of a bailee or other Person for sale, storage, transit, processing, use or otherwise consisting of whole goods, components, supplies, materials, or consigned, returned or repossessed goods) which are held for sale or lease or to be furnished (or have been furnished) under any contract of service or which are raw materials, work-in-process, finished goods or materials used or consumed in the Grantor's business or processed by or on behalf of a Grantor (collectively, the "Inventory");

(c)     all machinery, all manufacturing, distribution, selling, data processing and office equipment, all furniture, furnishings, appliances, fixtures and trade fixtures, tools, tooling, molds, dies, vehicles, vessels, aircraft and all other goods of every type and description (other than Inventory), in each instance whether now owned or hereafter acquired by a Grantor and wherever located (collectively, the "Equipment");

(d)     all rights, interests, choses in action, causes of action, claims and all other intangible property of a Grantor of every kind and nature (other than Accounts, Trademarks, Patents and Copyrights), in each instance whether now owned or hereafter acquired by a Grantor, including, without limitation, all general intangibles; all corporate and other business records; all loans, royalties, and other obligations receivable; all inventions, designs, trade secrets, computer programs, software, printouts and other computer materials, goodwill, registrations, copyrights, licenses, franchises, customer lists, credit files, correspondence, and advertising materials (to the extent the same are assignable); all customer and supplier contracts, firm sale orders, rights under license and franchise agreements (including all license agreements with any other Person in connection with any of the Patents and Trademarks or such other Person's names or marks, whether a Grantor is a licensor or licensee under any such license agreement but only to the extent such license agreements are assignable), and other contracts and contract rights; all interests in partnerships and joint ventures; all tax refunds and tax refund claims; all right, title and interest under leases, subleases, licenses and concessions and other agreements to the extent assignable relating to real or personal property; all payments due or made to a Grantor in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any property by any Person or Governmental Authority; all deposit accounts (general or special) with any bank or other financial institution; all credits with and other claims against carriers and shippers; all rights to indemnification; all reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; all proceeds of insurance of which each of the Grantors is a beneficiary; and all letters of credit, guaranties, liens, security interest and other security held by or granted to each of the Grantors; and all other intangible property, whether or not similar to the foregoing (collectively, the "General Intangibles");

(e)     all chattel paper, all instruments, all notes and debt instruments and all payments thereunder and instruments and other property from time to time delivered in respect thereof or in exchange therefor, and all bills of lading, warehouse receipts and other documents of title and documents, in each instance whether now owned or hereafter acquired by a Grantor;

(f)     all property or interests in property now or hereafter acquired by a Grantor which may be owned or hereafter may come into the possession, custody or control of the Lender in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise), and all rights and interests of each of the Grantors, now

existing or hereafter arising and however and wherever arising, in respect of any and all (i) notes, drafts, letters of credits, stocks, bonds, and debt and equity securities, whether or not certificated, and warrants, options, puts and calls and other rights to acquire or otherwise relating to the same; (ii) money (including all cash and cash equivalents held in the Existing Accounts or the Restricted Account, as the case may be (as defined and referred to in the Credit Agreement)); (iii) proceeds of loans, including, without limitation, Loans made under the Credit Agreement; and (iv) insurance proceeds and books and records relating to any of the property covered by this Agreement; together, in each instance, with all accessions and additions thereto, substitutions therefor, and replacements, proceeds and products thereof;

(g)     all trademarks, trade names, trade styles, service marks, prints and labels on which said trademarks, trade names, trade styles and service marks have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country or political subdivision thereof (except for "intent to use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of said Act has been filed), all whether now owned or hereafter acquired by each of the Grantors, including, but not limited to, those described in Schedule 4 annexed hereto and made a part hereof, and all reissues, extensions or renewals thereof and all licenses thereof (together, in each case, with the goodwill of the business connected with the use of, and symbolized by each such trademark, service mark, trade name and trade dress, all of the foregoing being herein referred to as the "Trademarks");

(h)     all letters patent of the United States or any other country, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, all whether now owned or hereafter acquired by a Grantor, including, but not limited to, those described in Schedule 5 annexed hereto and made a part hereof, and (ii) all reissues, continuations, continuations-in-part or extensions thereof and all licenses thereof (all of the foregoing being herein referred to as the "Patents");

(i)     all copyrights of the United States, or any other country, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other country or political subdivision thereof, all whether now owned or hereafter acquired by each of the Grantors, including, but not limited to, those described in Schedule 6 hereto and all renewals and extensions thereof and all licenses thereof (all of the foregoing being herein referred to as the "Copyrights");

(j)     all books, records, ledger cards and other property at any time evidencing or relating to the Accounts, Equipment, General Intangibles, Trademarks, Patents or Copyrights;

(k)     all other personal property of the Grantors, whether tangible or intangible, and whether now owned or hereafter acquired; and

(l) all proceeds and products of any of the foregoing, in any form, including, without limitation, any claims against third parties for loss or damage to or destruction of any or all of the foregoing and to the extent not otherwise included, all (i) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral and (ii) cash.

SECTION 2.     Security for Obligations.  This Agreement and the Collateral secure the payment of the Obligations.

SECTION 3.     Representations and Warranties. The Grantors represent and warrant as follows:

(a) All of the Inventory and/or Equipment is located at the places specified in Schedule 1 hereto. The chief places of business and chief executive offices of the Grantors and the offices where the Grantors keep their records concerning any Accounts and all originals of all chattel paper which evidence any Account are located at the places specified in Schedule 2 hereto. All trade names under which the Grantors have sold and will sell Inventory are listed on Schedule 3 hereto.

(b) The Grantors own the Collateral free and clear of any lien, security interest, charge or encumbrance except for the security interest created by this Agreement and except as permitted under Section 7.1 of the Credit Agreement. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except (x) such as may have been filed in favor of the Lender relating to this Agreement and (y) in favor of any holder of a Lien permitted under Section 7.1 of the Credit Agreement.

(c) As of the Filing Date, the Grantors do not own any material Trademarks, Patents or Copyrights or have any material Trademarks, Patents or Copyrights registered in, or the subject of pending applications in, the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, other than those described in Schedules 4, 5 and 6 hereto. The registrations for the Collateral disclosed on such Schedules 4, 5 and 6 hereto are valid and subsisting and in full force and effect. None of the material Patents or Copyrights have been abandoned or dedicated.

(d) Except for the Orders, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the grant and pledge by the Grantors of the security interests granted hereby or for the execution, delivery or performance of this Agreement by the Grantors.

SECTION 4.     Further Assurances.

(a) The Grantors agree that from time to time, at the expense of the Grantors, it will promptly execute and deliver all further instruments and documents, and take all further action that the Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce any of its rights and remedies hereunder with respect to any Collateral. Without limiting the

generality of the foregoing, and without further order of the Bankruptcy Court, the Grantors will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, in any jurisdiction as the Lender may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby.

(b)     The Grantors hereby authorize the Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Grantors where permitted by law.

(c)     The Grantors will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request in connection with any prospective sale of Collateral pursuant to Section 14 hereof, all in reasonable detail.

SECTION 5.     As to Equipment and Inventory. The Grantors shall:

(a)     Keep the Equipment and Inventory (other than Inventory sold in the ordinary course of business) at the places specified therefor in Schedule 1 hereto or, upon 5 days' written notice to the Lender prior to any transfer thereof to a different jurisdiction, at other places in jurisdictions where all action required by Section 4 shall have been taken to assure the continuation of the perfection of the security interest of the Lender with respect to the Equipment and Inventory.

(b)     Subject to provisions of the Credit Agreement, maintain or cause to be maintained in good repair, working order and condition, excepting ordinary wear and tear and damage due to casualty, all of the Equipment, and make or cause to be made all appropriate repairs, renewals and replacements thereof, to the extent not obsolete and consistent with past practice of the Grantors, as quickly as practicable after the occurrence of any loss or damage thereto which are necessary or reasonably desirable to such end, except where the failure to do any of the foregoing would not result in a Material Adverse Effect.

(c)     Until satisfaction in full of the Obligations, at any time when an Event of Default has occurred and is continuing: (i) each Grantor will perform any and all reasonable actions requested by the Lender to enforce the Lender's security interest in the Inventory and all of the Lender's rights hereunder, such as subleasing warehouses to the Lender or its designee (to the extent such subleases are not prohibited), placing and maintaining signs, appointing custodians, transferring Inventory to warehouses, and delivering to the Lender's warehouse receipts and documents of title in the Lender's name; (ii) if any Inventory is in the possession or control of the Grantor' agents, contractors or processors or any other third party, the Grantors will notify the Lender thereof and will notify such agents, contractors or processors or third party of the Lender's security interest therein and, upon request, instruct them to hold all such Inventory for the Lender and the Grantors' accounts, as their interests may appear, and subject to the Lender's instructions; (iii) the Lender shall have the right to hold all Inventory subject to the security interest granted hereunder; and (iv) the Lender shall have the right to take possession of the Inventory or any part thereof and to maintain such possession on the Grantors' premises or to remove any or all of the Inventory to such other place or places as the Lender desires in its sole discretion. If the Lender exercises its right to take possession of the Inventory, the Grantors,

upon the Lender's demand, will assemble the Inventory and make it available to the Lender at the Grantors' premises at which it is located.

SECTION 6.    As to Accounts.

(a)    Each Grantor shall keep its chief place of business and chief executive office and the offices where it keeps its records concerning the Accounts, and the offices where it keeps all originals of all chattel paper which evidence Accounts, at the location or locations therefor specified in Section 3(a) or, upon 5 days' prior written notice to the Lender, at such other locations in a jurisdiction where all actions required by Section 4 shall have been taken with respect to the Accounts. The Grantors will hold and preserve such records and chattel paper and will permit representatives of the Lender, at any time during normal business hours and upon reasonable prior written notice, to inspect and make abstracts from such records and chattel paper in accordance with the Credit Agreement.

(b)    Except as otherwise provided in this subsection (b), the Grantors shall continue to collect in accordance with their customary practice, at their own expense, all amounts due or to become due to the Grantors under the Accounts and, prior to the occurrence and continuance of an Event of Default, the Grantors shall have the right to adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any account debtor or obligor thereof, or allow any credit or discount thereon, all in accordance with their customary practices. In connection with such collections, the Grantors may, upon the occurrence and during the continuation of an Event of Default, take (and at the direction of the Lender shall take) such action as the Grantors or the Lender may reasonably deem necessary or advisable to enforce collection of the Accounts; provided, that upon written notice by the Lender to the Grantors in accordance with the Credit Agreement and the Orders, following the occurrence and during the continuation of an Event of Default, of its intention so to do, the Lender shall have the right to notify the account debtors or obligors under any Accounts of the assignment of such Accounts to the Lender and to direct such account debtors or obligors to make payment of all amounts due or to become due to the Grantors thereunder directly to the Lender and, upon such notification and at the expense of such Grantors, to enforce collection of any such Accounts, and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantors might have done. After receipt by the Grantors of the notice referred to in the proviso to the preceding sentence, and unless and until such notice is rescinded by the Lender by written notice to the Grantors (i) all amounts and proceeds (including instruments) received by such Grantors in respect of the Accounts shall be received in trust for the benefit of the Lender hereunder, shall be segregated from other funds of the Grantors and shall be forthwith paid over to the Lender in the same form as so received (with any necessary endorsement) to be held as cash collateral and either (x) released to the Grantors if such Event of Default shall have been cured or waived or (y) if such Event of Default shall be continuing, applied as provided by Section 14, and (ii) the Grantors shall not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any account debtor or obligor thereof, or allow any credit or discount thereon.

SECTION 7.    As to Trademarks. Patents and Copyrights.

(a)     The Grantors shall, either themselves or through licensees, continue to use the Trademarks as each is currently used in the Grantors' business in order to maintain the Trademarks in full force free from any claim of abandonment for nonuse and the Grantors will not (and will not permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Trademark may become invalidated, unless such failure to use a Trademark is not reasonably likely to have a Material Adverse Effect.

(b)     The Grantors will not do any act, or omit to do any act, whereby the Patents or Copyrights may become abandoned or dedicated and the Grantors shall notify the Lender immediately if it knows of any reason or has reason to know that any application or registration may become abandoned or dedicated, unless such abandonment or dedication is not reasonably likely to have a Material Adverse Effect.

(c)     The Grantors will not, either themselves or through any agent, employee, licensee or designee, (i) file an application for the registration of any Patent or Trademark with the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof or (ii) file any assignment of any patent or trademark, which the Grantors may acquire from a third party, with the United States Patent and Trademark Office or any similar office or agency in any other country or any political subdivision thereof, unless such Grantors shall, within 30 days after the date of such filing, notify the Lender thereof, and, upon request of the Lender, execute and deliver any and all assignments, agreements, instruments, documents and papers as the Lender may request to evidence the Lender's interest in such Patent or Trademark and the goodwill and general intangibles of the Grantors relating thereto or represented thereby, and the Grantors hereby constitute the Lender its attorney-in-fact to execute and file all such writings for the foregoing purposes, all lawful acts of such attorney being hereby ratified and confirmed; such power being coupled with an interest is irrevocable until the Obligations are paid in full.

(d)     The Grantors will take all necessary steps in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain in all material respects each application and registration of all material Trademarks, Patents and Copyrights, including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings.

(e)     The Grantors will, without further order of the Bankruptcy Court, perform all acts and execute and deliver all further instruments and documents, including, without limitation, assignments for security in form suitable for filing with the United States Patent and Trademark Office, and the United States Copyright Office, respectively, reasonably requested by the Lender at any time to evidence, perfect, maintain, record and enforce the Lender's interest in all material Trademarks, Patents and Copyrights or otherwise in furtherance of the provisions of this Agreement, and the Grantors hereby authorize the Lender to execute and file one or more accurate financing statements (and similar documents) or copies thereof or of this Security Agreement with respect to material Patents, Trademarks and Copyrights signed only by the Lender.

(f)    The Grantors will, upon acquiring knowledge of any use by any Person of any term or design likely to cause confusion with any material Trademark, promptly notify the Lender of such use, and if requested by the Lender, shall join with the Lender, at the Grantors' expense, in such action as the Lender, in its reasonable discretion, may deem advisable for the protection of the Lender's interest in and to the Trademarks.

SECTION 8.    Insurance.    Upon the occurrence and during the continuance of any Event of Default after giving notice to the Grantors in accordance with the Credit Agreement and the Orders, all insurance payments in respect of Inventory and Equipment shall be held, applied and paid to the Lender as specified in Section 13 hereof.

SECTION 9.    Transfers to Others; Liens.    The Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral, except for dispositions otherwise permitted by the Credit Agreement, or (ii) create or suffer to exist any lien, security interest or other charge or encumbrance upon or with respect to any of the Collateral to secure any obligation of any Person except for the security interest created by this Agreement and the Orders, or except as otherwise permitted by the Credit Agreement.

SECTION 10.    Lender Appointed Attorney-in-Fact.    The Grantors hereby irrevocably appoint the Lender as the Grantors' attorney-in-fact (which appointment shall be irrevocable and deemed coupled with an interest), with full authority in the place and stead of the Grantors and in the name of the Grantors or otherwise, from time to time in the Lender's discretion, upon and during the occurrence and continuation of an Event of Default after giving notice to the Grantors in accordance with the Credit Agreement and the Orders, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)    to obtain and adjust insurance required to be paid to the Lender pursuant to Section 8,

(b)    to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)    to receive, endorse, and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)    to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

SECTION 11.    Lender May Perform.    If the Grantors fail to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement, and the reasonable expenses of the Lender incurred in connection therewith (as to which invoices have been furnished) shall be payable by the Grantors under Section 14(b).

SECTION 12.    The Lender's Duties.    Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall

have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

SECTION 13. Remedies. If any Event of Default shall have occurred and be continuing, subject to the provisions of the Orders and Section 8 of the Credit Agreement, upon three (3) Business Day's notice of the occurrence of an Event of Default to the Grantors, counsel for the Grantors, counsel for any Official Committee that may be appointed in the Cases and the United States Trustee for the Eastern District of Michigan:

(a) The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, and without application to or order of the Bankruptcy Court, all the rights and remedies of a secured party on default under the Uniform Commercial Code and also may (i) require the Grantors to, and the Grantors hereby agree that they will, at their expense and upon request of the Lender, forthwith assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties and (ii) without notice except as specified in the following sentence, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Lender may deem commercially reasonable. The Grantors agree that, to the extent notice of such sale shall be required by law, at least ten days' notice to the Grantors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) The Lender may instruct the Grantors not to make any further use of the Patents, Copyrights or Trademarks or any mark similar thereto for any purpose to the extent that such use would be inconsistent with the exercise by the Lender of any other remedies under this Section.

(c) The Lender may license, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any of the Trademarks, Patents or Copyrights throughout the world for such term or terms, on such conditions, and in such manner, as the Lender shall in its sole discretion determine; provided, however, that any such license shall not conflict with any existing license or sublicense.

(d) The Lender may (without assuming any obligations or liability thereunder), at any time, enforce (and shall have the exclusive right to enforce) against any licensee or sublicensee all rights and remedies of the Grantors in, to and under any one or more license agreements with respect to the Collateral, and take or refrain from taking any action under any thereof, and the Grantors hereby release the Lender from, and agrees to hold the Lender free and harmless from and against any claims arising out of, any action taken or omitted to be taken with respect to any such license agreement except claims resulting solely from the gross negligence, willful misconduct or bad faith of the Lender.

(e)     In the event of any such license, assignment, sale or other disposition of the Collateral, or any of it, the Grantors shall supply their know-how and expertise relating to the Trademarks, Patents or Copyrights, and their customer lists and other records relating to the Trademarks, Patents or Copyrights to the Lender or its designee.

(f)     In order to implement the assignment, sale or other disposal of any of the Trademarks, Patents or Copyrights, the Lender may, at any time, pursuant to the authority granted in Section 10 hereof, execute and deliver on behalf of the Grantors, one or more instruments of assignment of the Trademarks, Patents or Copyrights (or any application of registration thereof), in form suitable for filing, recording or registration in any country.

(g)     Subject to the terms of the Credit Agreement, all cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and then or at any time thereafter applied (after payment of any amounts payable to the Lender pursuant to Section 14 hereof) in whole or in part against, all or any part of the Obligations in such order as the Lender shall elect. Any surplus of such cash or cash proceeds held by the Lender and remaining after payment in full of all the Obligations shall be paid over to the Grantors or to whomsoever may be lawfully entitled to receive such surplus.

SECTION 14.    Indemnity and Expenses.

(a)     The Grantors agree to indemnify the Lender from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities directly arising from the Lender's own gross negligence, willful misconduct or bad faith.

(b)     The Grantors will upon demand after the Termination Date pay to the Lender the amount of any and all reasonable out-of-pocket expenses as determined by the Bankruptcy Court, including the reasonable fees and disbursements of their counsel and of any experts and agents, which the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Lender hereunder or (iv) the failure by the Grantors to perform or observe any of the provisions hereof.

(c)     The Grantors assume all responsibility and liability arising from the use of the Trademarks, Patents and Copyrights.

(d)     The Grantors agree that the Lender does not assume, and shall have no responsibility for, the payment of any sums due or to become due under any agreement or contract included in the Collateral or the performance of any obligations to be performed under or with respect to any such agreement or contract by any of the Grantors, and except as the same may have resulted solely from the gross negligence, willful misconduct or bad faith of the Lender, the Grantors hereby agree to indemnify and hold the Lender harmless with respect to any and all claims by any Person relating thereto.

SECTION 15.  <u>Security Interest Absolute</u>. Except with respect to Permitted Liens, all rights of the Lender and security interests hereunder, and all obligations of the Grantors hereunder, shall be absolute and unconditional, irrespective of any circumstance which might constitute a defense available to, or a discharge of, any guarantor or other obligor in respect of the Obligations.

SECTION 16.  <u>Waiver of Claims</u>. Except as otherwise provided in this Agreement, THE GRANTORS HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE LENDER'S TAKING POSSESSION OR THE LENDER'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES AND ANY SUCH RIGHT WHICH THE GRANTORS WOULD OTHERWISE HAVE UNDER THE CONSTITUTION OR ANY SUCH STATUTE OF THE UNITED STATES OR OF ANY STATE, AND THE GRANTOR HEREBY FURTHER WAIVES, TO THE EXTENT PERMITTED BY LAW:

> (i)  all damages occasioned by such taking of possession except any damages which are the direct result of the Lender's gross negligence or willful misconduct;

> (ii)  all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Lender's rights hereunder; and

> (iii)  all rights of redemption, appraisement, valuation, stay, extension of moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and the Grantors, for themselves and all who may claim under them, insofar as they now or hereafter lawfully may, hereby waive the benefit of all such laws.

SECTION 17.  <u>Discontinuance of Proceedings</u>. In case the Lender shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Lender, then and in every such case the Grantors, the Lender and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the security interest created under this Agreement, and all rights, remedies and powers of the Lender shall continue as if no such proceeding had been instituted.

SECTION 18.  <u>Amendment or Waiver</u>. Neither this Agreement nor any terms hereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Lender and the Grantors.

SECTION 19.    Addresses for Notices. All notices and other communications provided for hereunder shall be in writing and shall be given in accordance with the applicable provisions of the Credit Agreement.

SECTION 20.    Continuing Security Interest. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Obligations, (b) be binding upon the Grantors, their successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the each of the Lender and its respective successors, transferees and assigns. Upon the indefeasible payment in full of the Obligations, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantors subject to any existing liens, security interests or encumbrances on such Collateral. Upon any such termination, the Lender will, at the Grantors' expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such termination.

SECTION 21.    Governing Law. This Agreement shall be construed in accordance with and be governed by the laws of the State of New York, exclusive of its conflicts of law principals, except to the extent that the validity or perfection of the security interest hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of New York and by Federal law (including, without limitation, the Bankruptcy Code) to the extent the same has pre-empted the law of the State of New York or such other jurisdiction.

SECTION 22.    Headings. The headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the Grantor and the Lender have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

GRANTORS:

RECTICEL INTERIORS NORTH
AMERICA, LLC

By:_____
Title:

RECTICEL NORTH AMERICA, INC

By:_____
Title:

LENDER:

RECTICEL N.V./S.A.

By:_____
Title:

EXHIBIT E

INITIAL BUDGET

## Consolidated RINA and RUNA Cash Flow - Chapter 11

| | Beginning Cash | Nov | Dec | Jan | Feb | Mar | Apr | Total |
|---|---|---|---|---|---|---|---|---|
| Cash Receipts | 1,945,826 | 1,665,025 | 4,567,020 | 3,605,993 | 2,895,661 | 3,087,401 | 3,737,007 | 21,503,933 |
| Cash Disbursements | | (3,805,204) | (4,172,462) | (4,446,083) | (4,820,765) | (3,991,688) | (4,117,775) | (25,353,977) |
| Net Cash Activity on the DIP | | (394,352) | 394,557 | (840,090) | (1,925,104) | (904,287) | (180,767) | (3,850,044) |
| Estimated DIP Interest | | (179) | (179) | (382) | (1,640) | (2,928) | (3,424) | (8,732) |
| Project DIP Loans Outstanding | | (394,531) | (153) | (840,626) | (2,767,370) | (3,674,585) | (3,858,776) | |

# Rectical Interiors North America, LLC
## RIS DIP Forecast
### as of 10/31/09

| | Beginning Cash | 11/30/2009 | 12/31/2009 | 1/31/2010 | 2/28/2010 | 3/31/2010 | 4/30/2010 | Totals 11/30/09 - 4/30/10 |
|---|---|---|---|---|---|---|---|---|
| Cash Receipts | 1,605,926 | 1,365,025 | 4,194,220 | 2,698,231 | 2,015,718 | 2,267,971 | 2,885,746 | 17,032,837 |
| | | | | | | | | |
| **Disbursements:** | | | | | | | | |
| Payroll & Benefits | | (1,054,892) | (1,434,309) | (1,097,142) | (1,531,169) | (1,075,065) | (1,065,747) | (7,258,325) |
| Raw Materials & Substrates | | (1,016,152) | (670,249) | (1,412,955) | (1,531,350) | (1,657,271) | (1,566,834) | (7,854,812) |
| Building Leases | | (205,761) | (205,761) | (205,761) | (205,761) | (205,761) | (205,761) | (1,234,566) |
| Utilities (electric, gas, water, etc) | | (53,333) | (138,834) | (140,427) | (144,503) | (149,372) | (137,014) | (763,483) |
| Waste removal | | - | (10,066) | (14,551) | (8,399) | (6,782) | (20,714) | (60,513) |
| Repairs & Maintenance | | (110,000) | (100,000) | (85,000) | (80,000) | (85,000) | (80,000) | (540,000) |
| R&M buildings | | | (14,000) | (14,000) | (14,000) | (14,000) | (14,000) | (70,000) |
| Rent Other | | (11,900) | (11,900) | (11,900) | (11,900) | (11,900) | (11,900) | (71,400) |
| Insurance (WC, liability, etc) | | (37,300) | (197,100) | (37,500) | (36,300) | (36,300) | (37,000) | (381,500) |
| Property Taxes | | | (600) | (200) | (63,600) | | | (64,400) |
| Warehouse (RTU) | | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (9,000) |
| Cleaning (RTU) | | | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (240,000) |
| Other taxes | | (10,177) | (9,761) | (22,614) | (6,823) | (9,925) | (11,786) | (71,085) |
| ConMet Rebates | | | | (5,305) | | | (7,614) | (12,919) |
| Attorney/Consulting fees for bankruptcy | | | (300,000) | (300,000) | (200,000) | (100,000) | (100,000) | (1,000,000) |
| U.S. Trustee | | | | (10,000) | | | (10,000) | (20,000) |
| SG&A and Other | | (140,000) | (206,000) | (219,000) | (140,000) | (130,000) | (150,000) | (985,000) |
| Utility deposit required | | (83,000) | | | | | | (83,000) |
| **Total Disbursements** | | (2,724,016) | (3,348,080) | (3,625,856) | (4,023,304) | (3,530,876) | (3,467,870) | (20,720,002) |
| | | | | | | | | |
| Net Cash Activity before interest (DIP draws needed) | | 146,936 | 846,139 | (927,625) | (2,007,586) | (1,262,905) | (482,124) | (3,687,165) |
| Estimated interest on DIP loan | | 67 | 518 | 482 | (852) | (2,340) | (3,136) | (5,261) |
| | | | | | | | | |
| Project DIP Loans Outstanding | | 147,003 | 993,660 | 66,517 | (1,941,921) | (3,207,167) | (3,692,426) | |

**Recticel Urepp N.A. Inc.**
**RIS DIP Forecast**
**as of 10/31/09**

| | Beginning Cash | 11/30/2009 | 12/31/2009 | 1/31/2010 | 2/28/2010 | 3/31/2010 | 4/30/2010 | Totals 11/31/09-04/31/10 |
|---|---|---|---|---|---|---|---|---|
| Cash Receipts | 339,900 | 300,000 | 372,800 | 907,762 | 879,943 | 819,430 | 851,261 | 4,477,095 |
| | | | | | | | | |
| **Disbursements:** | | | | | | | | |
| Payroll & Benefits | | (61,613) | (87,313) | (61,613) | (83,613) | (61,613) | (61,613) | (417,379) |
| Raw Materials | | (945,884) | (553,453) | (672,698) | (652,982) | (340,083) | (524,115) | (3,689,215) |
| Leases-auto, forklift, copier, Quality trailers | | (9,005) | (9,005) | (9,005) | (9,005) | (9,005) | (9,006) | (54,030) |
| Utilities (electric, gas, water, phones) | | (16,677) | (16,677) | (16,677) | (16,677) | (16,677) | (12,337) | (95,721) |
| Waste removal | | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (6,000) |
| Repairs & Maintenance | | (16,275) | (13,200) | (30,150) | (7,950) | (5,600) | (8,100) | (81,275) |
| Lab supplies | | (2,500) | (2,500) | | (2,500) | (2,500) | (2,500) | (10,000) |
| Rent Other | | - | | - | - | - | - | - |
| Insurance (WC, liability, etc) | | (803) | (803) | (803) | (803) | (1,403) | (803) | (5,418) |
| Property Taxes | | | (25,000) | | | | | (25,000) |
| SSC fee | | - | (92,500) | | | | | (92,500) |
| Cleaning | | (1,631) | (1,631) | (1,981) | (1,631) | (1,631) | (1,631) | (10,136) |
| Bank charges | | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (6,000) |
| Legal - DD | | | | | | | | - |
| Other | | (20,300) | (20,300) | (20,300) | (20,300) | (20,300) | (20,300) | (121,800) |
| US Trustee | | | | (5,000) | | | (7,500) | (12,500) |
| Utility deposit required | | (7,000) | | | | | | (7,000) |
| Total Disbursements | | (1,081,188) | (824,382) | (820,227) | (797,461) | (460,812) | (649,905) | (4,633,974) |
| | | | | | | | | |
| Net Cash Activity before interest (DIP draws needed) | | (541,288) | (451,582) | 87,535 | 82,482 | 358,618 | 301,356 | (162,879) |
| Estimated interest on DIP loan | | (246) | (698) | (864) | (787) | (588) | (288) | (3,471) |
| | | | | | | | | |
| Project DIP Loans Outstanding | | (541,534) | (993,814) | (907,143) | (825,448) | (467,418) | (166,350) | |

| | November | | December | | January | | February | | March | | April | | 6 Month P&L | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Actual | Budget |
| GROSS SALES | 2,804,925 | 3,678,959 | 1,830,743 | 3,246,223 | 2,075,611 | 2,101,223 | 2,751,450 | 2,788,429 | 3,182,261 | 3,277,063 | 2,939,686 | 2,945,666 | 15,584,676 | 18,037,562 |
| Trade discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NET SALES | 2,804,925 | 3,678,959 | 1,830,743 | 3,246,223 | 2,075,611 | 2,101,223 | 2,751,450 | 2,788,429 | 3,182,261 | 3,277,063 | 2,939,686 | 2,945,666 | 15,584,676 | 18,037,562 |
| Raw material cost chemical | (817,671) | (1,028,658) | (539,824) | (911,377) | (566,501) | (570,111) | (765,846) | (771,506) | (882,445) | (903,702) | (815,084) | (809,846) | (4,387,371) | (4,995,200) |
| Raw material cost other | (832,909) | (1,208,062) | (549,950) | (1,074,927) | (611,718) | (620,578) | (857,821) | (859,458) | (1,010,323) | (1,014,319) | (907,669) | (910,065) | (4,770,391) | (5,687,409) |
| Direct Labour cost | (457,555) | (500,488) | (321,410) | (456,194) | (355,568) | (361,274) | (444,651) | (451,351) | (512,503) | (501,009) | (462,142) | (464,492) | (2,542,336) | (2,746,301) |
| Indirect Labour cost | (358,436) | (484,110) | (325,014) | (441,734) | (354,888) | (354,888) | (403,505) | (403,505) | (439,510) | (439,510) | (415,506) | (415,506) | (2,296,859) | (2,539,254) |
| Other variable prod. cost | (211,986) | (307,069) | (177,596) | (250,547) | (199,629) | (199,629) | (250,426) | (250,426) | (279,587) | (279,587) | (254,240) | (254,240) | (1,373,464) | (1,541,498) |
| Customer claims | (12,358) | (21,218) | (8,206) | (18,739) | (12,161) | (12,161) | (16,153) | (16,153) | (19,030) | (19,030) | (17,111) | (17,111) | (85,019) | (104,412) |
| Transportation cost | (21,991) | (29,547) | (13,878) | (25,096) | (22,154) | (22,154) | (18,100) | (23,405) | (19,500) | (26,927) | (21,000) | (24,579) | (112,069) | (151,709) |
| NET CONTRIBUTION | 92,019 | 99,806 | (105,134) | 67,608 | (42,456) | (39,573) | (5,053) | 12,626 | 30,858 | 81,486 | 46,934 | 49,827 | 17,168 | 271,780 |
| Fixed prod. cost | (471,000) | (579,889) | (472,000) | (579,736) | (483,143) | (483,143) | (463,222) | (463,222) | (462,835) | (462,835) | (463,326) | (463,326) | (2,815,526) | (3,032,150) |
| Depreciation production | (5,510) | (6,508) | (5,510) | (6,508) | (4,771) | (4,771) | (4,771) | (4,771) | (4,771) | (4,771) | (5,350) | (5,350) | (30,683) | (32,679) |
| Depreciation dev & pre-op. | (725) | (2,120) | (725) | (2,120) | (2,120) | (2,120) | (2,120) | (2,120) | (2,120) | (2,120) | (2,120) | (2,120) | (9,932) | (12,723) |
| GROSS MARGIN | (385,216) | (488,711) | (583,369) | (520,756) | (532,490) | (529,607) | (475,166) | (457,488) | (438,868) | (388,240) | (423,863) | (420,970) | (2,838,972) | (2,805,772) |
| & A | (274,000) | (337,353) | (274,000) | (346,183) | (278,290) | (278,290) | (273,665) | (273,665) | (286,704) | (286,704) | (273,113) | (273,113) | (1,659,771) | (1,795,307) |
| & M | (74,000) | (68,297) | (72,000) | (75,024) | (70,436) | (70,436) | (68,115) | (68,115) | (67,044) | (67,044) | (67,263) | (67,263) | (418,858) | (416,179) |
| & D | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other operating result | - | - | (300,000) | - | (310,000) | - | (200,000) | - | (100,000) | - | (110,000) | - | (1,020,000) | - |
| EBIT | (733,216) | (894,361) | (1,229,369) | (941,963) | (1,191,216) | (878,333) | (1,016,946) | (799,267) | (892,615) | (741,987) | (874,239) | (761,347) | (5,937,601) | (5,017,259) |
| **Non Cash Expenses:** | | | | | | | | | | | | | | |
| Depreciation | 8,265 | | 8,265 | | 8,921 | | 8,921 | | 8,921 | | 9,500 | | 52,794 | |
| Amort of Onerous contracts | (78,708) | | (78,708) | | (75,488) | | (75,488) | | (75,488) | | (75,488) | | (459,366) | |
| | (70,443) | | (70,443) | | (66,566) | | (66,566) | | (66,566) | | (65,987) | | (406,572) | |
| EBITDA | (803,659) | | (1,299,812) | | (1,257,782) | | (1,083,512) | | (959,181) | | (940,227) | | (6,344,173) | |
| Interest | (618) | | (699) | | (736) | | (2,225) | | (3,714) | | (4,442) | | (12,433) | |
| EIP | | | (900,000) | | | | | | | | | | (900,000) | |
| IDC Chargeback | | | (1,300,000) | | | | | | | | | | (1,300,000) | |
| Chargeback | (45,500) | | (45,500) | | (45,500) | | (45,500) | | (45,500) | | (45,500) | | (273,000) | |
| Management Fees | (46,118) | | (2,246,199) | | (46,236) | | (47,725) | | (49,214) | | (49,942) | | (2,485,433) | |
| Net Loss | (779,334) | | (3,475,568) | | (1,237,452) | | (1,064,670) | | (941,829) | | (924,182) | | (8,423,034) | |

Note - the P&L's exclude the IP and royalty chargebacks that normally get recorded in December 2009.

**Monthly P&L's - RUNA - November 2009 - April 2010**

| | November | | December | | January | | February | | March | | April | | 6 Month P&L | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Forecast | Budget | Actual | Budget |
| GROSS SALES | 1,048 | 1,340 | 734 | 1,202 | 819 | 807 | 851 | 832 | 1,016 | 889 | 1,140 | 856 | 5,608 | 5,926 |
| Trade discounts | | | | | | | | | | | | | - | - |
| Cash discounts | | | | | | | | | | | | | - | - |
| NET SALES | 1,048 | 1,340 | 734 | 1,202 | 819 | 807 | 851 | 832 | 1,016 | 889 | 1,140 | 856 | 5,608 | 5,926 |
| Raw material cost chemical | (786) | (1,072) | (566) | (962) | (333) | (590) | (525) | (608) | (662) | (652) | (767) | (627) | (3,639) | (4,511) |
| Raw material cost other | (4) | (27) | (3) | (23) | (3) | (2) | (3) | (3) | (2) | (3) | (3) | (3) | (17) | (61) |
| Direct Labour cost | (13) | (17) | (13) | (17) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (86) | (94) |
| Indirect Labour cost | (20) | (21) | (20) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (124) | (126) |
| Other variable prod. cost | (39) | (50) | (40) | (42) | (54) | (54) | (54) | (54) | (54) | (55) | (54) | (55) | (295) | (310) |
| Customer claims | - | | | | | | | | | | | | - | |
| Transportation cost | - | | | | | | | | | | | | - | |
| NET CONTRIBUTION | 186 | 153 | 92 | 137 | 393 | 125 | 234 | 131 | 262 | 143 | 280 | 135 | 1,447 | 824 |
| Fixed prod. cost | (40) | (57) | (40) | (49) | (50) | (51) | (50) | (51) | (50) | (51) | (50) | (52) | (280) | (311) |
| Depreciation production | (29) | (32) | (29) | (27) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (28) | (170) | (171) |
| Depreciation dev & pre-op. | | | | | | | | | | | | | | |
| GROSS MARGIN | 117 | 64 | 23 | 61 | 315 | 46 | 156 | 52 | 184 | 64 | 202 | 55 | 997 | 342 |
| G & A | (31) | (36) | (31) | (29) | (32) | (32) | (32) | (33) | (33) | (33) | (32) | (32) | (191) | (195) |
| S & M | | | | | | | | | | | | | | |
| R & D | | | | | | | | | | | | | | |
| Other operating result | | | | | | | | | | | | | | |
| EBIT | 86 | 28 | (8) | 32 | 283 | 14 | 124 | 19 | 151 | 31 | 170 | 23 | 806 | 147 |
| **Non Cash Expenses:** | | | | | | | | | | | | | | |
| Depreciation | 31 | | 31 | | 30 | | 30 | | 30 | | 30 | | 185 | |
| Amort of Onerous contracts | | | | | | | | | | | | | | |
| | 31 | | 31 | | 30 | | 30 | | 30 | | 30 | | 185 | |
| EBITDA | 117 | | 23 | | 314 | | 155 | | 182 | | 200 | | 991 | |
| Management fees | (22) | | (22) | | (22) | | (22) | | (22) | | (22) | | (130) | |
| Interest | (0) | | (1) | | (1) | | (1) | | (1) | | (0) | | (3) | |
| Net Loss | 64 | | (31) | | 261 | | 102 | | 129 | | 148 | | 673 | |